```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF VIRGINIA
                   Harrisonburg Division

--------------------------x
                          :
UNITED STATES OF AMERICA, :
                          :
     Plaintiff,           :
                          :
v.                        : 5:16CR8
                          :
JASON BRADLEY, et al.     :
                          :
          Defendants.     : Harrisonburg, Virginia
                          : March 1, 2017
--------------------------x 10:30 a.m.

                    TELEPHONIC HEARING
          BEFORE THE HONORABLE  MICHAEL F. URBANSKI
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

      GRAYSON A. HOFFMAN, Esquire
      Assistant U.S. Attorney
      116 North Main Street
      Harrisonburg, Virginia  22802
          For the United States of America.

      AARON L. COOK, Esquire
      71 Court Square, Suite B
      Harrisonburg, Virginia  22801
          Counsel for the Defendant Bradley.

      J. LLOYD SNOOK, Esquire
      408 East Market Street, Suite 107
      Charlottesville, Virginia  22902
          Counsel for the Defendant Ryba.


Proceedings recorded by Stenography, transcript
produced by computer.

                  **BRIDGET A. DICKERT**
               **UNITED STATES COURT REPORTER**
               **180 WEST MAIN STREET, ROOM 104**
                   **ABINGDON, VIRGINIA 24210**
                      **(276) 628-5116**

1    APPEARANCES  (Cont.)

2

3        LOUIS K. NAGY, Esquire
         590 East Market Street
         Harrisonburg, Virginia  22801
4            Counsel for the Defendant N. Taylor.

5        DAVID L. PARKER, Esquire
         333 Neff Avenue
6        Harrisonburg, Virginia  22801
             Counsel for the Defendant E. Taylor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:30 a.m.)

2        THE COURT:  Good morning.  This is Judge Urbanski.  Is

3 the clerk on the phone?

4        THE CLERK:  Yes, Your Honor, I am.

5        THE COURT:  Would you call the case, please.

6        THE CLERK:  5:16CR8, *United States of America* v. *Jason*

7 *Bradley, et al.*

8        THE COURT:  Who do we have on the phone for the

9 Government?

10       MR. HOFFMAN:  Good morning, Your Honor.  This is

11 Grayson Hoffman.  I also have Gina Palmero from our office on the

12 line.

13       THE COURT:  Okay.  For the defendant Bradley?

14       MR. COOK:  This is Aaron Cook.

15       THE COURT:  Good Morning.  Is Mr. Bradley on the phone?

16       MR. COOK:  Yes, Your Honor.

17       THE COURT:  Okay.  How about for defendant Deborah

18 Ryba?

19       MR. SNOOK:  Lloyd Snook here for Deborah Ryba.  She is

20 also on the line.

21       THE COURT:  Good morning.  How about for Mr. Edward

22 Taylor.

23       MR. PARKER:  Dave Parker is on the line, Your Honor.

24       THE COURT:  Is Mr. Taylor on the line?

25       THE DEFENDANT E. TAYLOR:  Yes, I'm here.

1          THE COURT:  Okay.  How about for Nayna Taylor?

2          MR. NAGY:  Yes, Your Honor, I'm on the line and

3     Mrs. Taylor responded to your question.

4          THE COURT:  I have read these e-mails that were sent to

5     me late yesterday afternoon.  Let's see what the current status

6     is.  Mr. Hoffman, would you like to update the court, please?

7          MR. HOFFMAN:  I would, Your Honor.  I, I thank you for

8     holding the hearing.  I requested this hearing yesterday because

9     around 4:15 it became very apparent that the court had incomplete

10    information before it.  So, I thought it would be important that

11    the court know some additional facts before the court makes its

12    decision about going forward.

13         So, let me back up to Monday, the last court hearing we had.

14    As the court will recall, the court set yesterday's 5:00 p.m.

15    deadline to find a lab for the independent testing that

16    defendants Bradley and Ryba had requested.  Mr. Cook had no

17    obligation -- excuse me -- no objection to the United States

18    assisting in his efforts to find a lab.  We talked about that

19    before, and I reconfirmed that with him.

20         So, we both set out to find a lab, if possible.  After our

21    hearing I started contacting labs right away, Monday afternoon,

22    and into the evening, into late evening.  Mr. Cook and I stayed

23    in touch.  I kept him apprised of our progress along the way.

24         The first ray of hope that we had was Monday afternoon.  I

25    made contact with a lab in Colorado called, I believe, Rocky

1  Mountain, who said that they thought that they could do the

2  analysis, and they could do it in time.

3      I relayed this information to Mr. Cook.  Again, we were

4  staying in touch.  Mr. Cook explained that he wanted to have a

5  private conversation with the lab because he, he had an idea of

6  another substance or substances that might be in the exhibits,

7  and he wanted to make sure that the lab had the proper standards

8  in place in order to test for those potential other chemicals.

9      I offered to relay that information to the lab.  Mr. Cook

10 said, understandably, he wanted to keep that information private.

11 He wanted to have a direct communication with the lab and share

12 contact information with them.

13     He contacted the lab.  Shortly thereafter -- again, this is

14 Monday, 4:00, 5:00 -- the individual from the Rocky Mountain Lab

15 contacted me and said, "Sorry, we're not going to be able to do

16 the test in time before the trial.  The additional chemicals, we

17 don't have the standards for, and we'd have to request the

18 standards.  It will take a couple of weeks."

19     I relayed that information back to Mr. Cook on Monday

20 evening.  I continued contacting additional labs Monday evening

21 late into the night.  I was communicating with one lab at 11:30.

22 We were working hard, and we were striking out.

23     Let's move to yesterday.  Yesterday morning, and most of the

24 day, we spent on the lab issue, calling lab after lab after lab.

25 I was contacting labs, my intern was cold calling labs.  We were

striking out.  We were striking out.  Mr. Cook and I talked

throughout the day updating one another.

    Importantly, Your Honor, during these conversations with

Mr. Cook there was never a mention of any additional special

testing requirements.

    I'll also say that because we kept striking out I called

Mr. Cook and I asked Mr. Cook if we could consider using a

different Government agency lab like a Virginia state DFS lab or

FBI lab.  Mr. Cook said he would check with his client and call

me back with an answer.  I never heard back from Mr. Cook on

that.

    I continued calling labs, and then finally around noon

yesterday I got in touch with Cayman Chemical in Ann Arbor,

Michigan who said they could do it, and who said they could do it

in time.

    I immediately notified Mr. Cook with a text.  I think I may

have tried to call, Mr. Cook was very busy yesterday, but I

provided contact information, again, to Mr. Cook so he could

contact them and have that conversation they, that he had earlier

to make sure they had the right standards in place.

    About an hour later I heard that Mr. Cook had scheduled a

3:45 appointment with Cayman to talk with them.  I thought that

was a little later, so I called Mr. Cook again to see if we could

accelerate it.  We were almost out of time.

    At that time Mr. Cook and I could not get in touch.  I

called the Cayman Lab again, and they explained to me that the
3:45 appointment, as they understood, was just to discuss
administrative and process issues, payment, how the whole testing
process would work.  She explained to me that she could tell
Mr. Cook right at that moment if they had the ability to do the
testing for his special chemical or chemicals right on the spot.

I tried to get back to Mr. Cook to communicate to him.  His
staff said he wasn't available.  I texted him.  I didn't hear
back from him.  I sent him another texting:  "We're almost out of
time."  I called his office a couple of times.  He and I managed
to get on the phone right at 3:45 just as his 3:45 with Cayman
Chemicals was about to begin.  He said he'd call me back when I'm
done with them.

At 4:05, less than an hour from the deadline, I received a
call from Cayman Chemical that said, "I'm sorry, things have
changed.  We can no longer do your testing in time."  I said,
"Excuse me?  What just happened?  Four hours ago you said you
could do it."  They said, "Well, in our conversation with
Mr. Cook just now he just announced a new testing requirement
called quantitative analysis which is going to take us another
few days.  It would take another few weeks to perform this."

I hadn't heard that term before.  I said, "What is
quantitative analysis?"  The scientists on the phone explained to
me it's akin to purity.  They were careful to say it's not
exactly purity; it's a little more complicated than that.  But

1   it's part per unit, one part per every 50 milligrams, or

2   whatever.

3       I told him, of course, this additional testing requirement

4   for quantitative analysis was a total surprise to me.  They said

5   it was a total surprise to them, of course.  I completed the

6   call, I hung up, and then I saw Mr. Cook's e-mail to the court

7   simply saying Cayman couldn't do the requested analysis, without

8   any additional facts.

9       So, I wanted to call the court and set this up to explain

10  and share with the court all these additional facts, and make

11  sure that the court understood that this was a total surprise to

12  everyone.  There had never been mentioned by Mr. Cook in any of

13  our conversations about this extra quantitative analysis.  Mr.

14  Cook and I had, we were talking directly, we had great rapport,

15  the lines of communication were open, we were working well

16  together.  But then this just kind of rolls in at the last

17  second.

18      I also wanted to point out to the court, I think it's

19  important to understand that this quantitative analysis stuff is

20  rare in our cases.  Because it doesn't make a difference.  The

21  only time in drug cases we ever request a purity-type analysis is

22  in a meth case, or as the court knows, the Code, when it comes to

23  meth cases, differentiates, you know, standards and mandatory

24  minimums based on actual meth versus a mixture and substance, so

25  purity is relevant.

1    In these cases, in these cases purity is not relevant.  I

2  mean, if a substance tests as .0001 percent pure, or 100 percent

3  pure, it doesn't make a difference under the Code.  It's totally

4  irrelevant.

5    I mean, so, given the fact that there was never any mention

6  of this new quantitative testing requirement until inside of an

7  hour of the deadline, and the fact that there was, there's no

8  relevance at all to the case, in our opinion shows that this is,

9  this is another transparent attempt to stall and to delay the

10  trial.

11    The court set a 5:00 p.m. deadline to find a lab that could

12  do the analysis.  We moved heaven and earth for 24 hours to meet

13  that deadline.  And inside of an hour there's a surprise

14  requirement announced on everyone.

15    Your Honor, I think we've met the deadline.  We found the

16  lab, the lab can do the test, so we should have the trial on

17  Monday.

18    THE COURT:  Okay.  Thank you for that summary,

19  Mr. Hoffman.  I suppose it's appropriate to hear from Mr. Cook.

20  Mr. Cook?

21    MR. COOK:  Thank you.  Thank you.  First of all, I

22  appreciate Mr. Hoffman's perspective, and certainly I can

23  understand how much of what he's saying he believes to be

24  accurate.  If I can just fill in the court, first of all to say

25  this is an independent analysis, and we have our own reasons for

wanting this analysis, for the way it would be, what we would be looking for. I don't feel free to go much further than that because, because it's pertinent to our defense, which I don't think the Government is yet fully aware of.

But, so, we were looking for labs, called a number of labs, followed up with labs that Mr. Hoffman handed off to me and, you know, we drilled down on what each lab could do for us in an expedited fashion. A lot of times they said, "We can't make the ID that fast." The ones who could we had conversations about quantitative analysis we believe are pertinent to our defense, and I did not talk to Mr. Hoffman about that because that's our defense.

Then he's saying he was surprised. I can see why it was a surprise to him, but the lab that I've been talking to over the last day, if they were in the ball park we also talked about other chemicals, and whether or not they could do a quantitative analysis. So, it's not, it's not -- it's been discussed with other labs. I think it was just a surprise to Mr. Hoffman.

I'll say that we made this motion a couple of weeks ago whenever we found out that the drugs were coming from Hong Kong this weekend. Since focusing on this shipment, I feel even more stronger that this analysis is important to the defense, to the defendants, to at least one of the defenses that we intend to present.

And I would represent to the court this is not made for

purposes of delay; this is necessary for what could be our
defense to the charge.

So, as far as what happened yesterday afternoon, it was
around the time when Mr. Hoffman contacted me.  I had a phone
number, called her up, she said Roxanne was the person I needed
to talk to, and Roxanne was not available until 3:00.  I had a
3:00 appointment.  I said, "Can we do it at 2:30?"  She said,
"No, Roxanne can't be available until 3:00."  I said, "I should
certainly be done with my appointment by 3:30," and she said,
"Well, how about we schedule it for 3:45?" I said, "That would be
fine."

That's how the 3:45 appointment came about.  It was not
nefarious or structured by me.  I was prepared to, to have this
conversation with them at noon, or 12:30, whatever time it was
that I got ahold of Donna initially.

When I called in, they called me at 3:45, or actually, I'm
not sure who all the -- we had a further discussion about the
chemicals, and the quantitative analysis to what I was looking
for.  I, of course, asked them not to provide the details of that
to the prosecutor but, you know, because it's pertinent to our
defense, and it sounds like they didn't, which I appreciate.
That's, I guess, where we are.  Do you have any questions, Judge?

          MR. HOFFMAN:  Your Honor, if I may respond?

          THE COURT:  Sure.  Go ahead, Mr. Hoffman.

          MR. HOFFMAN:  As Mr. Cook has just made plain, it is

not tipping his hand in disclosing secret defense strategy to simply say we're looking for quantitative analysis.  It has been since the pretrial conference on, what, two weeks ago where we've been talking about this independent analysis, and we've been trying to contact labs.  It would not, it would not have tipped the hand of the defense, whatsoever, to say, "Hey, when you're talking to the lab let's all make sure they can do a quantitative analysis in time."  I mean, he shared information with me, "Hey, let me have a private conversation with them to make sure they have the standards," but there was never even a casual mention of, "We also want to do a quantitative analysis."  This happened at the very last second.  It was a complete surprise.  Your Honor, it will not be relevant at trial.

        THE COURT:  Mr. Cook, did you want to respond to that?

        MR. COOK:  Again, it may have surprised Mr. Hoffman, but when we talked last week we were talking about quantitative analysis.  From his perspective I think he's thinking that I introduced this yesterday afternoon for the purposes of delay.  And that's just not the case at all.

        THE COURT:  Okay.  Let me -- I appreciate each side's perspective.  Before I ask other counsel to weigh in on this issue if they want to, Mr. Cook, I have a couple of questions for you.

        MR. COOK:  Yes, sir.

        THE COURT:  One being did you get an estimate from

1  Cayman Labs about how long it would take to do a quantitative

2  analysis?

3          MR. COOK:  On one of the chemicals they felt they could

4  complete it, they could probably complete it by trial.  On

5  another one they indicated that they could not complete it by

6  trial.

7          THE COURT:  Okay.  Did they indicate if they could

8  complete it within a week?

9          MR. COOK:  They didn't know.  They had to develop a

10 method --

11         MR. HOFFMAN:  Your Honor, I discussed that with them.

12         THE COURT:  Hold on, Mr. Hoffman.  I'll give you a

13 chance to respond.  Go ahead, Mr. Cook.

14         MR. COOK:  They couldn't give me a time estimate, and

15 they couldn't give me a price on that, as well.  But --

16         THE COURT:  Did you -- I'm sorry, go ahead, Mr. Cook.

17 Okay.

18         MR. COOK:  I'm done.

19         THE COURT:  How many chemicals are you having tested?

20 Two?  Can you tell me that?

21         MR. COOK:  At least three.  My conversations with other

22 labs, we've actually talked about four.

23         THE COURT:  At least, at least three, maybe four.

24 Well, I'm not asking you to disclose your defense.  I understand

25 you and the Government may have a different view as to the

relevance of this evidence, and as to whether or not this, this
quantitative analysis might be necessary, or not.

You know, I understand what Mr. Hoffman is saying about, you
know, the general relevance to this issue about whether or not
there is a controlled substance found. I mean, generally it
doesn't matter because it's a mixture or substance. But I also
remember something that, that Mr. Snook said at the hearing that
we had on Monday, that this issue may relate to the existence of
a conspiracy in knowledge. I think Mr. Snook said something
about this, that this goes to the question of what they thought
they were getting.

Of everybody on the phone I'm the least knowledgeable of the
facts in this case because I have not seen the discovery,
obviously, and so, but we want to make sure at the end of the day
that justice is done, and part of justice is making sure that
trials are held when they're scheduled.

This case was indicted in July of 2016, Nanya and Edward
Taylor had initial appearances on July 28th, Bradley had their
initials on August 11th, case was set for trial on October 17.
On August 24th Ms. Ryba moved for a continuance and the case was
continued until March 6th. The issue of continuing that trial
date arose because not due to the -- not blaming anyone -- but
due to the fact that some of these substances were across the
world in Hong Kong and needed to get to the United States. I can
only imagine the heaven and earth Mr. Hoffman has tried to move

```
 1   to get these substances here, and it sounds like over the last
 2   few days the Government has, and defense has tried to work hard
 3   to meet this deadline.  I greatly appreciate this.
 4       My question is this.  What if we simply said, all right,
 5   let's -- I mean, we don't need this testing, seems to me, for the
 6   first day of trial.  What if we say okay, get, get your testing
 7   done by -- the Government is going to take at least a week to put
 8   it's evidence on -- get the testing done next week, and have each
 9   side not mention it during opening statements, and just deal with
10   it, you know -- I understand they may not be able to get it done
11   by day after tomorrow, but if they got another week, it seems to
12   me, perhaps they ought to be able to get it done.
13       What, what my sort of compromise solution is, get it done
14   by, you know, the end of the first week of trial and, you know,
15   get this analysis done on these chemicals by the end of the first
16   week of trial, neither side mention it in opening and, and just
17   once you get that evidence it should be available in time for the
18   defense to use in its case-in-chief.  What about that, Mr. Cook?
19             MR. COOK:  My initial reaction is this.  This testing
20   will dictate what direction we go with the defense, which of
21   course will affect how we question witnesses, what we talk about,
22   what we stay away from in our cross, in opening.  And like I said
23   earlier, you know, two weeks ago I hadn't thought much about the
24   significance of this testing because at the time I thought this
25   stuff wasn't coming.  But then I thought about it, it's really
```

1   going to impact what direction we had with, with at least the

2   second part of the conspiracy.

3        So, I would be concerned about starting the case without

4   knowing what my evidence was going to be.

5              THE COURT:  Okay.  Let me ask you this other question,

6   then.

7              MR. COOK:  Yes, sir.

8              THE COURT:  I have two other lines of inquiry that I

9   want to ask you about, one being your indication that it only

10  affects part of the alleged conspiracy, all right?  So, what part

11  of the conspiracy is this testing relevant to?

12             MR. COOK:  I think the other day when we were in court

13  we were talking about two time frames in the conspiracy, one

14  being before certain substances were scheduled, and in the second

15  time frame certain substances were scheduled.  This is a very

16  keen piece of evidence in regard to that second, what I call the

17  second part of the conspiracy, after the --

18             THE COURT:  Does this deal with a-PVP or m-PVP?

19             MR. COOK:  A-PVP.

20             THE COURT:  Okay, a-PVP, after it's scheduled, that's

21  the aspect of the case it relates to, that's what you're telling

22  me this testing relates to?

23             MR. COOK:  Yes, sir.

24             THE COURT:  If the Government were to decide we want to

25  go forward on Monday with all charges, and dismiss the charges as

1  to a-PVP, for the time period, then this testing would be

2  irrelevant to it?

3      MR. COOK:  I think the answer is yes.  But also, I

4  mean, it's going to go to -- I don't want to go into it.  It's

5  not like purity of crystal meth, for example, where there's a

6  statutory issue.  There's other issues involving Mr. Slouder

7  (phonetic), for example, who is one of the witnesses -- anyway, I

8  don't want go further than that, Judge, I guess, here in open

9  court.

10     THE COURT:  Okay.  I understand, I don't know what the

11  nature of your defense is, and I understand your, your interest

12  in defending your client in an appropriate manner.  I was just

13  asking the question to see whether or not should, should the

14  Government determine that its interest in going forward outweighs

15  its interest in this small part of the case, that the Government

16  could simply drop those charges, eliminate this issue and we go

17  on Monday.  That was just something that was sort of, my sort of

18  off the top of my head stream of consciousness thought.

19     The other, the other question I have for you, Mr. Cook, is

20  are there -- let me ask Mr. Hoffman, let me ask you this

21  question.  Are there other substances in this case other than, I

22  mean other substances, other than the Hong Kong sample we've been

23  talking about that the Government has, has had tested and intends

24  to offer evidence about?

25     MR. HOFFMAN:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Well, then, Mr. Cook, have you
 2    requested this quantitative analysis of those substances?
 3              MR. COOK:  No, sir.
 4              THE COURT:  Well, I guess my question is why are these
 5    different, then?  If you haven't requested the analysis of the
 6    other substances does it suggest that this is all part of an
 7    attempt to delay the case, and as opposed to getting to your
 8    defense?
 9              MR. COOK:  No, sir.  There's reason why the Hong Kong
10    substances are different, I should say.  I guess -- yeah, again,
11    I don't want to say anything to the detriment of my client's
12    defense.
13              THE COURT:  Okay.  But your position is, as an officer
14    of this court, that there is a difference between the Hong Kong
15    substances and these others, and that there might be a different
16    reason that's material here as to why you want these Hong Kong
17    substances tested and why you need a quantitative analysis.  That
18    is what you're telling me?
19              MR. COOK:  Yes, sir.
20              THE COURT:  Okay.  Let's hear from any other counsel
21    who want to weigh in on this issue?  Mr. Snook?
22              MR. SNOOK:  Judge, the first thing I would say to you
23    is getting a quantitative analysis is not an issue in a
24    controlled substances analogue case.  The cases I have tried when
25    there has been an independent lab doing the testing, and of
```

course in other cases where they were testing for the presence of XLR11 in the Ritchie (phonetic) case, we would get a report that would say 97 percent XLR11, three percent something else. In fact, that wound up in our case in Norfolk to be a problem because the lab would report 99.7 percent XLR11, and .3 UR144, and the Government was pursuing a theory that they were intentionally distributing both XLR11 at 97.4 percent and UR144 at .3 percent when the experts will tell you when XLR11 is getting made, it is getting made in a way that produces a certain residue of UR144. So, that one could certainly defend by saying even if I intended to possess this XLR11, I did not intend to possess UR144. I say this without having any knowledge at all -- so, that's where we look at the purity question. We want to see what else is in there. The tests will, as I understand the way the Government's test comes back, if there's any a-PVP in there it will come back as, back as positive for a-PVP even if it's only a very small percentage of a-PVP and, in fact, the bulk of what is, there is an entirely different chemical. If that's the situation, if we're getting a chemical that is, say, 99 percent completely different substance, and one percent alpha-PVP, that presents a defense for us of we didn't intend to be getting alpha-PVP; we intended to be getting the other chemical. The chemicals that have been discussed, that we have lab reports on or suggestions from e-mails the parties might have been looking to distribute, some of which are controlled substances, some of

which are not, and some of which are not either arguably
controlled substances analogues, I would add, are all things that
possess certain chemical characteristics in common, so that one
could imagine if the, if the test results come out a certain way
now we've got a defense of this other chemical, I'll just call it
ABCD, that we were intending to distribute ABCD, and son of a
gun, it turns out in the process of manufacturing ABCD they wound
up manufacturing some alpha PVP along the way, but that wasn't
the intent.

My point being the quantitative analysis allows for a very
different discussion, and I say this without having coordinated
efforts in this comment with Mr. Cook, I'm not sure this is
necessarily responsive to where he's going, or necessarily giving
away any intent that he has, but certainly as I look at the
quantitative analysis that has been typical of the private labs
that we've received in controlled substance analogue cases, and
the kinds of discussions that we've had about defenses that have
flowed from that, I, I very much would like to see the
quantitative analysis, as well.

Furthermore, as to the court's suggestion, let's go ahead
and get started with the trial and see what happens, number one,
if the result doesn't come in do we end up with a mistrial, do we
end up with charges getting dismissed, or what happens there;
number two, I'll tell the court there have been a couple of times
in my legal career where I have had the situation where evidence

1  was being developed as the trial was going on, and expert

2  opinions were being developed as the trial was going on, and it

3  is not a good way to try a case, certainly for the defense, and I

4  can't imagine that it is conducive to getting a fair and accurate

5  result.

6        THE COURT:  Well, if quantitative analysis is so

7  important to the defense then why have these other substances not

8  been subject to, the other ones that the Government has, has been

9  seized or had possession of, not the subject to quantitative

10 analysis, and we're only talking about the Hong Kong substances,

11 if this is such an important part of the defense, why is it we're

12 only doing it with the Hong Kong stuff at the last minute,

13 Mr. Snook?

14       MR. SNOOK:  Judge, I think the answer, and I'll have to

15 be a little bit uncertain in this respect, I'm not 100 percent

16 sure that I remember what analyses have been done on other

17 products, but we've got basically, as I understand it, basically

18 three kinds of analyses that have been done.  The first analysis

19 are, or two different sets of chemicals that have been analyzed,

20 the first would be anything that was seized in the 2011, 2012

21 time frame when the chemicals were arguably analogues, and I'll

22 just say that at this point the, the defense that I've been

23 thinking about along those lines hasn't been dependent upon that

24 kind of analysis.  The second is there are, as I understand it

25 there are two types of chemicals that were, or two types of

1   seizures in the 2014, 2015 time frame, the first being chemicals

2   that were seized, as I understand it, from Slouder, or I guess it

3   was from, there's a fellow here in, whose name is escaping me

4   now, who had some stuff seized in October of 2014 where I think

5   that we're, it's clear that that wasn't even stuff that could

6   possibly have come from our clients, and so the stuff that does

7   clearly have a possibility under the Government's theory coming

8   from our clients is the stuff from Hong Kong. So, the

9   quantitative analysis wouldn't be relevant to the second,

10  certainly, arguably not to the first in the way that I'm thinking

11  about in a defense. That's why, from my perspective. I don't

12  know what Mr. Cook's perspective is.

13          THE COURT: All right, Mr. Snook. Like I said, of all

14  the people on this conference call I'm the only one who hasn't

15  seen the discovery. I appreciate the, the benefit of all

16  counsel's perspective. Let me ask to hear from Mr. Nagy, and

17  then let me ask to hear from Mr. Parker, and then I want to

18  circle back to see if the Government has got a response, and then

19  give everybody a chance to weigh in. Mr. Nagy?

20          MR. NAGY: Your Honor, I mean this is a fight that

21  frankly I am not really involved in all that much. I mean, I

22  certainly would be curious to see what the results of the testing

23  that Mr. Cook and Mr. Snook have been asking for are. I

24  personally don't know how much relevance that is going to have to

25  my case, maybe none. I just don't know.

 1          I will tell the court at this point that the case was

 2    scheduled for March due in, in large part to my client's demands

 3    for a speedy trial, and since that time period we have released

 4    that, so at this point I just, we defer to the court, whatever

 5    the court feels is appropriate.

 6          At this point -- I can tell the court it is important to my

 7    client, at this point, to keep everything together.  For that

 8    reason she is willing to not only waive speedy trial, but agree a

 9    continuance is proper if the court deems that it's necessary, and

10    I'm just going, going to leave it at that.

11                THE COURT:  All right.  Mr. Parker?

12                MR. PARKER:  Your Honor, I'd echo Mr. Nagy's thoughts

13    on the subject.  We're kind of in the same boat here with our

14    clients.  I would add that, you know, the trial when we first

15    scheduled this, as Mr. Nagy said, was largely scheduled in March

16    due to our clients' refusal to waive speedy trial.  We have done

17    that, of course, since then, and have different reasons for that.

18    So, you know, in regard to the trial being in March, to be

19    honest, we have no objection since speedy trial has been waived.

20          I would also state that we continue to get this new

21    discovery on this case.  You know, up until, you know, a week or

22    so before trial.  This evidence just came in from Hong Kong,

23    pretty much, a few weeks ago.  It's very difficult, I mean, the

24    Government has had a long time to get this stuff here, and I know

25    Mr. Hoffman has tried to do this, but as Mr. Nagy, he told the

court the other day, we're trying to prepare for a three week

trial, and schedule things all around that, and do things, I

mean, we, and we get new discovery and new evidence, and it

really puts a huge burden on us.

THE COURT: Mr. Parker, when I went back this morning

and reviewed the docket, and looked at the minute sheet done by

the clerk when, when we had a teleconference on September 13th of

last year, the, the clerk said looks like the best time to try

this case is going to be the summer of 2017 with everybody's

calendars. And it was over the objection, it was Mr. and

Mrs. Taylor who were saying, "No, no, we need to go sooner than

that." And so your, your recollection of that, and Mr. Nagy's

recollection of that are consistent with what the minute sheet

said from that time.

You know, I do not want to continue this case. In my view,

continuance of the case with, with multiple defendants only makes

matters more complicated, leads to more delay. And, I mean, if

that isn't apparent from the Alvarado case that Mr. Cook is

counsel to, boy, that case has been continued a number of times

due to no one's fault, but just unforeseen circumstances

including the, you know, the health of counsel, family issues

that no one could have predicted and that were causing

difficulty, changes of counsel, just all kinds of things, and I'm

really reluctant to continue this case because A, the case was,

you know, the case has been pending since last year; B, I'm

concerned that if this case gets continued that someone is going

to want to continue it again, and I am not going to agree to

that, I am not going to allow that. Even if someone has a

dispute with counsel, I don't want to continue this case.

I think -- the other thing I am mindful of is the heaven and

earth the Government has been moving to get the witnesses here.

I'm seeing the defense perspective in this case, but the

Government, you know, all these witnesses are ready to go, people

from all over the place, and they've spent an inordinate amount

of time and money to get this case ready for trial, and I am

mindful of that. And I, you know, these cases are set, and I

don't want to continue this case. I really don't.

So, let me hear from -- that's my perspective. And, you

know, these cases are set for trial. Continuances don't do

anybody any good, in my experience, other than delay justice.

All right, Mr. Hoffman, let's hear what you have to say in

response to what counsel have said.

MR. HOFFMAN: Your Honor, just a moment ago the court

asked a question that was right on point. The court asked the

defense, "Why haven't you requested quantitative testing on the

other exhibits?" I want the court to understand that we have

drug exhibits from post scheduling of alpha-PVP, this second

phase the defendants are talking about. We have multiple drug

exhibits from around this same period of time, and they have not

requested quantitative analysis on those exhibits. The, and

those are post scheduling of alpha-PVP.  And they have alpha-PVP
in them.  And the evidence suggests that those were part of this
same five kilogram order that was placed at the end of '14 and
early '15.

     As I described a couple of days ago in court, our evidence
suggests, and we believe, that this five kilogram order came to
the United States in pieces.  Some of the parts made it; some of
them didn't.  The parts that made it came here post scheduling of
alpha-PVP.  We've turned over all those labs.  They did not have
quantitative testing, but the defense has those, the defense has
not requested quantitative testing on any of them.  The only
quantitative testing that they've requested was this surprise
request an hour before the deadline yesterday just on these Hong
Kong exhibits that we haven't even seen yet.

     So, I think it provides context to the nature of their
request, and why they're requesting it.  I don't believe I would
have the same concerns if they would have made, made a blanket
request for quantitative analysis testing on all of the post
scheduling alpha-PVP scheduled exhibits that we have on the
table, but, but they did not.

          THE COURT:  Mr. Hoffman, are you finished?

          MR. HOFFMAN:  That's the one point I wanted to make,
Your Honor.

          THE COURT:  That thought occurred to me, too.

          MR. HOFFMAN:  So, we've got the other exhibits that are

on the table, the labs don't show this special quantitative

analysis was done.

    The other point I would make is -- well, I'm just going to

leave it there.  I think that, I think that the facts speak for

themselves.

        THE COURT:  Thank you, Mr. Hoffman.  Someone was trying

to say something.

        MR. NAGY:  Judge, I'm going to throw, I'm going to

throw this out there, and I will preface this by saying I've had

no conversation about Mr. Cook's strategy or what he, what he is

planning to do as a defense, but as I am sitting here listening

to this, without -- I don't want to hurt anybody's case,

including my own -- but without getting into it, as we've been

talking, I think I see where Mr. Cook may be going with this.

And with all candor, if he is correct and if he is right, it is a

defense that I think could potentially be relevant to my case, as

well, that I had not really considered before.

    But as we're sitting here, and as Mr. Hoffman was making

certain statements about the fact that the Government has not

tested for, you know, just merely for presence and not for

volume, or anything of that nature, it just strikes me that I may

very well understand Mr. Cook's interest, as well as Mr. Snook's

interest, and it does pose an interesting perspective that I had

not considered before.  I will throw that out there.  I cannot

sit here and tell the court that I've given this any thought

other than what we're saying right now, but I'm listening to the two parties banter back and forth about whether, why it is or is not relevant. I'm just going to go out on a limb and say I will tell the court that I, I believe I understand at this point where Mr. Cook is going, and I believe it could potentially present a defense for my client depending on whether or not I'm correct.

I haven't talked to Mr. Cook about that at all. Nevertheless, I just wanted to make sure that the court understood, as I understand the arguments of the parties, there may be some benefit to seeing this out, and seeing what the tests come out to, as far as that can be done. I don't have a stake in that, but I will go on the record and say I think I understand that.

MR. HOFFMAN: Your Honor, we are four days before trial, and defense counsel is coming up with new ideas and strategies. We are four days before trial. I mean, any of this could have been considered for the last, what, eight months? We're on the eve of trial.

THE COURT: Okay.

MR. HOFFMAN: If the defendants can't, if the defendants can come in days before trial and say we've got a new idea, we've got a new strategy, we need a continuance, and the court grants that, that is an awfully slippery slope going forward, an awfully slippery slope.

THE COURT: Well, Mr. Hoffman, I appreciate that

argument. But all of this, this entire deal is caused by the

fact that these Hong Kong chemicals didn't arrive into the United

States until about a week before trial. So, you know, this is

not --

MR. HOFFMAN: We agreed to not introduce them, Your

Honor. We appreciate that. We've agreed to not even use them.

THE COURT: I understand that, but the defendants feel

as though they're important. As I've said three times, with

regard to the chemical analysis and the evidence, all those I've

tried to, I understand the issue with regard to the chemical

analysis and the evidence, you've got a much better feel for that

than I do.

Mr. Cook, I want to go back to the question I raised that I

thought Mr. Hoffman fairly artfully picked up on. If this is so

doggone important to you, this quantitative analysis, why have

you not tested those other substances if, indeed, some of those

other substances are post, post scheduling of a-PVP and come from

the same shipment that we're talking about from Hong Kong? Come

on.

MR. COOK: Well, we don't think there's a distinction.

We have a defense to those substances that differ. The Hong Kong

stuff, there's evidence that my client was in Asia at the time

and is closely tied to the Hong Kong package. That makes a

difference than the evidence tying the other substances to my

client.

1           Your Honor, I don't know if that's clear.  But this is close

2    in geography to where they think my client was at the time, which

3    places this not in his hands, but closer to his hands, and it's,

4    it's different.

5           Now, that being said, maybe we should go back and

6    quantitatively analyze the others.  At this point I didn't think

7    that was necessary until, because the Hong Kong, the Hong Kong

8    packages, I didn't think, would be here for trial.  So that, that

9    changed things for us.

10           THE COURT:  All right, Mr. Snook, do you want to say

11    something about this?

12           MR. SNOOK:  The only thing I can think of to point out,

13    Judge, is if I understand the evidence correctly the Government

14    has other samples or other substances that they have seized that

15    they would argue are from this same transaction, you know, from

16    the fall of 2014, early 2015, they were not, in fact, the same

17    shipment.  And so when there is a, there was a representation

18    made at some point it was the same shipment, that is not true.  I

19    believe the Government's evidence would be that the transaction

20    would be, the transaction was to be completed in a series of

21    different shipments, some of which apparently made it through,

22    some of which apparently did not.  So, how they -- because our, I

23    think our defense would be we weren't setting this up at all, the

24    stuff had actually got there, the purity of it, and so on, is not

25    really quite the issue.  That's the only thought I would add.

1     MR. HOFFMAN:  This is Mr. Hoffman.  I want to be clear

2  it has not been our position -- I don't believe I've ever said

3  that it was one shipment.  The evidence certainly makes it appear

4  that it was one order, and I said before that it came in numerous

5  shipments, some of them got here, we have them in evidence, and

6  the defense has not requested a quantitative analysis on those.

7     THE COURT:  Right.  I appreciate that distinction,

8  Mr. Hoffman.  I don't think you've ever suggested that it was the

9  same shipment.  In fact, it couldn't be from the same shipment

10  because this shipment was seized in Hong Kong.  But it was, but I

11  do understand the argument that it was from the same order, okay?

12     Now, am I correct, and I just want to hear from all counsel

13  and their clients right now on the record that they are

14  requesting a continuance to June 21st, and that they are waiving

15  any objection with regard to the, the right to speedy trial under

16  the Sixth Amendment or under the Speedy Trial Act.  Mr. Cook, is

17  that correct for your client?

18     MR. COOK:  Yes, on behalf of Mr. Bradley, yes, sir.

19     THE COURT:  Mr. Bradley, do you understand what I'm

20  asking?

21     THE DEFENDANT BRADLEY:  Yes, Your Honor, I agree.

22     THE COURT:  You're agreeing you want this case

23  continued to, to June?

24     THE DEFENDANT BRADLEY:  Yes, Your Honor.

25     THE COURT:  And, and you are waiving any contention you

1  have of a violation of, a violation of the Sixth Amendment or the

2  Speedy Trial Act?  You understand that?

3         THE DEFENDANT BRADLEY:  Yes, Your Honor.

4         THE COURT:  Mr. Snook?

5         MR. SNOOK:  Yes, Your Honor, we agree to waive speedy

6  trial, and we agree to the June 21st date.

7         THE COURT:  All right.  Ms. Ryba, do you understand and

8  agree to that?

9         THE DEFENDANT RYBA:  Yes, Your Honor, I do.

10        THE COURT:  Now, if I continue this case because of

11 this chemical testing stuff, I am not going to continue it again

12 for any reason including anyone changing counsel.  Do you

13 understand that, Ms. Ryba?

14        THE DEFENDANT RYBA:  I do.

15        THE COURT:  I think Mr. Snook has made some persuasive

16 arguments during this conference call, but should you decide you

17 want to hire a different lawyer, I'm not continuing this case

18 again.  Do you understand me?

19        THE DEFENDANT RYBA:  Yes, Your Honor, I do.

20        THE COURT:  Mr. Nagy?

21        MR. NAGY:  I've previously talked to my client, I

22 haven't talked to her this morning, but she has been listening

23 in.  We do not oppose a continuance.  We would waive speedy trial

24 issues through the June 21st court date that would be scheduled

25 if a continuance was granted.

```
 1            THE COURT:  Okay.  Ms. Taylor, do you understand and
 2   agree to that?
 3            THE DEFENDANT N. TAYLOR:  Yes, Your Honor.
 4            THE COURT:  Mr. Parker?
 5            MR. PARKER:  Yes, Your Honor, we would agree to the
 6   continuance to the June 21st date and we would waive speedy
 7   trial.
 8            THE COURT:  Mr. Taylor, do you agree to that?
 9            THE DEFENDANT E. TAYLOR:  Yes, Your Honor, I do.
10            THE COURT:  Okay.  All right.  I'm sorry, was that
11   Mr. Hoffman?
12            MR. HOFFMAN:  Yes, Your Honor.  I just wanted to know
13   if I could make one more statement.
14            THE COURT:  Sure.  Absolutely.
15            MR. HOFFMAN:  Before the court grants, I'm not sure
16   this is where the court is going, but before the court does make
17   its decision, this is something I tried to interject earlier and
18   I haven't been able to interject, in my conversations with the
19   lab yesterday they made it very clear to me that it would be
20   possible, depending on the chemicals that are there, it would be
21   possible that they could get this quantitative analysis done in a
22   matter of days.  In other words, it might spill into Monday,
23   Tuesday, and they might have it done mid-week.  They said it
24   just, they could get it done fast, or it could, depending on
25   what's in it, take longer than that.  But in talking with them it
```

1    sounded like it was a real possibility that perhaps early in the

2    week.  One guy even said maybe, maybe Sunday, Monday, but early

3    in the week we could have the quantitative analysis done that the

4    defense is asking for.

5        So, I would ask the court to just consider that as an

6    alternative and compromise to everyone.  Defense has requested

7    this quantitative analysis at the ninth hour.  It sounds like the

8    lab might be able to pull it off by just adding a couple extra

9    days, not a week, not two.  So, it might be worth considering to

10   see if the lab could get it done, and we could start on Tuesday

11   or Wednesday instead of moving it to the middle of the summer,

12   which just disrupts everybody.  We could keep the trial on

13   schedule and give the defense what they're asking for, assuming

14   that the lab could do that.

15       I just wanted the court to know that the lab highlighted

16   that for me yesterday as a possibility, and I think we're

17   probably at the point now where, you know, they'll be able to

18   look at the substances and make a prediction and say, "No, this

19   is going to take us a week or two, or maybe we can have it done

20   by Tuesday."  We could probably still get the trial done in the

21   three week estimated time.  Just a thought.

22           THE COURT:  Well, of course, I don't know, and you guys

23   are the ones talking to the lab.  Mr. Cook, that was one of the

24   things I had mentioned early on.  Why couldn't we go forward next

25   week?  And Mr. Cook, do you have a sense when they could finish

1    this quantitative analysis?

2         MR. COOK:  They couldn't tell me, Judge.  They hoped

3    they could have it done, like Mr. Hoffman said, by middle of next

4    week, but they couldn't, couldn't tell me that they would.  So,

5    that's what I can say.

6         Like I said, to get started without having it in hand, I

7    think, would be detrimental to my client's case, the uncertainty

8    on how we intend to proceed on a major piece of evidence.

9         MR. HOFFMAN:  To be clear, I'm not suggesting we start

10   without the labs; I'm suggesting it's possible the lab could

11   finish it.  In other words, we won't pick a jury to start until

12   Tuesday or Wednesday if the lab says they can get it done in that

13   time, and in that way we're still operating in the same time

14   frame.  We're planning on roughly 60 witnesses.  There's a lot of

15   things in play here.  And I think if we can get the defense what

16   they are asking for, which is the quantitative analysis of these

17   exhibits, and still keep the trial in place, you know, starting a

18   day or two late, then everybody wins, and we don't have to get a

19   continuance.

20        MR. COOK:  If I can throw in, in talking to these labs

21   I've not talked to them about being able to come and testify at

22   trial.  We were just trying to see if we could expedite.  Quite

23   frankly, if the court does continue the case, I intend to go back

24   through and call the labs in to choose which one I want to do my

25   independent analysis.  I'll tell you the one we're talking about

1    right now was exponentially more expensive, I don't know why, the

2    pricing was just very high relative to the other places I was

3    talking to.

4         So, again, this is CJA, this will all be passed on to the

5    court, I understand that, but if the continuance is granted

6    within a day or two I will have identified the independent lab

7    that we would like to have do it, and hopefully somebody closer,

8    somebody not quite so extraordinarily expensive, and be ready for

9    trial to testify in the defense of the case.  I'd just throw that

10   in while we're talking.

11            THE COURT:  All right.  Thank you.  Does anybody else

12   have anything they'd like to add?

13            MR. SNOOK:  No, Your Honor.

14            MR. HOFFMAN:  No, Your Honor.

15            THE COURT:  Given the uncertainty, all the factors that

16   I'm considering with regard to the trial set for Monday,

17   March 6th, given the fact that all the defendants have waived

18   speedy trial, and any defense or objection to a continuance based

19   on the Constitution, Sixth Amendment or under the Speedy Trial

20   Act, given the fact that, you know, we just don't know right now,

21   today, three days before trial, when this quantitative analysis

22   could be performed.

23            MR. HOFFMAN:  Your Honor, what if we could get you an

24   answer in a couple of hours?  What if we could get you an answer

25   today?  What if we could try to get the lab to say yes or no?

1  The amount of taxpayer dollars that are going to be wasted by

2  this continuance, I mean, it's going to pale in comparison to the

3  amount of money that the CJA panel is going to spend on this

4  analysis.

5          THE COURT:  Well, let me ask you this question,

6  Mr. Hoffman.  Let me ask you this question.  Is the Government

7  willing to stipulate the admissibility of whatever lab test they

8  get out of Michigan without having someone come here?

9          MR. HOFFMAN:  Absolutely.  We will stipulate to the

10 accuracy of the Certificate of Analysis.  If it comes in and it

11 says it's jelly beans, we will stipulate to that.

12         THE COURT:  All right.  I'm going to take this matter

13 under advisement until 2:00 p.m., okay?  If, if I get a

14 definitive word back that, that this quantitative analysis can be

15 performed and the defense has their evidence, and the Government,

16 and the Government stipulates to the admission of this

17 quantitative analysis, and they can get it done so that trial can

18 start on Wednesday, March 8th, okay, no later than that, because

19 we've got calendars that are all backed up as a result of this,

20 then if you can get me that information, Mr. Hoffman, by

21 2:00 then I'll issue an order this afternoon one way or the

22 other.

23         MR. COOK:  If I could just jump in here, scheduling, I

24 mean Mr. Hoffman jumped in on the ruling, if I could just jump in

25 here and say I'm in front of Judge Conrad in Charlottesville at

2:00; and secondly, this is an independent analysis at the
defendant's request, and I appreciate Mr. Hoffman doing what he's
done to identify the lab, and so forth, but I'm going to have
conversations with the lab that Mr. Hoffman should not be privy
to.  Ordinarily, he wouldn't be had we not requested his
assistance, but he's now engaged in conversations, substantive
conversations with my independent lab about what they're doing,
and that's something that could be detrimental to my client.

So, I am very willing to have this conversation with the
lab, but if, but it's not Mr. Hoffman's job to tell the lab what
they can and cannot do for me.  I just wanted to be clear about
that.

MR. HOFFMAN:  I'm not exactly sure where that's coming
from.  We've been contacting labs asking if they can do the job,
and then when Mr. Cook has asked to have private conversations
with them we've allowed them to do so.

Your Honor, we can absolutely get in touch with the lab and
just ask them if they are capable of completing the quantitative
analysis by 2:00.  We can do our best to give answers to the
court by then, and get back to the court.  I have to be in the
same hearing that Mr. Cook does at 2:00, it's a case he and I are
both parties to, so, you know, I'm facing the same challenges as
Mr. Cook.  But I think I can get him on the phone and ask, I can
get them on the phone and ask them if they can get it done by
Wednesday, and just let the court know.  From our perspective we

1    think we can accomplish that.

2          MR. COOK:  He's saying I can make the call, I can have

3    my conversation with my independent lab and report back to the

4    court?

5          THE COURT:  I think that's appropriate, Mr. Cook.  I

6    don't think Mr. Hoffman has to be in the loop anymore.  It's your

7    independent lab, your conversation with whether or not they're

8    able to get done what they can get done.  You have a conversation

9    with them and report back to the court by today.  I don't know

10   how long your hearing is going to go with Judge Conrad, but you

11   report back to me today, and I'll take the matter of a

12   continuance under advisement until I hear back from you,

13   Mr. Cook.  And once I hear back from you then I will issue a

14   ruling.

15        It is my inclination, given the fact that the defendants

16   believe this evidence is material to their defense, to, to go

17   ahead and, and continue this matter to give them an opportunity

18   to have this chemical testing done.  This is all, and it's

19   Mr. Hoffman's perspective that this is all done for delay, but I

20   credit Mr. Cook at his word that it is not being done for delay,

21   it is being done for strategic reasons, and I have no reason, in

22   all my years of dealing with Mr. Cook, I have no reason to

23   believe that he's being anything other than perfectly candid with

24   me.  So, I, I am concerned about the evidence that's coming along

25   at such a late date right before trial, that I am concerned that

1  if I don't get this quantitative testing done that the defendants

2  raised, that I may have to try this case again if, if there's a

3  conviction and the Fourth Circuit believes that I should have

4  allowed them to do this.

5      I do understand the cost and burden to the Government, and I

6  understand that nothing good comes from a continuance.  But that

7  is my inclination.  But, I will allow Mr. Cook one more

8  opportunity to see if this quantitative analysis can be done

9  before the start of trial on Wednesday, March 8th.  I'll move the

10 trial two days to allow that, but I think the problem is if I

11 move it any more we get into the situation Mr. Nagy was talking

12 about yesterday with all the other stuff he's got backed up, and

13 other counsel have backed up.  I appreciate that.

14     So, let's make one last effort this afternoon, see if they

15 can get it done by Monday or Tuesday, the quantitative analysis

16 done.  And it's your expert, your analysis, and you let me know.

17 I'm taking you at your word, and as all counsel know the

18 credibility of counsel with the court is something that is

19 critically important, so I'm taking you at your word.  And you

20 check to see whether or not they can get it done by Tuesday.  And

21 if you tell me that you can get it done, then we'll start on

22 Wednesday.  If you tell me they can't get it done, or they can't

23 assure you that it will be done, then I'm going to move this case

24 until June 21st.

25     So, Mr. Hoffman, I'm going to give, I thought, you a

compromise. You suggested another, we'll go a couple more days
to see if we can get it done, and I appreciate everyone's
perspective on this. But, you know, I don't really think this is
a situation where the defense is coming in at the last minute and
saying we thought of a new defense and we need to have a
continuance. This is all a result of the delay in these
substances coming out of Hong Kong.

So, I don't fault the Government, I don't fault the defense.
I want this case to go more than anybody else, probably, because
I've got a lot of things backed up, but let's give them their
defense and let's see if we can get this done.

Excuse me, Mr. Hoffman, Mr. Cook, I want to hear from you
today.

MR. COOK: Yes, sir, I'll report back.

THE COURT: Mr. Hoffman, did you want to say something
else sir?

MR. HOFFMAN: Yes, sir. It's for the benefit of the
court and Mr. Cook. Since I am now, as I understand, I'm going
to stay out of the communications with this lab, if they contact
me I'll simply refer them to Mr. Cook. But I did want to share
some information. Yesterday they said what would be
determinative of their decision are obviously what substances
are, are detected or are in the chemicals, themselves. Basically
what they told me, there are two substances that need to be run
through the quantitative analysis. That will obviously be much

```
1   faster than three or four or five.  So, I say that to share this,
2   that I believe if, if the lab needs to know what kind of
3   substances are there, or how the DEA may very well have been to a
4   point in their analysis, because they've had the exhibits for a
5   couple of days now, they may be able to share that information,
6   if requested, with Cayman to help Cayman Chemicals give Mr. Cook
7   his answer.
8        So, if Mr. Cook calls and Cayman says we don't know what
9   substances we're looking at, perhaps the DEA lab, if it's
10  helpful, we can find out whether the DEA lab has identified those
11  substances yet, and they could share the information with
12  Mr. Cook or with the lab to give a solid answer.
13            THE COURT:  Mr. Hoffman, that's a fair point.  If the
14  DEA lab has done some analysis already, can you get them to
15  provide that to defense counsel?
16            MR. HOFFMAN:  Yes, I can call and ask, and if they've
17  done, if they've got anything done in a certifiable form I can
18  share that with Mr. Cook, and that might help in his discussions
19  with Cayman and help them better predict how long it will take.
20            THE COURT:  Okay.
21            MR. HOFFMAN:  I'll, for my part I'll go ahead and reach
22  out to the lab folks, and I'll let Mr. Cook deal with Cayman
23  going forward.
24            THE COURT:  As soon as I know -- the other question I
25  have for you, Mr. Hoffman, do you want me to sign this order
```

1  authorizing the DEA to provide this stuff to Cayman, or do you

2  want me to hold off and wait until we hear from Mr. Cook?

3         MR. HOFFMAN:  I'd say, like Mr. Cook said a moment ago,

4  and I might have misunderstood him, but if there is a continuance

5  granted he may consider a different lab so maybe it's prudent to

6  wait.  Is that right, Mr. Cook?

7         MR. COOK:  That's right.

8         THE COURT:  All right.  Mr. Hoffman is going to contact

9  the DEA to see if they have any further information that might

10  assist Cayman in making a decision as to whether they can get

11  this information for us, Mr. Cook is going to reach out, and any

12  other counsel who are willing to talk, defense counsel, like

13  Mr. Snook or any of the others, if you want to weigh in on this,

14  talk to the Cayman folks today, get me an answer by 5:00, and I

15  will enter an order.  All right?

16         MR. COOK:  Thank you.

17         MR. HOFFMAN:  Yes, sir.

18         THE COURT:  I'm trying to do what I can to save this

19  trial date, but I also want to make sure the defendants have the

20  opportunity to present evidence consistent with their defense.

21  So, let's try.  If it doesn't work, then if we can't get it done

22  by Wednesday, we'll move it to June, and we'll have a 90 day

23  continuance.  And I will not continue this case again.  All

24  right.  Thank you all.

25         MR. HOFFMAN:  Thank you, Your Honor.

1          MR. COOK:  Bye-bye.

2       (Proceedings concluded at 11:55 a.m.)

3

4                          CERTIFICATE

5

6          I certify the foregoing is an accurate transcript

7    from the record of proceedings in the above-entitled

8    matter.

9

10

11   6/6/17                    /s/ Bridget A. Dickert
     Date                          Bridget A. Dickert
12

13

14

15

16

17

18

19

20

21

22

23

24

25