```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF VIRGINIA
 2                 Charlottesville Division

 3   UNITED STATES OF AMERICA,          Criminal No. 3:16cr50008

 4               Plaintiff,

 5          vs.                         Charlottesville, Virginia

 6   JASON BRADLEY, NAYNA TAYLOR,
     and EDWARD TAYLOR,                 2:45 p.m.
 7
                 Defendants.            June 26, 2017
 8

 9      TRANSCRIPT OF CROSS-EXAMINATION OF ROBERT SCHROEDER
              BEFORE THE HONORABLE NORMAN K. MOON
10          UNITED STATES DISTRICT JUDGE, and a Jury

11   APPEARANCES:

12   For the United States:       GRAYSON HOFFMAN
                                  U.S. Attorney's Office
13                                116 N. Main St.  Room 130
                                  Harrisonburg VA 22802
14
                                  KARI MUNRO
15                                U.S. Attorney's Office
                                  310 First St. SW, Room 905
16                                Roanoke VA 24011

17   For Defendant Bradley:       AARON L. COOK
                                  Cook and Cook Attorneys
18                                71 Court Square
                                  Suite B
19                                Harrisonburg VA 22802

20   For Deft.  Nayna Taylor:     LOUIS K. NAGY
                                  590 E. Market St.
21                                Harrisonburg VA 22801

22   For Deft.  Edward Taylor:    DAVID L. PARKER
                                  333 Neff Ave. Suite A
23                                Harrisonburg VA 22801

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

1   APPEARANCES (Cont'd):

2   Court Reporter:                    Sonia Ferris, RPR, OCR
                                       U.S. Court Reporter
3                                      116 N. Main St.  Room 314
                                       Harrisonburg, VA 22802
4                                      540.434.3181.  Ext. 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Cook.

2          MR. COOK:  Judge, I believe Mr. Nagy is going to go

3  first.

4          MR. NAGY:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6  BY MR. NAGY:

7  Q.   You pronounce your last name Schroeder?

8  A.   Correct.

9  Q.   Mr. Schroeder, I want to go back to a couple things Mr.

10 Hoffman touched on here just recently.

11      You indicated a minute ago that you had given several

12 different statements to law enforcement prior to your

13 testimony here today; is that correct?

14 A.   Correct.

15 Q.   Okay.  And each of those statements -- or at least many

16 of those statements were done pursuant to what's called a

17 proffer; isn't that correct?

18 A.   Yes, sir.

19 Q.   Explain to the jury, if you would, what your

20 understanding of a proffer is.  What is a proffer?

21 A.   A proffer is a debriefing session that cannot be held

22 against me unless I go to trial, and what it is -- it's

23 basically giving all the information I know in exchange

24 for -- hoping, like we had talked about on Friday, the

25 reduced sentence.

1  Q.   It's part of the level of cooperation that's expected

2  for you if you're going to try to work toward that 5K that

3  you talked about last week; is that right?

4  A.   Correct.

5  Q.   And they explained to you during the beginning of these

6  proffers that if you were to lie during those proffers, and

7  get caught in a lie during those proffers, that could have

8  some pretty dire consequences for you; right?

9  A.   Yes, sir.

10 Q.   So with each of the proffers that you gave previously,

11 you would not have told any lies to law enforcement officers

12 during those proffers, would you?

13 A.   No.   Everything's the truth.

14 Q.   Okay.   Let's talk about kind of -- I want to go through

15 the sequence of events with some of these proffers with you.

16      By my calculation of what I've seen here, you gave your

17 initial proffer to law enforcement shortly after your arrest

18 in October of 2015.   Does that sound right?

19 A.   That sounds right.

20 Q.   That particular proffer was a proffer that was over a

21 couple different days also.   Is that also generally accurate?

22 A.   Yes.   Correct.

23 Q.   I think the first time was maybe October 15.   Then you

24 came back on the 20th and again on the 23rd?

25 A.   If that's what's down there.   That sounds about right.

1   Q.   Okay.  And, then, during that time period when you gave

2   that initial proffer, were you in custody?

3   A.   No, I was not.

4   Q.   Okay.  And, then, later, you give a second proffer in

5   December of 2015, approximately two to two-and-a-half months

6   later.  Do you remember that?

7   A.   Yeah.  I remember several.  There were several after

8   that as well, I believe.

9   Q.   Yep.  We'll get to them all.

10       The December 15th proffer, that particular proffer --

11  you were also at liberty; correct? You were not in jail

12  during that time period.

13  A.   In December, no.  I didn't get locked back up until

14  February 22nd, I believe.

15  Q.   And that is my next series of questions, which is:  In

16  February, you violate terms and conditions such that you get

17  your bond revoked; is that correct?

18  A.   Yes, sir.

19  Q.   Okay.  And that, as you said, was in or around February

20  of 2016; correct?

21  A.   2016.  Yes, sir.

22  Q.   Okay.  Then, subsequently, you are charged with what's

23  called an information; is that correct?

24  A.   I'm charged with "an information"?

25  Q.   Correct.  You weren't charged by indictment, were you?

1    You waived your right to be indicted, and you pled guilty to

2    what's called an information? Isn't that correct?

3    A.    I'm not familiar with that term.

4    Q.    Okay.  But at some point, you were officially charged,

5    in or around May of 2016; is that correct?

6    A.    I pled guilty in May, yeah.

7    Q.    That's right.  And you entered a guilty plea in May.

8    A.    Yes, sir.

9    Q.    May 15th?

10   A.    May 15th or 16th, yeah.

11   Q.    Then, subsequent to that, in late May or early June of

12   2016, after you pled guilty, you give yet another proffer to

13   the government; correct?

14   A.    Yeah.

15   Q.    And that proffer was given to the government after you

16   were in custody; right?

17   A.    Correct.

18   Q.    And after you had signed a plea agreement.

19   A.    Correct.

20   Q.    And after that -- you had gone over that plea agreement

21   with your attorney; correct?

22   A.    Yeah.

23   Q.    And at that point, you're well aware of what a 5K is and

24   what you're trying to work toward at that point; correct?

25   A.    Yes, sir.

1    Q.   And then you gave another proffer later on, in June of

2    2017.   That would have been before this trial started back in

3    June.   Is that accurate?

4    A.   June 2017? So you're talking about --

5    Q.   It would have been a short proffer.   It wouldn't be a

6    very long one.

7    A.   Yeah.   They came and asked me a couple more questions.

8    Q.   Okay.   Now, I want to focus here on some things you said

9    during your testimony.   I want to go all the way back to the

10   very beginning of your testimony.

11        Now, when you testified originally, you had indicated

12   that you sort of got into the synthetic chemical world due to

13   being on probation; is that correct?

14   A.   Correct.

15   Q.   You wanted to be able to continue to use illicit

16   substances or substances that you thought were illicit or

17   something and not test positive; is that correct?

18   A.   That's correct, sir.   Yes.

19   Q.   So the search at that point was for something that you

20   could personally utilize and that you could deceive your

21   probation officer to the fact that you weren't trying to get

22   high.   Is that accurate?

23   A.   Yeah.

24   Q.   Okay.

25        And it's at this point in time that you kind of get

1    involved with Mr. Toma.  Is that a fair statement?

2    A.   Well, John Sieja was my friend, who was Matt Toma's

3    friend.  I said, "Hey, I can't smoke marijuana."  They said,

4    "But you got to see this new thing Matt has" -- which is Matt

5    Toma.  And, you know, they brought some by, and I tried it.

6    Yes.  So that's where I was introduced to Matt Toma.

7    Q.   And the other part of that was these chemicals, to the

8    best of your understanding, at that time were not scheduled;

9    correct?

10   A.   Yeah, it wasn't illegal.  It didn't show up in a drug

11   test, yes.

12   Q.   And you end up, as you testified, working with Sieja and

13   Toma for some period of time throughout 2010 and into 2011;

14   correct?

15   A.   Correct.

16   Q.   And it's during that time period that you also start

17   working, I know -- well, let me withdraw that question.

18        You knew Ryan Buchanan prior to all this getting

19   started; correct?

20   A.   I knew Ryan.  I knew John.  I knew of Matt Toma.  I had

21   only seen him a couple times.

22   Q.   But Ryan is the one who also comes in and starts working

23   with you in this enterprise you guys have going with Sieja

24   and Toma.

25   A.   Correct.

1    Q.    Now, as to that particular relationship, you and

2    Buchanan were basically, at that point in time, acting as

3    sales persons; is that correct?

4    A.    Correct.

5    Q.    But you also did help, in that particular instance, with

6    packaging and things of that nature also; is that correct?

7    A.    You are correct, sir.

8    Q.    But at some point in 2011, you testified that you guys

9    wanted to kind of find your own way.  You were, perhaps, not

10   happy working only for Toma and Sieja.  Is there a a fair

11   statement?

12   A.    I was perfectly content, but what happened was the

13   packages were getting seized that were going to Toma and

14   Sieja, and also, if they got seized, we had to pay for them.

15   Also, there was no product to sell.  So in turn, I went out

16   and looked for other sources.

17   Q.    Because it wasn't financially lucrative for you; right?

18   A.    It was financially lucrative, yeah.  I made over a

19   hundred thousand dollars in a couple months.

20   Q.    But it was more financially lucrative for you to be able

21   to cut them out; correct? That's why you ultimately made the

22   move; isn't it?

23   A.    No.  I sold for both parties for a while.  It

24   overlapped.

25   Q.    Okay.  Let's talk about that.

1    You overlapped for a while.  You actually got terminated

2  by Toma, did you not, and Buchanan did as well?

3  A.   Correct.

4  Q.   And that was because the two of you were running,

5  essentially, a side business that was competing with their

6  business; correct?

7  A.   Correct.

8  Q.   And they felt like you guys were cutting into profits

9  and basically taking money they should have been getting a

10  cut of; correct?

11  A.   That's how the dope game works.

12  Q.   Now, that leads us to our situation that you described

13  at -- was it Bono's? Was that the name of the restaurant?

14  A.   Bono's, yes.

15  Q.   Now, that meeting -- I want to be very clear about this.

16  That meeting at Bono's -- that involved three people;

17  correct?

18  A.   Yes, it did.

19  Q.   You; right?  Scholz, Buchanan.

20  A.   Correct.

21  Q.   And at that time meeting, the three of you get together

22  and you start talking about ways to, essentially, form this

23  organization to try and maximize profit and to get this stuff

24  out; correct?

25  A.   Yeah.  That happened before we were fired.

1   Q.   Understood.  Understood.

2       You guys actually formed this little organization of

3   yours before you got fired.

4   A.   Yeah, correct.

5   Q.   You guys were in direct competition with your former

6   employer during that time period.  Well, it was your current

7   employer at that time period.

8   A.   Yeah.

9   Q.   I mean, you were selling to clients who were their

10  clients that just happened to be also your clients; right?

11  A.   Yeah.

12  Q.   Again, these are clients you're selling to -- customers;

13  right.  Some of their customers and you're selling to their

14  customers.

15  A.   Correct.  And I was selling the Spice because we didn't

16  have no Spice going on.  Yeah.

17  Q.   Understood.

18      And as you were -- and I want to go back to that meeting

19  at Bono's again.  As you guys worked at Bono's -- I think you

20  went into this with Mr. Hoffman -- but there was talk about,

21  essentially, who was going to play which roles in this little

22  organization you guys were putting together; right?

23  A.   Not at the Bono's there wasn't, but eventually.

24  Q.   That came later?

25  A.   Yeah.

1    Q.   As this proceeded, you guys clearly had delineated roles

2    you took on; correct?

3    A.   Yeah.

4    Q.   You talked about that, and everybody understood and

5    talked specifically about what their role was; correct?

6    A.   Correct.

7    Q.   And you indicated during your direct testimony that your

8    role was -- at least to a certain extent dealt with sales --

9    is that fair -- at the beginning?

10   A.   Yeah, it was sales and like I said --

11   Q.   Legality.

12   A.   What I knew of legality.  I'm not a lawyer or anything.

13   Q.   You were doing what you could to try and find out what

14   you could about legality.  Is that fair?

15   A.   Yeah.  There was a website called Bud's Wholesale you

16   could go on that would give you basically the breakdown in

17   the states, but it wasn't as up-to-date as it should be.

18   Q.   Okay.

19        Now, you said that Buchanan had a role in this little

20   group as well.  What was his role in the group?

21   A.   His role was also of sales, and he dealt with a lot of

22   the shipping, you know.  Worked out a deal with the FedEx

23   people.  That's about it.

24   Q.   Okay.  And then you indicated that Scholz's role was

25   essentially to try and find a source for the product, for the

1    chemicals.

2    A.    Yeah.  Dave had known the source so that was, like, his

3    main duty there, and he also was trying to pick up customers,

4    and he also took care of the packaging, which Buchanan

5    also -- like I testified, he had some people that would take

6    care of packaging as well.  They kind of both combined on

7    that.

8    Q.    Let me ask you a couple questions about that

9    specifically.

10        So during this time period, is it fair to say that Dave

11   was also into some other stuff over and above and separate

12   and apart from what you guys were doing with the chemicals?

13   A.    Yeah, he was involved with marijuana trafficking.

14   Q.    And do you have any experience with that?

15   A.    Do I?

16   Q.    Yeah.

17   A.    I sold a little bit of weed throughout my life.

18   Q.    When you're involved with trafficking marijuana, is that

19   something you want to alert the authorities to?

20   A.    No.

21   Q.    No.  And it's also true that when you're trafficking in

22   marijuana, you don't really want the authorities looking at

23   you at all for fear that they stumble into something like

24   marijuana that you didn't really even want them taking a look

25   at; right?

1    A.   Yeah.  Dave's thing at that time was something going on

2    in Michigan.  Like, it was technically legal or something.

3    So I -- I don't know -- I know a little bit about it but not

4    enough to say that I do know a lot about it.

5    Q.   The point is, Dave didn't want law enforcement looking

6    at him for any reason, did he?

7    A.   Yeah.  They're already looking at him for dealing with a

8    house in Illinois or something, which I came to learn later.

9    Q.   Now, how early -- I was confused about this.  How early

10   did you meet Nick Purintun?  Was he involved early on or did

11   he come in a little later?

12   A.   I met Nick Purintun -- Dave had came by the house to

13   pick up the money for that first original kilogram order, and

14   Nick was the driver, and I didn't even want to deal with it

15   because I didn't even know who this guy was.  So I just gave

16   Dave the money.  I kept it kind of short.  I said, "Hey, nice

17   to meet you."  That was my first meeting of Nick.

18   Q.   You mentioned it, so let's go and let's talk about that

19   first -- that first kilo that you referenced a minute ago.

20        When you purchased the first kilo that you referenced a

21   minute ago, you guys were actually looking for things at that

22   time that were not banned substances; is that right?

23   A.   Correct.

24   Q.   Specifically, you indicated that you were asking

25   questions about methylone and MDPV at that time because you

1    believed they were legal at that time; isn't that correct?

2    A.    Yes, you are right.

3    Q.    You had done, as you said before, some amount of

4    research to try and determine if, in fact, those things were

5    legal at that time -- or excuse me -- if those things were

6    not scheduled at that time.

7    A.    Not scheduled, yes.  That's what, at the time, Bonsai,

8    Incorporated, was selling and a lot of these other companies

9    I had dealings with.

10   Q.    And so when you provided -- you had testified previously

11   that you provided a list of chemicals to Dave to see about

12   obtaining them; is that correct?

13   A.    Yeah.

14   Q.    The list that you gave him was a list that was

15   specifically provided there because you believed -- or at

16   least -- you believed that those chemicals were, in fact, not

17   scheduled and legal at that point in time; isn't that right?

18   A.    Correct.

19   Q.    You were not going out looking for scheduled chemicals

20   to later distribute at that point; right?

21   A.    Correct.

22   Q.    Now, in order to -- in order to make all this happen,

23   there had to be -- there had to be money that was put up;

24   right?

25   A.    Yes.

1    Q.    Okay.  And some of that money came from you; right?

2    A.    Correct.

3    Q.    And some of that money came from Dave?

4    A.    Correct.

5    Q.    And some of that money came from Ryan.

6    A.    Correct.

7    Q.    And that's the three guys that contributed the money to

8    get this organization going; correct?

9    A.    Yes, sir.

10   Q.    So at that point, Purintun -- he did not contribute any

11   money at that point in time; isn't that right?

12   A.    That is correct.

13   Q.    That comes later.

14   A.    Yes.

15   Q.    You guys at that point in time are, in fact, able at

16   some point to get the first kilogram of the chemicals that

17   you ordered; is that correct?

18   A.    Yes.

19   Q.    Those chemicals eventually come in.

20         Now, when those chemicals come in, they come in and --

21   so it's Dave Scholz, is it not, who's the recipient of those

22   chemicals.  He gets them and brings them to you; is that

23   right?

24   A.    Yes.

25   Q.    At that point in time, you knew what you guys had

1   ordered; isn't that right?

2   A.   Yes.

3   Q.   But when Dave brings the chemicals in, you guys

4   basically immediately get to work trying to break down and

5   package the chemicals.  Is that also fair?

6   A.   That's fair to say.

7   Q.   Okay.  During that time period, you -- to be clear for

8   everybody here -- and we all know the answer to this --

9   you're not a chemist; right?

10  A.   No.

11  Q.   You didn't have a laboratory available during this time

12  period; correct?

13  A.   Correct.

14  Q.   You did not actually test the chemicals that came in on

15  that first kilo, did you?

16  A.   No, not on the first one.

17  Q.   So that first kilo that comes in -- while you certainly

18  believed you were distributing MDPV, as you testified before,

19  at that time, you didn't really know what was in that mix,

20  did you?

21  A.   No.

22  Q.   Now, how many total packets would you say you guys were

23  able to make out of that first -- that first kilo?

24  A.   Well, a kilogram is roughly a thousand grams.  We

25  probably had, at the time, 250 of the creatine.  So that

1   would roughly make about 2500 half-gram packages.

2   Q.   Again, you testified there were two reasons why you did

3   that; one being to water down or dilute the chemicals a bit.

4   Correct?

5   A.   Yes.

6   Q.   And the other reason is to stretch the product; correct?

7   A.   Yes.

8   Q.   Because you could sell more and make more money if

9   you're able to sell more packets; correct?

10  A.   Yes, sir.

11  Q.   Now, as I recall, you're still, during that time

12  period -- you are still employed with Bonsai during that

13  period you were dealing with the first shipment; is that

14  right?

15  A.   Correct.

16  Q.   And how long did it take you and the other two guys to

17  unload that first shipment, to sell out of that shipment?

18  A.   It was quick.  I think it took us two or three weeks.

19  Q.   So it's gone almost as soon as it comes in.  Is that a

20  fair statement?

21  A.   Yes.

22  Q.   A couple weeks and it's out the door.

23  A.   Yes, sir.

24  Q.   It's at that point you guys decide to make a second

25  purchase; is that right?

1    A.    Yes.

2    Q.    Now, on that second purchase, you -- strike that.

3          On the second purchase when you guys put in this order,

4    you again gave instructions for there to be provided

5    chemicals that were not banned; isn't that correct?

6    A.    I mean, I didn't give the instructions.  It was just

7    kind of known that we didn't want to deal with anything that

8    was banned then.

9    Q.    Okay.  Do you remember in your first proffer -- do you

10   remember previously stating:  "Schroeder does not know how

11   the money got to Scholz's cousin but was aware that the

12   cousin was to make sure that the chemicals sent were not

13   banned."

14         Do you remember telling law enforcement that back in

15   2015?

16   A.    I'm sure I did say that, but, I mean, that's saying for

17   the cousin to make sure it's not banned.  That's protecting

18   both ends, isn't it?  Not, you know -- I can tell Dave

19   anything.  Sounds like he's, you know, going to go and

20   communicate every last word I say.

21   Q.    You don't really know what Dave Scholz is doing, do you?

22   He's off doing his own thing to a certain extent, isn't he?

23   A.    Yeah, at that time.  Yeah.  He had a couple different

24   things going on, yep.

25   Q.    One of the things you testified about the other day was

1    there was this insurance policy; right?

2    A.    That comes on later on, yes.

3    Q.    I understand, but at some point, there came this idea of

4    an insurance policy; right?

5    A.    If you want to call it that, yeah.

6    Q.    Did you take advantage of that?

7    A.    Yeah.

8    Q.    You would agree with me, would you not, that that money

9    for that insurance policy was given to Scholz to give to

10   whomever.  You say Bradley.  Is that correct?

11   A.    Correct.

12   Q.    It never occurred to you that Scholz was just sticking

13   it to you and taking your money on this insurance?

14   A.    I'm a paranoid man.  A lot of that came across my mind a

15   time or two.

16   Q.    You couldn't really trust everything Scholz told you.

17   You knew that. That's part of this, isn't it?

18   A.    Later on, that becomes a very -- a very relevant

19   statement, yes.

20   Q.    Do you also -- going back to the original question.  Do

21   you also remember previously telling law enforcement that

22   they -- and you clarify that as you, Scholz and Buchanan --

23   operated by, "staying one step ahead of the law and it took

24   time to create laws to ban substances."

25        Is that right?  Do you remember saying that to law

1    enforcement?

2    A.   Laws do take time to pass, yes.

3    Q.   Again, the whole point of this is you're trying to deal

4    in what you considered at that point to be legal chemicals;

5    right? Not illegal chemicals.

6    A.   Correct.

7    Q.   So this agreement between you three to get this stuff --

8    again, the agreement was to try to purchase legal,

9    nonscheduled substances; right?

10   A.   Yeah.  I mean, we knew what they were doing with them,

11   but we were trying, you know -- it was a gray area, and we

12   were trying to skirt by on that.

13   Q.   Okay.  We'll come back to that gray area here a little

14   later.

15        Now, for those first two shipments, my understanding is

16   that you guys are still operating out of Illinois; is that

17   right?

18   A.   Correct.

19   Q.   After that third -- I'm sorry.  After that second one --

20   and this would have been in late 2011 -- you guys end up in

21   Cincinnati; is that right?

22   A.   Early 2011, we end up in Cincinnati.

23   Q.   Okay.

24   A.   You're right.  It's later.

25   Q.   Okay.  Thank you.

1       And that is the location where you rented that first

2   apartment; is that right?

3   A.    Yeah; correct.

4   Q.    Whose name was that in?

5   A.    That was in either Modern Day Prophet's, mine or Dave's.

6   I believe it was mine, because I did a hotel or something

7   online.

8   Q.    Who was responsible for -- was it rent?

9   A.    You paid like $4000, and you got like 40 days or

10  something or 35 days.

11  Q.    And that came out of the funds provided by you, Dave and

12  Ryan; is that correct?

13  A.    Correct.

14  Q.    Modern Day Prophets.

15  A.    Yeah.

16  Q.    Now, this brings us to, I believe, shipment number

17  three, which would have been late 2011.  Does that sound

18  about right?

19  A.    Yeah.  Now we're going to move to, like -- I believe it

20  was a 5-kilogram order.

21  Q.    Okay.

22      And that order, again, at this point -- you indicated

23  previously, I believe, that you believed that MDPV

24  specifically was about to be banned at that point, or it was

25  about to be scheduled; is that correct?

1   A.   There was a lot of -- yeah.  I mean, the stuff was in

2   the news and all that at that time.  You know, it was a big

3   wave of things, you know -- Dateline and all that stuff.

4   Q.   The wheels were already in motion to obtain the

5   chemicals; correct?

6   A.   Correct.

7   Q.   And you received the chemicals; correct?

8   A.   Yep.

9   Q.   And in that particular circumstance, I believe you had

10  testified previously it was 4 kilograms that time?

11  A.   Yeah.  I can't remember the specific weights, but,

12  roughly, I'd say four and then one of JWH.  That seems like

13  about the weights, best that I can recall.

14  Q.   Because of the speed you needed to get rid of it, you

15  actually sold about 2 kilos of that to an Arabic male that

16  you knew as RJ; is that right?

17  A.   Yeah, RJ and --

18  Q.   In Ohio.

19  A.   Correct.  He had came down from up top -- Ohio or

20  something or New York.

21  Q.   You unloaded almost half of the chemicals on that third

22  shipment to one guy.

23  A.   Yeah.  Well, I also got a -- we had got a kilo from

24  Bonsai.  This is how I actually get caught up in the whole

25  thing and get fired.  But yeah, I had ordered a kilo from

1   Bonsai to Cincinnati as well because we didn't have enough,

2   and they were trying to get rid of it because the ban was

3   going in.  So I said, "I've got this guy I'm going to go meet

4   in Cincinnati.  Could I get a kilo down there?"

5        That didn't come up the other day, but I know I

6   proffered about that.

7   Q.   Now, at some point -- you mentioned it, and you

8   testified to it.  At some point, Modern Day Prophet is

9   established; correct?

10  A.   Modern Day Prophet was established, I think, even before

11  we went out to Cincinnati, I believe.

12  Q.   I believe it was, perhaps, a little bit before that.  I

13  believe you are correct.  However, who, again, were the

14  individuals who were the -- that was formed as an LLC, was it

15  not? I think we saw the documents entered into evidence a

16  while back?

17  A.   Yeah.

18  Q.   Who were the members who were the owners of the LLC?

19  A.   It was Dave, Ryan and myself.

20  Q.   Okay.  Dave, Ryan and you.

21       And the three of you were responsible for operations;

22  correct?

23  A.   Correct.

24  Q.   And you were responsible for filling orders; correct?

25  A.   Yes.

1   Q.   And again, at this point, I believe you testified that

2   Dave's primary responsibility is he's the one who's supposed

3   to be obtaining the chemicals?  Is that fair?

4   A.   That's fair.

5   Q.   And who, at this point, are the guys also participating

6   in packaging as shipments are coming in?

7   A.   At this point, we have Nick, who came down to package,

8   but he didn't really last too long.  We have this guy named

9   builder Bob -- Bob the builder -- not the cartoon character.

10  Q.   Understood.

11  A.   And a couple other gentlemen that they knew.

12  Q.   Those guys were brought in for short-term, quick work;

13  correct?

14  A.   Correct.

15  Q.   Bring them in; get the packaging done; pay them; they

16  move on.

17  A.   Correct.

18  Q.   But the core unit -- you, Buchanan and Scholz -- you

19  continue on, and you guys continued to bring in -- you guys,

20  after it's all packaged, continue to set up and effectuate

21  the distribution of the chemicals; is that correct?

22  A.   Yes, sir.

23          MR. NAGY:  If I could have just a moment, Judge.

24          (Defense counsel conferred.)

25  BY MR. NAGY:

1    Q.   Correct me if I'm wrong, but it is shortly after this,

2    while you're in Cincinnati, that the brand name starts being

3    used, the Crystaal Bubbly; is that fair?

4    A.   Yes.

5    Q.   Again, you came up with the name; correct?

6    A.   Yeah.  I had kind of incorporated that from Bonsai.

7    They were Crystal Clean, but -- pipe cleaner.  We were

8    Crystal Bubbly.  The design was my idea, yeah.

9    Q.   When you say the design was your idea, do you mean those

10   packages we've seen?  It was your idea of how to put that

11   together?

12   A.   Yeah.  It's mimicked after the Cristal champagne.

13   Q.   Who actually did the graphic design for that, because

14   you did not do that, did you?

15   A.   No.  Laura did that.  Laura Greenwald.

16   Q.   So Ms. Greenwald -- she, in fact, designed these

17   packages that we're seeing regularly and that the government

18   has introduced into evidence?

19   A.   Correct.

20   Q.   And that's Dave's mom?

21   A.   Correct.

22   Q.   Correct me if I'm wrong.  I didn't see her name on the

23   indictment with yours; isn't that right?  Or I didn't see her

24   name on the indictment or information?

25        THE COURT:  That doesn't make any difference.

1    Unknown people are named in the indictment, and he's not the

2    person to question about that.

3              MR. NAGY:  I will withdraw the question, Your Honor.

4    BY MR. NAGY:

5    Q.   Now, I believe you also mentioned -- during this time

6    period, again, you're still in Cincinnati.  You guys

7    indicated -- or you indicate at some point that there is a

8    short break between Cincinnati and Columbus; correct?

9    A.   Correct.

10   Q.   And the break was a couple months.  Is that accurate?

11   A.   It wasn't that long.  It was maybe two or three months.

12   Q.   Okay.

13   A.   A couple months, yeah.  Two months.

14   Q.   Okay.

15        And again, at this point, MDPV -- as you testified a

16   little bit ago, you had received information that that was

17   now a scheduled substance; is that right?

18   A.   It wasn't scheduled.  It was temporarily banned.

19   Q.   Okay.  Nonetheless, you took active steps at that point

20   that the next shipment that came in would be a different type

21   of chemical; correct?

22   A.   We did our best, yes.

23   Q.   In fact, do you remember telling law enforcement

24   specifically after that:  "There was a new makeup of bath

25   salts products with a new structure that was not banned."

1       Do you remember telling law enforcement that back in

2   2015?

3   A.   Yes.

4   Q.   And it was those that you were trying to get your hand

5   on; isn't that right?

6   A.   Correct.

7   Q.   Because, again, the idea here is not to be distributing

8   a scheduled product; right?

9   A.   Correct.

10  Q.   Now, we're going to fast-forward to the next purchase.

11  That next purchase was made in or around March of 2012, and

12  that was for the 10 kilos; is that right?

13  A.   Yeah, early February, March.

14  Q.   Okay.

15  A.   The first one was probably 10.  What we did was we took

16  all the money that we made -- not all but a majority of it --

17  and reinvested it right back into it.

18  Q.   Let me go back to something I asked you before that I

19  neglected to ask you on some of the others.  As the chemicals

20  are coming in and you guys are cutting them and distributing

21  them out -- you guys are able to do this very quickly, are

22  you not?

23  A.   Fairly quickly.  I mean --

24  Q.   I mean, with the third load that came in, you indicated

25  you're able to unload approximately 2 kilos to one buyer at

1   one time; isn't that right?

2   A.   Yeah, yeah.  He bought it all in bulk.  It didn't need

3   to be packaged or anything.

4   Q.   Right.

5        In total, for Modern Day Prophet, it's fair to say that

6   we're talking about a sequence of exactly the number of

7   purchases that you have described with Mr. Hoffman; isn't

8   that right? We're talking about a kilo -- a kilo, 2, 4, 10,

9   20.  Those are the purchases, are they not, from --

10  A.   Give or take, I mean, a couple kilos here and there.

11  Q.   Again, is it fair to say that on each of those

12  occasions, you guys were able to get rid of the chemicals

13  pretty quickly after they came in, even with the big amounts?

14  A.   Correct, yeah.  It moved pretty quickly.

15  Q.   It's not stuff that's just sitting around very long;

16  correct?

17  A.   Correct.

18  Q.   Now, it's with this 10-kilo order that you described

19  where you start getting into some of the different colors of

20  product of chemicals; isn't that right?

21  A.   That was more on the 25.

22  Q.   You think that was more on the 25.

23  A.   It would do it on other orders as well, too, you know.

24  Like, you know, it would be like 8 of 1.  We might get one of

25  a different color or smell, texture.

1    Q.    Okay.

2          Again, with the 10-kilo order, much like the orders

3    before that, the folks that are sharing the profits are you

4    and Scholz and Buchanan; right?

5    A.    Yes -- and the packagers.  They're not profits.

6    Q.    They're not profit sharers, are they? You guys are

7    paying them by the unit or time or something of that nature;

8    correct?

9    A.    Correct.

10   Q.    They're more akin to employees than partners, aren't

11   they?

12   A.    Correct.

13   Q.    I mean, they're short-term help; right?

14   A.    Yeah.  And they're friends, yeah.

15   Q.    Right.

16         But for each of these purchases that are made, the

17   people that are paying the money for it are the three of you;

18   right?

19   A.    Correct.

20   Q.    Correct.

21         And more than that, it's also the three of you that are

22   directing what is to happen when the chemicals go in and then

23   how the chemicals are subsequently to be shipped back out

24   again; right?

25   A.    Correct.

1   Q.   I mean, it's you three calling all the shots and doing

2   the majority of the leg work; right?

3   A.   Yeah.

4   Q.   Now, fast-forwarding ahead again.

5        In Columbus, you order the large 20-kilo order; is that

6   right?

7   A.   25, I thought.

8   Q.   Now, in your -- would it surprise you -- well, do you

9   recall making a statement to law enforcement in 2015 where

10  you said that it was 20 kilos?

11  A.   The 5 might have been the lidocaine.

12  Q.   And just to drive that home, do you recall making a

13  statement specifically -- you recalled receiving five boxes

14  of lidocaine but was unsure if it was all 25 kilos?  Does

15  that sound right?

16  A.   Could you reword that or say it again?

17  Q.   I'm reading back --

18  A.   -- what I said, yeah.

19  Q.   -- what you told law enforcement.

20       "Schroeder recalled receiving five boxes of lidocaine

21  but was unsure if that was for all 25 kilos."

22       Do you remember telling law enforcement that?

23  A.   Yeah.  The lidocaine didn't come, like, smuggled and

24  things like that.  It came -- just a raw product.

25  Q.   Okay.  Now, is it fair to say that at this point, as the

1  enterprise is building up volume of chemicals, you guys are

2  hiring more people to help with processing and packaging?

3  Isn't that correct?

4  A.   Correct.

5  Q.   You guys also take on, at this point in time in

6  particular, Purintun and Lister to help with the sales.

7  Isn't that correct?

8  A.   Yeah, beginning of 2012.

9  Q.   By this time, Purintun and Lister are still employees,

10  but they're working their way into your inner circle, are

11  they not?  Is that a fair statement?

12  A.   That's a fair statement, yes.

13  Q.   I know Scholz and Purintun were friends, but, again, as

14  far as getting into the inner circle, inner group there, they

15  don't really make their way into that group fully until

16  later.  Isn't that a fair statement?

17  A.   Right.

18  Q.   That occurs, basically, when Buchanan leaves; is that

19  correct?

20  A.   Correct.

21  Q.   Buchanan leaves, and that leaves you and Dave, and then

22  you guys -- at that point in time, you form the Platinum

23  Prophet enterprise; right?

24  A.   Yeah, the Platinum was already established.  This was an

25  idea of Nick's and Dave's before -- while Dave was still

1   active and going.  Again, they wanted to open up a head shop,

2   which I was against.  They basically had called me one night

3   there in California.  They were intoxicated.  I was like,

4   "Yeah, I'll get involved."  It was -- either it was going to

5   be, like, just a bowl shop -- like, you know, a

6   marijuana-accessory shop -- T-shirts and so forth.  But

7   anyways, I gave my information to start the business and paid

8   them back later.  I believe there are two businesses my name

9   is on.  I don't know.

10        Go ahead.  I'm sorry.  I drifted off.

11  Q.   Once the -- once it was established, though -- I think

12  you had testified that the members of that organization were

13  you and Purintun and Dave; is that correct?

14  A.   That was who was on the quote, unquote "Platinum

15  Prophet" business, yes.

16  Q.   But Lister did at some point become a fourth comember of

17  the group; correct?

18  A.   Correct.  But he wasn't in our original plans of

19  starting this head shop or smoke shop or whatever we were

20  going to start, so he wasn't involved in that.  Not only

21  that, but he was stuck in Illinois, and we were talking about

22  opening that in California or something.  Ryan was also, you

23  know -- it wasn't just that he wanted to be all done and set

24  with, you know.  He was lacking on coming out there and

25  shipping out orders and stuff, you know, which I went into

1    detail on, but that's irrelevant, too.

2    Q.   But he becomes a one-quarter partner; right?

3    A.   Purintun -- or Lister?

4    Q.   Lister.

5    A.   Lister, 25; Purintun, 25; me, 25; Scholz, 25, per se.

6    Q.   Again, he moves into a situation where he's

7    profit-sharing with you guys.   25 percent of the take?

8    A.   Right.

9    Q.   And he's making decisions for the company to some

10   extent; right?

11   A.   Right.

12   Q.   Talked about it, consulted with one another before

13   making big decisions, things of that nature?

14   A.   Yeah.  Late 2012, yeah.

15   Q.   And also in 2012, Lister, as you described a little bit

16   ago, is the guy that comes in and starts agressively pursuing

17   other smoke shops and head shops; correct?

18   A.   Right.

19   Q.   You indicated specifically he was actually cold-calling.

20   Correct me if I'm wrong.  Did you not testify -- I think you

21   used "hundreds" in your testimony at some point.  Am I wrong

22   about that?

23   A.   (No response.)

24   Q.   He was calling on a lot of places; right?

25   A.   Yeah.  He went on to headshopfinder.com.  It's a list of

1   smoke shops.

2   Q.   All over the United States.

3   A.   Correct.

4   Q.   One of the other practices that he and Purintun were

5   using -- they would routinely send out samples to

6   organizations as well, would they not?

7   A.   Correct.

8   Q.   Would you participate in that as well, or was that

9   mainly those two?

10  A.   I was done sending out samples, but I would send out the

11  samples for them or Dave or Ryan would, yeah.

12  Q.   But it was a practice you guys talked about and

13  routinely used together; right?

14  A.   Correct.   That's how I learned.

15  Q.   And the idea of sending out the samples was to give,

16  essentially, a free opportunity for somebody to take a look

17  at the product; right?

18  A.   To try it out, yeah.

19  Q.   Okay.   And you guys took active steps to make sure that

20  these folks you were sending these samples to knew that the

21  chemicals were not banned substances; right?   Because that's

22  what you guys were telling them.

23  A.   Yeah.   There was lab reports that came with it and so

24  forth.

25  Q.   Again, the intent being you wanted to make sure your

1  customers knew that these were not banned substances; right?

2  A.   Correct.

3  Q.   Now, this is where I really kind of want to get into

4  some of the nuts and bolts, because I just want to make sure

5  I understand.

6      At some point in late -- is it fair to say that based on

7  your testimony that you gave a little bit ago, that

8  20-kilogram order was the last order that came in while you

9  understood Mr. Bradley to be in China? Is that correct?

10 A.   There might have been, like, one after that, like

11 another 10 or something.

12 Q.   But by July, you guys are already planning to send Dave

13 to China, are you not?

14 A.   Yeah, yeah.  Even before that, we were planning on doing

15 that, I believe.

16 Q.   But by July, I believe -- I believe -- if we could

17 see --

18 A.   We were done in Columbus around May.

19 Q.   Right.

20     Could we potentially see Government 603 again?

21     If we could highlight the paragraph there that is at the

22 bottom?

23 A.   July 16th, yeah.

24 Q.   Again, by July 16, 2012, Mr. Bradley, as you have

25 testified to -- he's no longer in China, and Dave is already

1   there attempting to pick up chemicals; is that right?

2   A.   Correct.

3   Q.   And it's fair to say that your testimony was that after

4   -- after Mr. Bradley comes back from China, you guys aren't

5   supposedly dealing with Bradley anymore after that.

6   A.   Yeah, he goes cold.

7   Q.   Up to a point. I understand you testified there comes a

8   point where he --

9   A.   -- reenters the picture, yeah.

10  Q.   But basically, by July of 2012, you guys are taking

11  steps to get chemicals from sources, either yourself or

12  through other sources; is that fair?

13  A.   That is a true statement, yes.

14  Q.   Now, again, the stuff that comes in -- thank you, Mary;

15  I appreciate it.   That's all I need on that.

16      The stuff that comes in -- the chemicals that come in

17  after that that Dave picks up or has shipped to the United

18  States -- those chemicals come in, and is it fair to say,

19  again, that as soon as those chemicals come in, they're

20  processed, they're packaged, and they're sent back out again?

21  A.   Fairly quickly, yes.

22  Q.   When you say "fairly quickly," are we talking about

23  weeks?

24  A.   Two months.

25  Q.   Two months and it's all gone.  So by September-ish --

1    again, I understand there's some generalization, but by

2    September-ish of 2012, any product Dave had sent back from

3    China is gone.

4    A.    Yeah, I'd say September, October, yeah.  That would be

5    fair.

6    Q.    Okay.  Now, that being said, who was your source post

7    September 2012?  Because by that time, you're not even in

8    Atlanta yet, are you?

9    A.    We're in Atlanta, yeah.  We touched down in Atlanta

10   August, September.

11   Q.    You indicated the whole Atlanta enterprise lasted only

12   two or three months; correct?

13   A.    Yeah.  August, September -- like a little in October.

14   Q.    So your testimony is that Platinum Prophet is done by

15   2013?

16   A.    Correct.

17   Q.    But again, the last shipment Dave brings in comes in --

18   what -- August, September?

19   A.    July.  It would be a week or two after that email.  So

20   it would be like the end of, you know, July, early August.

21   Q.    It would be fair to say that anything that was

22   distributed by you four at that time period would have been

23   basically what Dave sent back from China.  Isn't that fair?

24   A.    Correct.

25   Q.    And any amount of chemicals that came in at that time

1   period, as you say, that were distributed in Atlanta -- those

2   chemicals were gone fairly quickly.

3   A.   As quick as we can move them, yes. Now, there's acts

4   going on, too, at that time against the chemical we were

5   using -- a-PVP -- so we had to, you know, hurry it up as

6   well.

7          THE COURT:  Let's stop here for a recess.  We'll pick

8   up in 20 minutes.

9          (Recess at 3:35 p.m. to 3:50 p.m.)

10         (Jury returned to courtroom.)

11         You may resume.

12  BY MR. NAGY:

13  Q.   Thank you, Your Honor.

14       Mr. Schroeder, I want to go back and pick up with

15  something that I kind of stepped aside with, but I wanted to

16  make sure that I understood.

17       When you testified earlier for Mr. Hoffman, you had

18  indicated -- you had said something about Operation Log Jam.

19  Do you remember talking about Operation Log Jam?

20  A.   Yes, sir.

21  Q.   Okay.  And while you were talking about Operation Log

22  Jam, you had indicated that that was a period of time when

23  you saw some of your customer base being subject of arrests

24  and investigations.  Is that true?

25  A.   Correct.

1    Q.    And you indicated specifically that you received -- you

2    and the others received calls from these people and other

3    customers who had not been confronted by law enforcement; is

4    that correct?

5    A.    Yes, sir.

6    Q.    And I believe you specifically testified that they were

7    asking you things like, "So you're sure that this stuff is

8    legal?"

9         That's accurate; right? That's the kind of stuff they

10   were asking you?

11   A.    They were asking that, yes.

12   Q.    And again, that's because when you guys were selling to

13   them, you were telling them and/or inferring or both that the

14   chemicals that you guys were giving to them were, in fact,

15   legal; right?

16   A.    To the best of my knowledge, yes.

17   Q.    But that's what you were telling them.

18   A.    Legal, yeah.  I mean, you know --

19   Q.    I'm not asking you about whether they were legal or not.

20   I'm asking you:  Is that what you were telling them?

21        MR. HOFFMAN:  Your Honor, I'd just ask that the

22   witness be permitted to answer the question.

23        THE COURT:  He can answer.

24   BY MR. NAGY:

25   Q.    Is that what you were telling them?

1   A.    I can answer?

2         I was telling -- these shops knew they were giving them

3   out for human consumption.  So as soon as you cross that

4   line, you know, the legality is completely gone.

5   Q.    So I go back to my question, which is:  But you guys

6   were telling them these chemicals were legal; right? That's

7   what you were telling them.

8   A.    As long as they weren't used for human consumption,

9   technically, they were legal.

10  Q.    Okay.  I want to come back around to kind of the end of

11  the Platinum Prophet enterprise in 2012.  Again, I believe

12  you testified before we left that Platinum Prophet was pretty

13  much finished by 2013.  Is that true?

14  A.    Platinum Prophet was; correct.

15  Q.    Again, I think you testified what Platinum Prophet was

16  distributing to their customers while you were based in

17  Atlanta was primarily the chemicals that came in from Dave

18  when he made the trip to China; is that correct?

19  A.    Yes, it is.

20  Q.    Okay.  Now let's pick up with 2013, because it's fair to

21  say that even though Platinum Prophet stopped distributing

22  chemicals in 2013, you did not.  Isn't that accurate?

23  A.    Correct.  There was a time I took a little break where I

24  couldn't get anything.

25  Q.    Correct.  In a previous statement, you actually

1   indicated you took a four- to six-month break.  Does that

2   sound about right?

3   A.   That sounds about right, yeah.

4   Q.   You indicate that somewhere in that time frame, you are

5   looking for and reaching out for other sources of chemicals;

6   is that correct?

7   A.   Yes, it is.

8   Q.   And you start -- you start having access to those

9   chemicals -- what -- May, June, 2013? Does that sound about

10  right?

11  A.   Yeah.  I get back in touch with Bonsai's old supplier,

12  who is still moving in research, but he had been cold for a

13  little while.

14  Q.   But to be clear, all this stuff from 2012 -- that stuff

15  is dead, gone, sold.  You don't have any of that in your

16  possession anymore.  That's all been sold; right?  Platinum

17  Prophet got rid of all that in 2012; right?

18  A.   Correct.

19  Q.   So, therefore, anything you distributed yourself in 2013

20  would have come from a different source; right?

21  A.   Correct.

22  Q.   Even if it was coming in Crystal Bubbly packets, you

23  were still using those packets in 2013, weren't you?

24  A.   No, sir.

25  Q.   No.

1   A.   I didn't have access to those.  The only way I could get

2   them is to get them through Dave, and I didn't want Dave to

3   know I was trying to get my own stuff.

4   Q.   So if Chris Kaestner had access to Crystal Bubbly packs

5   in 2013, are you saying you didn't have access to it in

6   summer, June of 2013?

7   A.   In June of 2013, the only way -- I mean, he might have

8   had them left over.

9   Q.   You think he held on to those packets for more than six

10  months? Is that what you're saying?

11  A.   I never met Chris Kaestner.  I never knew too much of

12  him.  From what I knew, he never really sold.  I've testified

13  he always used it for himself, you know.

14       You know, I might have had -- you know, I might have had

15  a couple random sleeves and I threw it in there.

16  Q.   So now you're saying you might have some stuff left over

17  from 2012.  Is that what you're saying now?

18  A.   I might have had a couple empty packets, like, laying

19  around the house, and I put it in there and sealed it up with

20  the hair crimper.

21  Q.   You may have had access to some of the packaging in June

22  of 2013.  Is that fair?

23  A.   10 to 15 packs, maybe.

24  Q.   Okay.  But if he was, say, caught with or was

25  distributing those types of packs in, say, Harrisonburg in

1   2013, that would have been narcotics that came from somebody

2   else, not from the Scholz thing; right?  Because, again, that

3   stuff is already gone

4          MR. HOFFMAN:  Object to speculation unless he was

5   there with Christian Kaestner.

6          THE COURT:  Sustained.

7   BY MR. NAGY:

8   Q.  Yes, sir.

9          But to be clear, the last sales made to anybody --

10         MR. HOFFMAN:  I'll object.  Asked and answered about

11  six times, Your Honor.

12         MR. NAGY:  Judge, I think --

13         THE COURT:  Well, if he's not clear, go ahead.

14  BY MR. NAGY:

15  Q.  The last sales that were made by Platinum Prophet were

16  in 2012; right?

17  A.  Correct.

18  Q.  Okay.  Now --

19  A.  Can I touch base on that a little bit?

20  Q.  Perhaps we will.  Let me continue going with this

21  because we're going to talk about 2013.  As we go through

22  2013, again, you take a break, as you said, and we're going

23  to move into mid 2013.  You have other sources that are

24  providing you with chemicals at this point.  Where are those

25  sources? Where are you getting your chemicals from at this

1    point?

2    A.    I have one source, like, Elijah, from Texas.

3    Q.    He was actually a fairly large source for you during

4    this time period, was he not?

5    A.    He was a fairly large source for Bonsai back in that

6    time but not for me.  I got, I think, half a kilo or

7    something from him.

8    Q.    Okay.  Who else?

9    A.    Everybody else that I tried to get it through -- the

10   packages got seized.  I didn't really -- I wasn't receiving

11   them.  That's what I was running into a little issue with.

12   Q.    Is it fair to say that you were actually trying,

13   repeatedly, to order off of different web pages also during

14   this time period?

15   A.    Yeah, that's what I'm talking about.

16   Q.    Now, during that time period, 2013 to 2014 -- and I'm

17   going to go basically January 1 of '13 all the way through

18   approximately October of '14.

19        You're operating almost completely independently during

20   that time period, are you not?

21   A.    Well, yeah, with the 500 grams I got from Elijah.

22   Q.    Again, you remember telling law enforcement back in 2015

23   that at that time.  You were operating the bath salt

24   distribution alone for most of 2013. You remember saying

25   that; right?

1   A.   I wouldn't call it an operation but --

2   Q.   Well, that's -- do you want to look at your statement? I

3   can show it to you. Will that help refresh your recollection?

4        MR. HOFFMAN:   Your Honor, I'm going to object to the

5   defense counsel's characterization of a statement and reading

6   from something that he claims as the witness's statement when

7   it's not a statement and hasn't been shown as a statement.

8        MR. NAGY:   If it helps refresh his recollection, I

9   can show it to him.  It purports to be his statement.  It

10  came from law enforcement.

11       THE COURT:   The objection is claiming something as a

12  statement that's not a statement.

13       MR. NAGY:   I'll withdraw the question.

14  BY MR. NAGY:

15  Q.   Do you remember using the word "operating" in a prior

16  statement to law enforcement?

17  A.   The word "operating"?  No, I don't really use that word.

18  Q.   So, then, that would have been a word that the agent

19  inserted into his report after you give him a statement.

20       MR. HOFFMAN:   Object to speculation.

21       THE COURT:   Sustained.

22  BY MR. NAGY:

23  Q.   Let's talk about your use of substances throughout your

24  tenure here.   Okay?

25       So when you -- when all of this kind of began back with

1   Bonsai in 2010, what type of substances were you using at

2   that time, legal or illegal, as far as chemicals, drugs,

3   things of that nature?

4   A.   Well, I was on parole, so I wasn't using anything

5   besides -- I tried the K2 and then -- whatever you want to

6   call it -- the Spice.  Then I tried the bath salts a little

7   bit after that, but I was tested every -- randomly.

8   Q.   So it was mostly synthetics during that time period

9   while you were on parole; right?

10  A.   One time, synthetics.  I tried it, and I didn't really

11  like it.  It was a little too intense and paranoia for me.

12  Q.   You were a heavy user of alcohol, however; right?

13  A.   Yes.

14  Q.   That dates all the way back to when you were on parole

15  as well; right?

16  A.   That dates back to when I was 16. I've always had an

17  issue with alcohol.

18  Q.   Okay.  And that issue with alcohol -- that stayed

19  consistent all the way from -- all the way since when -- you

20  stated when you were 16, basically all the way up through the

21  point in time you were ultimately incarcerated on these

22  charges; isn't that right?

23  A.   There were breaks of sobriety.  I went to AA.  Did some

24  rehab.

25  Q.   During the course of the time period that you and Scholz

1  and Buchanan were working together under the Modern Day

2  Prophet banner, were you using any controlled or

3  noncontrolled substances other than alcohol during that time

4  period?

5  A.   Marijuana.  I smoked marijuana like every day at that

6  time.

7  Q.   So that was a frequent occurrence where you were smoking

8  marijuana pretty much as much -- you said on an everyday

9  basis; correct?

10  A.   If I got it, I was smoking it, yeah.

11  Q.   How many times a day?

12  A.   Depends how long the day was.

13  Q.   So it was something you were doing pretty consistent

14  though; correct?

15  A.   Yeah.

16  Q.   Was that true as the -- as you and Scholz and Lister and

17  Purintun migrated over into the Platinum Prophets?

18  A.   Well, we were in Atlanta at that time.  We had a hard

19  time getting marijuana, but if we had it, me and Dave were

20  smoking it.

21  Q.   And what about other controlled substances? I believe

22  you testified previously you used controlled substances in

23  the past.  Were you, in fact, using any of those from time to

24  time during this time period?

25  A.   No, I couldn't get any -- you know -- I didn't have any,

1   you know, hookups, per se.

2   Q.   So it was primarily marijuana, when you could get it,

3   and alcohol.

4   A.   Yeah.

5   Q.   Now, as you progressed into 2014, you testified a couple

6   minutes ago that you were having trouble finding people -- is

7   that right -- finding sources for chemicals?  Is that right?

8   A.   Correct.

9   Q.   And your testimony here today is that you were --

10  what -- not -- how would you characterize your level of

11  participation in distribution of synthetic chemicals in 2014?

12  A.   Small to moderate.  I mean, I dealt -- I had three or

13  four people.

14  Q.   Okay.

15  A.   At the end of 2013 -- to touch back on that -- when we

16  did send out the end of the bulk, we would send empty packets

17  with it.  That's how Chris Kaestner could have had packets

18  laying around.

19  Q.   Now, at some point after all this is over, you become

20  aware that they were tapping your phone; is that right?

21  A.   Well --

22  Q.   You became aware of that at some point after your

23  arrest; right?

24  A.   Yeah.

25  Q.   And you became aware of the fact that that tap was

1    ordered somewhere around, I think, September to October of

2    2014; isn't that right?  Or is it '15?

3    A.   No, in '15 -- it might have been -- I don't know.  I

4    know it was tapped, yeah.

5    Q.   And it was that tap that we were hearing some of the

6    conversations from a little bit ago between you and Dave

7    talking about attempting to get more chemicals again in 2014;

8    isn't that right?

9    A.   Yeah.  So it would be 2014.

10   Q.   I just wanted to clear that up.  So that's during 2014.

11        And again, that was pursuant to a tap that was acquired

12   during that time period.

13   A.   Correct.

14   Q.   September, October 2014. Okay.

15        Now, when you guys -- and by "you guys," I mean you and

16   Dave Scholz -- reach, as you testified to -- you say you

17   reached back out to Mr. Bradley and his wife -- how involved

18   was Purintun and Lister at that time period?

19   A.   They weren't involved at all.

20   Q.   Is it fair to say that at that time that y'all reached

21   back out -- that at that point in time, Lister and Purintun

22   are basically out of the group at this point?

23   A.   Yeah.  They moved on to different.

24   Q.   Okay.  So the folks who are making the decisions

25   about -- and making plans for getting chemicals at this point

1   is primarily you and Dave; right?

2   A.   Yes, sir.

3   Q.   And again, that's -- as you testified to, that is when

4   the two of you reached back out to Mr. Bradley and Ms. Ryba;

5   is that right?

6   A.   Yeah.  That's when Dave reached out.  I didn't have

7   any -- I never had any contact information with either of the

8   two.

9   Q.   But he reached out pursuant to an agreement that you and

10  he had together; right?

11  A.   That's correct.

12  Q.   You talked about it and said, "This is a good idea,"

13  right, because your sources were all dried up at that time.

14  You didn't have anybody else, according to what you testified

15  a minute ago.

16  A.   That's correct, sir.

17  Q.   So you reach back out, and Dave tells you it might be

18  possible; right? Let me rephrase my question.  I'm sorry.

19       Dave tells you it might be possible to obtain some more

20  chemicals; is that right?

21  A.   We went and saw Jason, and he was the one that was

22  making that decision, yes.

23  Q.   Okay.

24       Judge, if I could have one moment?

25       When you reached back out, the intent that you guys had,

1   once again, was to obtain nonscheduled chemicals; is that

2   correct?

3   A.    To do our best, yeah.  I mean, at the time, I wasn't

4   keeping up with things.  I didn't know the legality of a lot

5   of the things that were going on.

6   Q.    Okay.

7   A.    But what I knew -- I had one lady who wanted a big order

8   and, you know, that's where we were ordering the a-PVP for.

9   Q.    Let's talk about that because that is, in fact -- you

10  had testified previously for Mr. Hoffman that the order was

11  for a-PVP.  Do you remember testifying to that?

12  A.    A-PVP, yes.

13  Q.    Do you remember giving a previous statement to law

14  enforcement in 2015 where you told them that the list

15  included alpha-PHP -- a-PHP? Do you remember that?

16  A.    A-PHP, I tried to order from one of the online people.

17  That was one of the packages I had sent to Kaestner.

18  Q.    Do you remember --

19  A.    That's one of the packages I had sent to Kaestner, I

20  believe -- the a-PHP.

21  Q.    So there were five -- you guys allegedly sent a list to

22  Bradley with five chemicals on it; is that right?  Five types

23  of synthetics; right?

24  A.    On the 2015 order?

25  Q.    Yep.

1   A.   Yeah.  I inquired about a couple other ones, yeah.

2   Q.   And again, one of those was alpha-PHP, which is what you

3   believe you ordered; right?

4        MR. HOFFMAN:  Your Honor, I'm going to object to

5   mischaracterizing his testimony.

6   BY MR. NAGY:

7   Q.   I'm sorry.

8        Do you recall telling the officer that?  That you

9   believe you ordered alpha-PHP, back in 2015 during your

10  proffer?  Do you remember that?

11  A.   Might have been I misunderstood the time frame, but I

12  remember ordering a-PHP from an online supplier.

13  Q.   Do you remember telling law enforcement that you did not

14  believe that the bath salts was a-PVP, because that was

15  illegal and Bradley was smart?  He would not send something

16  like that that might get looked at?  Do you remember telling

17  law enforcement something like that back in 2015?

18  A.   He is a smart guy.  I mean, I don't think he would have

19  dealed in anything that was illegal.

20  Q.   That's why you told law enforcement you did not believe

21  that that shipment was alpha-PVP?

22  A.   I mean, again -- I mean, you touched on this.  I'm not a

23  chemist.  How am I supposed to know?

24  Q.   Are you trying to say you don't know exactly what it was

25  you guys got in that shipment? Is that what you're trying to

1   tell me?

2   A.    I saw the lab reports back from the government, and it

3   said a-PVP, so that's what I believed.

4   Q.    Let's back up.  I'm not asking what you saw from the

5   government later.  I understand the government gave you

6   information later.  I'm talking about right there in the

7   moment.  You just got a shipment in in 2015.  You don't even

8   know what's in that shipment, do you? You didn't have it

9   tested.

10  A.    I didn't have it tested, no.

11  Q.    So you have no idea what chemical is actually in that

12  stuff that you received and packed in 2015 at that time, did

13  you?

14  A.    It said a-PVP on the bag when it came.  That's the only

15  thing I can attest to.

16  Q.    Why did you tell the government in 2015 that you did not

17  believe it was a-PVP?  Why did you tell them that?

18  A.    I thought maybe he put it on there just to make us happy

19  and say it was what it was.

20  Q.    Your testimony is maybe he listed a scheduled chemical

21  on the bag and sent it to you? That's what your testimony is?

22  A.    I didn't know it was scheduled.

23  Q.    And your statement, in 2015, again -- do you remember

24  telling law enforcement that, again, it was illegal, and

25  that's why Bradley wouldn't have done it? Isn't that what you

1   told law enforcement in 2015?

2   A.   I mean, the man's smart.  I don't know, you know -- I

3   can't hop in Bradley's brain and tell you what he's doing and

4   not doing.

5   Q.   Let me ask it this way. You don't dispute you told law

6   enforcement something like that back in 2015; right?

7   A.   I could have.  I mean, they questioned me many times.  I

8   don't know, you know.

9   Q.   Let's go back.

10  A.   Those might not be my specific words.  Those could be

11  their words interpreting what my words are saying.

12  Q.   Let's go back for a second.  Correct me if I'm wrong,

13  but at that time, in 2015, you were not under arrest; right?

14  You weren't in custody -- let me back up.  You weren't in

15  custody at that point, were you, when you gave that

16  particular statement?

17  A.   No.

18  Q.   No.  And you weren't placed in custody until several

19  months later; is that correct?

20  A.   Correct.

21  Q.   And I guess this is as good a time as any to get into

22  the next issue that I want to talk to you about, which is --

23  let's talk about your plea agreement.

24       Mary, would it be possible, please, to see Government

25  No. 28?

1        If we could go to -- actually, let's stay on page 1.

2        Mary, if you could be kind enough to highlight the lower

3   third of the page.

4        Now, let's talk a little bit about your plea agreement.

5   You have pled guilty to two counts; is that correct?

6   A.   Yes.

7   Q.   And let's talk about Count 1.  Count 1 carries a period

8   of incarceration of up to 20 years; is that right?

9   A.   Yes, that's what it says.

10  Q.   So you pled guilty to a charge.  As Mr. Hoffman pointed

11  out, you still have to go to sentencing in front of the judge

12  after all of this is over, don't you?

13  A.   Yes.

14  Q.   Okay.

15       If you would, Mary, be kind enough to go to page 2 and

16  highlight the -- yes.

17       You pled guilty to a second offense that also carries a

18  potential punishment of up to 20 years; isn't that correct?

19  A.   Correct.

20  Q.   Overall, on both charges you pled guilty to, you run the

21  risk of getting up to 40 years in federal penitentiary based

22  on your pleadings of guilty; isn't that right?

23  A.   Yes.

24  Q.   Thank you, Mary.

25       If you would be kind enough to pull up page 4, paragraph

3.

Now, you talked about this in your -- you talked about
this in your conversations with Mr. Hoffman, but this 5K.1
motion -- you understand that that is a motion that's filed
by the government attorneys; right?

A.    Yes.

Q.    They have to file it.  That can't come from anyone else;
right?

A.    I believe so.  I don't know too much about it.

Q.    But you know that what it does do is that if the
government were to file that, it would essentially be a very
strong recommendation to the judge to take your cooperation,
as they characterize it, into consideration; correct?

A.    That's what I've been told.

Q.    And the hope you have here, as I'm pretty confident you
testified to, is that you would like for the judge to give
you a sentence at the end of the day that is below what you
would potentially normally be looking at in your
circumstances.  Is that a fair statement?

A.    Yes, that's fair.

Q.    Okay.

Now, let's talk about that a little bit.

Mary, if you would be kind enough to flip back to page
three, and I'm looking at basically the last half of the
page, starting with "Sentencing Guidelines."

1        Now, let's talk about sentencing guidelines.  There are

2    no stipulations in your plea agreement regarding the weight

3    or the volume of chemicals that you were moving.  Isn't that

4    correct?

5    A.   Not in there.

6    Q.   Okay.  And is it your understanding that your guidelines

7    when they are calculated are ultimately going to be heavily

8    driven by the volume or the weight of chemicals that you were

9    responsible for throughout the course of your participation

10   in all of this? Is that right?

11   A.   Could you rephrase that? I'm sorry.

12   Q.   Basically, the more chemicals that you are responsible

13   for moving, the higher your sentencing guidelines are going

14   to be.  Isn't that right?

15   A.   My attorney had informed me that anything above -- I

16   believe it was 5 kilos -- went all the way up to 50.

17        MR. HOFFMAN:  Your Honor, I don't want to get too far

18   into communications between him and his attorney.

19        MR. HOFFMAN:  It wasn't my intention to ask about

20   those conversations.

21        THE COURT:  Okay.  He volunteered.

22   BY MR. NAGY:

23   Q.   I'm just asking about your understanding, and I'm not

24   inquiring about anything in your conversations with your

25   attorney.

1        Again, your understanding is that the recommended

2   levels, based on the weight or the volume of chemicals that

3   you're moving, are very high in your case, are they not?

4        MR. HOFFMAN:  I'm going to object as to a vague

5   characterization of "very high."

6        THE COURT:  Like, substantially high?

7        MR. HOFFMAN:  Touché, Your Honor.

8        THE COURT:  Go ahead.  The question is okay.

9   BY MR. NAGY:

10  Q.   Let's just cut to the chase.

11       Your guidelines calculations, depending on how they run,

12  can run upwards of well over 20 years, can't they? You've

13  seen those numbers, haven't you?

14  A.   I have not seen those numbers, no.

15  Q.   You have not been shown anything where the numbers are

16  up that high?

17  A.   No.

18  Q.   If I could just have one second.

19       (Defense counsel conferred.)

20  Q.   You've seen numbers upwards of 15, though, haven't you?

21  A.   I've seen -- if I took it to trial and lost, my lawyer

22  sent me a thing saying 15 to 18.

23  Q.   And as you participate in this particular proceeding,

24  again, your hope is that the judge sentences you to numbers

25  that are lower than what your recommended numbers would be by

1   virtue of your cooperation with the government; correct?

2   A.   Not only that, sir, but just being straight honest from

3   the get-go, pleading guilty, not playing any games with the

4   government -- "Just put it all on the table" is what I've

5   been told.

6   Q.   Okay.  Okay.

7        Now, with regard to the substantial assistance motion

8   that we talked about just a couple minutes ago -- running

9   back to that again, ultimately, whose decision -- let me

10  strike that.

11       Ultimately, it's the government that you have to satisfy

12  in order for the government to file that 5K motion, is it

13  not?

14  A.   I suppose so, yes.

15  Q.   So with regard to -- let's talk about that.  We said a

16  few minutes ago that you made several different statements

17  under proffer to law enforcement; right?

18  A.   Several different times, not several different

19  statements.

20  Q.   This goes back to what I was originally asking you about

21  as to this idea of whether or not you actually knew there was

22  alpha-PVP in the packets that you received in 2015, and

23  you're saying that you knew there was alpha-PVP.  That's your

24  statement today; right?

25  A.   That's my statement.  I mean, I really -- it was never

1  brought to my attention it was ever tested.  It was, you

2  know -- it was kind of, you know --

3  Q.  Well, you're saying it was on the package when

4  it arrived; right?

5  A.  Yeah, it was on the package, but just because it quacks

6  and walks like a duck doesn't mean it's a duck.

7  Q.  Did you tell law enforcement that back in 2015?

8  A.  No.

9  Q.  But you're telling it today after you signed a plea

10  agreement; right?

11  A.  I was never asked was it tested by a laboratory or

12  anything.

13  Q.  But that's what you're saying today after you signed a

14  plea agreement; right?

15  A.  I'm saying that I don't know if it was, you know.

16          THE COURT:  What did you order, and what did you pay

17  for?

18          THE WITNESS:  What we ordered was a-PVP.  What we

19  got -- I can't attest to what exactly it was because, you

20  know, there's a laboratory that you would send the stuff out

21  to to have it tested, and we never sent that.  We had on

22  previous orders, but we also had it tested for things that

23  weren't in the -- things that they were looking for was not

24  in there.  The illegal substances were not part of the

25  laboratory results.

1  BY MR. NAGY:

2  Q.   Let's go into that because, again, this 2015 proffer --

3  I'm sorry.  This 2015 shipment that came in -- you indicate

4  that there was -- that about 1200 grams of that was this bunk

5  you described earlier; right? It was junk you couldn't use?

6  A.   Yeah.  More than that, I thought.

7  Q.   Again, do you remember telling law enforcement about

8  1200 grams, back in 2015?

9  A.   Yeah.  I thought it was more like 1800, 2200.

10  Q.   Maybe this will help.  Do you recall telling them there

11  was another 400 grams along with that that wasn't bunk? Do

12  you remember that?

13  A.   Yeah.

14  Q.   Would that be closer to the 18 you were just

15  referencing?

16  A.   18 and 22 would be the 2.2.  So I was missing 2.8.

17  Q.   Do you recall telling law enforcement that that

18  400 grams -- that you believed that it was alpha-PHP? Do you

19  remember telling law enforcement that in 2015?

20  A.   No, I never --

21  Q.   If I showed you your statement from 2015, would that

22  help refresh your recollection?

23       MR. HOFFMAN:  Your Honor, once again, I'm going to

24  object to the characterization. It's not his statement.

25       THE COURT:  We've gone through this.  Do you have a

1   written statement by him?

2          MR. NAGY:  Your Honor --

3          THE COURT:  I know what -- I think I know -- and we

4   go through this drill all the time.  You can ask him if he

5   said it, and that's all.  If he didn't, call in the person

6   that you say he said it to.

7          MR. NAGY:  Yes, sir.

8          THE COURT:  If he admits he said it, that's it.

9          MR. NAGY:  Yes, sir.

10         THE COURT:  I mean, you have the notes of somebody

11  else's conversation with him.  He didn't sign it; is that

12  right?

13         MR. NAGY:  I have the proffer that was prepared based

14  on the statement that he purportedly gave to law enforcement

15  in 2015.  Yes, sir.

16         THE COURT:  Is that his statement? I don't know.  I

17  thought you had the FBI thing.  What is --

18         MR. HOFFMAN:  Your Honor, I'm not sure what document

19  he's referring to.

20         THE COURT:  He said it was a proffer.

21         MR. HOFFMAN:  It sounds like it's proffer notes taken

22  by law enforcement during an interview.  Not the defendant's

23  statement.  Not signed or adopted by the defendant.

24         MR. NAGY:  I'll call the officer later if I need to.

25         THE COURT:  Go ahead.

1          MR. NAGY:  Yes, sir.

2     BY MR. NAGY:

3     Q.   Now --

4          THE COURT:  You can ask him, "Did you say that?"  If

5     he says "Yes," that's the end of it.  If he says "No," then

6     you can prove it.

7          Let's not go through that again.  We go through it

8     every trial -- not with you, but every trial I get, we go

9     through this, and it's not the way to do it.

10         Let's go.

11         MR. NAGY:  Yes, sir.

12    BY MR. NAGY:

13    Q.   Now, is it also true that in 2015, right around this

14    same time that you got this shipment in from Scholz -- that

15    you also placed a separate order from a Ting Tingy; is that

16    right?

17    A.   I was trying to get something that was seized by

18    customs.  Ting Tingy -- they had sent something.  It was,

19    from my knowledge, seized by customs -- is what they told me

20    through email.  What I was trying to do was still to get that

21    back at the same time they told me they were going to

22    reimburse me.

23    Q.   And the order that you placed in -- at that time was for

24    100 grams.  Does that sound about right?

25    A.   I can't recall, but maybe that's what he was going to

1   send me in place of it to make my money back on.

2        The reason I used to order so much was because it came

3   at a cheaper price and would incentive you to buy more.

4   Q.   Let me ask it this way.  Do you recall whether or not

5   you made an order for approximately 100 grams from Ting Tingy

6   in approximately 2015?  Do you recall that?

7   A.   I thought it was for more than that.

8   Q.   So it was for at least 100 grams?

9   A.   Yeah.  I wouldn't order just a hundred grams.

10  Q.   And you recall, do you not, that that order was for

11  100 grams of alpha-PHP; right?

12  A.   Yeah, depending on -- I don't know if you have our

13  emails, but there would be going back and forth.  I was,

14  again, trying to stay within the legality, and they would

15  also say, "We don't make that no more.  We don't ship that to

16  the U.S."  If it was technically scheduled in the U.S., a lot

17  of those people in China would say, "We won't ship that to

18  the U.S.  You have to order something else.  But we have

19  this, and this is similar to it, and people say it's most

20  like it."

21  Q.   But again, just to make sure I'm clear about this -- so

22  when you're ordering from Ting Tingy, you're trying to stay

23  on the right side of the law by ordering alpha-PHP? That's

24  what you're saying?

25  A.   That's a fair statement.

1   Q.    And that's in 2015.

2   A.    Yes.

3   Q.    Mr. Hoffman, at some point, also referenced that you had

4   signed something called a "Statement of Facts."  Do you

5   recall signing a Statement of Facts along with your plea

6   agreement, back in May of 2016?

7   A.    Yes.

8   Q.    And in that Statement of Facts -- first of all, what is

9   your understanding of what the Statement of Facts is?  What

10  is it?

11  A.    That's a statement I'm signing to -- admitting to what

12  I've done and what I've co-conspired in.

13  Q.    Fair enough.

14      I want to go back now and bring this all back around to

15  my client. You identified my client, Ms. Taylor, earlier as

16  somebody you had provided chemicals to; is that correct?

17  A.    Yes.

18  Q.    Now I want to go back.  During the planning and

19  execution phases of your little enterprise with Scholz and

20  Buchanan under Modern Day Prophet, Nayna Taylor did not

21  participate in any of the planning to obtain the chemicals,

22  did she?

23  A.    No, she did not.

24  Q.    She did not take part in any profit-sharing.  Namely,

25  she wasn't sharing profits with you guys, was she?

1  A.    No.  She was making more money than us.

2  Q.    Now -- and that's based on your -- what?  Your belief?

3  A.    No, she told me she was selling it for $50 a packet in

4  there.

5  Q.    Now, with regard to the other things that she was not

6  doing, she was not making business decisions for Modern Day

7  Prophet, was she?

8  A.    No.

9  Q.    She was not talking to you guys on the phone about how

10 to obtain more chemicals from China, was she?

11 A.    No.

12 Q.    She didn't take part in any of that, did she?

13 A.    No, she did not.

14 Q.    She's not on any of the paperwork for Modern Day

15 Prophet?

16 A.    She's a nice lady.

17 Q.    She's not on any of the paperwork for Platinum Prophet?

18 A.    (Indicating no.)

19 Q.    For the record -- let the record show he shook his head

20 no.  Thank you.

21 A.    Yeah -- no.

22 Q.    Coming back around to that, do you recall how many

23 times -- actually, who prepared the Statement of Facts that

24 you talked about a little bit ago.  Who drafted that

25 document? Did you do that?

1    A.    I believe Grayson drafted that.

2    Q.    Mr. Hoffman.  Somebody from the United States Attorney's

3    Office drafted it; right?  And you indicated a minute ago

4    that that document laid out the nature of your

5    co-conspirators; is that right?

6    A.    Correct.

7    Q.    How many times is Nayna Taylor referenced in that

8    document?

9    A.    (No response.)

10   Q.    Is the answer zero?

11   A.    She was in the first one, but I didn't want her in the

12   second one.

13   Q.    So she's not in the signed Statement of Facts that was

14   tendered to the Court, is she?

15   A.    Could I see it again?

16   Q.    Would that help refresh your recollection?

17   A.    Yeah.

18        MR. NAGY:  I'm going to use the document.  If this

19   can be displayed only to the witness, please?

20        THE CLERK:  One second.

21   BY MR. NAGY:

22   Q.    I'm going to let you review each page.  When you're

23   done -- because it's a three-page document, when you're done

24   reviewing each page, let me know and I'll switch pages.

25        THE COURT:  What is the point of this? How many times

1    he mentioned her?

2            MR. NAGY:  Correct.

3            THE COURT:  Why don't you tell us? We don't need to

4    go through this exercise.

5            MR. NAGY:  I asked him the question, and he at first

6    indicated the answer was zero, but then he said he wasn't

7    sure and wanted to see the document.  I was just doing what

8    the witness asked.

9            THE COURT:  Have you counted them?

10           MR. NAGY:  Judge, she's not referenced.

11           THE COURT:  Not what?

12           MR. NAGY:  She's not referenced in the Statement of

13   Facts.

14           THE COURT:  Then we don't need to go read it.  We'll

15   take your word for it.

16           MR. NAGY:  Is there a stipulation from the government

17   she's not in the Statement of Facts signed by Mr. Schroeder?

18           THE COURT:  Do you agree to that?

19           MR. HOFFMAN:  That her name isn't mentioned in the

20   Statement of Facts?

21           THE COURT:  Right.

22           MR. HOFFMAN:  I think so.

23           THE COURT:  What you're trying to do -- it takes so

24   much time to read and not find something.

25           MR. HOFFMAN:  Your Honor, I agree with the Court.

1          THE COURT:  You agree with me, but I haven't read the

2     Statement of Facts.  He pled guilty to Judge Urbanski.

3          MR. NAGY:  Judge, I'll --

4          THE COURT:  Ladies and gentlemen, I think these are

5     going to be in evidence.  I think I'm --

6          MR. NAGY:  I'm not going to seek to admit them --

7          THE COURT:  I'm going to take the lawyer's word that

8     her name is not in the Statement of Facts.

9          Let's go.

10          MR. NAGY:  Thank you, Your Honor.

11          If I can have one moment to ask cocounsel a question?

12          (Defense counsel conferred.)

13          Your Honor, I do not have any more questions for the

14     witness.

15          THE COURT:  Thank you.

16          Any questions from you, Mr. Parker?

17          MR. PARKER:  No questions, Your Honor.

18          THE COURT:  You're not going to --

19          Mr. Cook?

20                    CROSS-EXAMINATION

21     BY MR. COOK:

22     Q.   Good afternoon.

23     A.   Good afternoon.

24     Q.   I believe you indicated that you were arrested in

25     October of 2015 on the charges you're about to be sentenced

1    on; is that correct?

2    A.    Correct.

3    Q.    And in October of 2015, shortly after your arrest, you

4    sat down and spoke with the prosecutor and some police

5    officers in this case; is that right?

6    A.    Correct.

7    Q.    In fact, you sat down over, I think, parts of three

8    different days within a week or two and had an extended

9    period of time to lay out your story for these individuals;

10   is that right?

11   A.    Yeah.  There was a lot of -- a long time period to fill

12   in.

13   Q.    So you took -- they allowed you to take your time and

14   you told the story as you best recalled it at that point;

15   correct?

16   A.    Yeah.  And they would ask questions in between, yeah.

17   Q.    Sure.  At that point, you were not locked up in jail;

18   correct?

19   A.    Correct.

20   Q.    After that series of meetings, you returned home to

21   Illinois; is that right?

22   A.    Correct.

23   Q.    And after you returned home to Illinois, you spoke with

24   Ryan Buchanan.  Do you remember that?

25         MR. HOFFMAN:  Your Honor, I'm going to object.  This

1    far exceeds the scope of his direct examination.

2            THE COURT:  I don't know.

3            Go ahead at this point.

4    BY MR. COOK:

5    Q.   You spoke with Ryan Buchanan.  Do you remember that?

6    A.   Yeah.  He had came by a couple times, yeah.

7    Q.   He was a little worried what you might say about him; is

8    that right?

9            MR. HOFFMAN:  I'll object to hearsay as well, Your

10   Honor.

11           THE COURT:  Overruled.

12           Go ahead.

13           THE WITNESS:  I can answer?

14   BY MR. COOK:

15   Q.   Yes, sir.

16   A.   I'm sure he was.  I don't know his exact feelings, you

17   know, but he was very questionable in his nature.

18   Q.   Do you recall telling him that you thought what they

19   wanted was Bradley?

20   A.   Yeah.

21   Q.   Do you recall telling him:  "It looks like a lot is

22   about Bradley"?

23   A.   I could have told them that.

24   Q.   Do you remember telling him:  "They want me to go after

25   Bradley"?

1    A.    That's what I was told from my lawyer.

2    Q.    So then, two months later in December, you came back to

3    Virginia and spent another day or two -- I think a day and

4    then another day on the phone with law enforcement; is that

5    right?

6    A.    That sounds about right, yes.

7    Q.    And you -- and they continued to ask you questions about

8    your statements; is that right?

9    A.    They asked me specifically about banking deposits on the

10   phone call, and the day before that, they had asked me to go

11   into more of the nature about different events and go deeper

12   into them.

13   Q.    But you knew at that point that what they wanted was

14   Jason Bradley; is that right?

15   A.    No.  I thought they wanted all of us at that point.

16   Q.    Okay.

17         Did you ever tell your mother on the phone that you had

18   to pawn your ringleader status off onto Bradley?

19   A.    I never said that I have to.  I said that's what they

20   want me to do.

21   Q.    Your impression was at that point you were being painted

22   as the ring leader of this operation; is that right?

23   A.    That -- I would say so, but they knew about Bradley way

24   before I talked.  When I went to court on -- in Virginia, my

25   first time in Virginia, they said, "We want to know about

1    Bradley, Buchanan, Purintun and Lister and Ryba."

2    Q.   But it was your understanding that if -- it was your

3    understanding that you were going to be painted as the

4    ringleader unless you could pass that on to somebody else; is

5    that right?

6    A.   I mean, it's obvious where this stuff was coming from.

7    I wouldn't say I would be painted as the ringleader, no.

8    Obviously, there was financial documents going from us three

9    to one:  Mr. Jason Bradley.

10   Q.   Do you remember telling your mother:  "They're going to

11   get Nick, Ryan and Brian to say I was the ringleader and I

12   have to pawn my ringleader status onto Bradley"?

13   A.   I remember -- maybe you're listening to it wrong.  What

14   they're going to do is if I plead not guilty, they're going

15   to get those three to testify against me, and what they want

16   me -- the government -- to do is to testify against Jason.

17   Q.   Like you're doing today.

18   A.   Correct.

19   Q.   Okay.  I believe your testimony earlier was that you

20   think your sentencing guidelines are somewhere in the

21   neighborhood of 15 to 18 years if you'd gone to trial?

22   A.   Yeah, that's what I was told.

23   Q.   And you understand that the sentencing guidelines are

24   just a recommendation.  The judge can go higher or lower than

25   that; right?

1   A.    I've been informed that, yeah.

2   Q.    And you're hoping that by testifying against Jason

3   Bradley that the judge -- that the prosecutor will ask the

4   judge to go lower than that; right?

5   A.    I would hope for my truthfulness and the overall case,

6   not just my testimony.

7   Q.    What number are you hoping for?

8   A.    I don't really have anything in mind.  I just want to

9   get on with my life.

10  Q.    I believe you testified that whenever you were arrested

11  in October of 2015, you had quite a few illegal drugs in your

12  house; right?

13  A.    Some Xanax, some Vicodin.  Prescription drugs, mostly.

14  A lot of -- I had seen the DEA outside the house.  I assumed

15  they were the DEA, and I did all the drugs.

16  Q.    You used them all really fast?

17  A.    Correct.

18  Q.    You weren't charged with possessing any of those items;

19  correct?

20  A.    I had some marijuana.

21  Q.    They didn't charge you with that when you were arrested?

22  A.    No.  The DEA usually doesn't charge you with marijuana

23  unless it's hundreds of pounds.  But no.

24  Q.    Because you agreed to meet with the government right

25  away, they even recommended that you be released on bond;

1   correct?

2   A.   Those are your words, not mine.

3   Q.   Did they recommend you be released on bond?

4   A.   I don't recall that.

5   Q.   You were released on bond; correct?

6   A.   I was released on bond, but I thought that was from, you

7   know, the judge being lenient.

8   Q.   You were actually brought back into court in December of

9   2015 on an alleged bond violation; is that right?

10  A.   Yes, sir.

11  Q.   That had to do with excessive use of alcohol; is that

12  right?

13  A.   Yeah.  I got drunk and passed out.

14  Q.   And possession of drugs; right?

15  A.   No possession of drugs.

16  Q.   Marijuana?

17  A.   No, sir.

18  Q.   Okay.

19  A.   Didn't smoke pot at that time.  I passed all my drug

20  tests.

21  Q.   But at that bond violation hearing in December, you

22  weren't violated and you continued to be on bond; right?

23  A.   I was on an ankle bracelet.

24  Q.   They put you on an ankle bracelet?

25  A.   Correct.

1    Q.    The one you ultimately cut off?

2    A.    The one, yeah, that I ultimately cut off.

3    Q.    Is it your understanding you got that second -- or that

4    third chance because you were cooperating with the

5    government?

6    A.    No.  I really didn't think -- I mean, it was in traffic

7    court.  There was no means to violate a pretrial.  I didn't

8    even understand why I was on pretrial because -- what

9    happened to being presumed innocent until found guilty?

10   Q.    Something you testified to, I think, near the end of

11   your direct examination.  In 2015, here toward the end,

12   whenever you were possessing what you called Dave's Bradley

13   phone or his burner phone, that's the first time you had

14   texted or talked on the phone with Jason Bradley; is that

15   right?

16   A.    Yes.

17   Q.    That's because the contact of the Prophets, Modern Day

18   Prophets, was always Dave Scholz; right?

19   A.    Yeah.  And Dave was busy at that time.

20   Q.    But until that time, any contact between Deb and the

21   Prophets was through Dave Scholz; right?

22   A.    No.  The emails would come to my email, so I'd sometimes

23   see them and show them to Dave.

24   Q.    So there were emails, and I believe you testified to

25   several face-to-face meetings, but primarily, it was through

1  Dave Scholz; right?

2  A.   Yeah.

3  Q.   So for example, whenever you testified that Jason wanted

4  Dave to drop off cash to a man in Indiana, that's information

5  that you heard from Dave Scholz; correct?

6  A.   That's correct.

7  Q.   You didn't hear that from Jason Bradley; correct?

8  A.   Never heard that from Mr. Bradley, no.

9  Q.   So you would sometimes pass your cash contribution to

10  Dave Scholz, and he would take it to the man in Indiana?

11  A.   Yeah.  And times, he would come back with other

12  supplements, which I was never asked about.  I don't know if

13  it's relevant or not, but he would come back with Xanax all

14  in the same Mylar packaging -- not with the Crystal Bubbly

15  but the silver ones we got from Jason.  He'd also come back

16  with steroids.

17  Q.   But you trusted Dave to deliver the money; right?

18  A.   Yeah.  I mean, I trusted him with a lot more than that.

19  Q.   So 2014 -- back in 2011, 2012, this idea that the phones

20  had to be hidden or put away or whatever -- that's what Dave

21  told you; right?

22  A.   Well, yeah.  That's what Dave was comfortable with.

23  Q.   Okay.

24       You testified that Jason Bradley bought -- bought this

25  Bradley phone for Dave; is that right?

1    A.    That's what I was told, sir.

2    Q.    That's what you were told by Dave; right?

3    A.    Yes.

4    Q.    Now, you testified that on a couple of occasions, these

5    Mylar bags came, you believe, from Deb or from Jason.  Were

6    there any other places these Mylar bags came from, to your

7    knowledge?

8    A.    Early in the beginning, before we established, you know,

9    the Crystal Bubbly package, we had bought some from a local

10   supplier.  Ryan had took care of that.  He had found them

11   online somewhere.  But this is, like, still while we're

12   operating with the first, second kilo.

13        First, we'd buy jars.  The jars were so expensive, we

14   went on to buy, like, little Mylar silver packs.  Yes, we did

15   have other places to get them.

16   Q.    And it's true, isn't it, that there were other people

17   who printed up these Crystal Bubbly hookah cleaner packets as

18   well; correct?

19   A.    Of my knowledge, we had the only dye of it, but I'm

20   sure -- later on, the government introduced 2012 packets,

21   which I had never even seen before.

22   Q.    And have you seen two different packagings even of the

23   2011?  One where there's only one weight listed and one where

24   there's two weights listed?

25   A.    Yeah.  Those are the first original 5,000 we got.  It

1    took too much time to mark each one, so we got rid of that.

2    It would wipe off, and we wouldn't know which one was which,

3    but it was 500 milligrams and a thousand milligrams.  Yes,

4    you're right.

5    Q.    All right.  You testified to a meeting at Bono's.  Do

6    you know the date on that?

7    A.    It would have to be -- I mean, this is 2011, so it was

8    six years ago, but sometime in the spring or summer.

9    Q.    May or June?

10   A.    April or May.

11   Q.    2011.  You testified it was, I believe, a week or so

12   later that you placed an order, and a couple weeks later, it

13   arrived; correct?

14   A.    Yeah.

15   Q.    And this is the shipment that you said was MDPV;

16   correct?

17   A.    That's what I was -- believed so, yeah.

18   Q.    As far as you know, it was MDPV; right? You don't know

19   that for sure because you didn't have it tested?

20   A.    No.  It had the same effect as the MDPV from Bonsai, if

21   not stronger.

22   Q.    You testified, I believe, it was a white powder; isn't

23   that right?

24   A.    It was an off-white, yeah.

25   Q.    And that's the one you were filling up the jars.

1   A.    Correct.

2   Q.    It was right around in that general area that you

3   actually formed the Modern Day Prophet, LLC; is that right?

4   A.    I think that was in May or June, but it's --

5   Q.    2011?

6   A.    Yeah.  I mean, that's a long time ago.  I can't be

7   specific on everything.  But to the best of my knowledge.

8   Q.    You all registered the company in Nevada; is that right?

9   A.    Correct.

10  Q.    And that's because of your belief that it would have a

11  good tax effect; correct?

12  A.    Well, that and the legality in Nevada was -- our main

13  reason was because Bonsai was, you know, doing business out

14  there.  So I kind of followed their whole business imprint.

15  And not only that but I told the guys -- the reason they

16  moved out there was because of that and because there's no

17  income tax.

18  Q.    You actually consulted with a tax attorney named Michael

19  Bazonka; correct?

20  A.    Yeah.  That was Buchanan's guy.

21  Q.    Did you hire a payroll company to write paychecks and do

22  W-2s?

23  A.    Yeah.

24  Q.    When you sent out shipments and so forth, you provided

25  receipts and invoices; correct?

1  A.   Yeah, most of the time.

2  Q.   You had business cards?

3  A.   Yeah.  I believe we did, yeah.

4  Q.   You had a brochure with your products listed on it?

5  A.   Yeah.

6  Q.   You advertised on craigslist?

7  A.   Yes.

8  Q.   Dave even checked with an attorney to see if what you

9  were doing was legal; right?

10        MR. HOFFMAN:  I'll object, Your Honor.  That's

11  hearsay.

12        MR. COOK:  Judge, that would be a statement in

13  furtherance of the conspiracy.

14        THE COURT:  Sustained -- I'm sorry -- overruled.

15        MR. COOK:  Thank you.

16  BY MR. COOK:

17  Q.   Dave even checked with an attorney to see if what y'all

18  were doing was illegal; correct?

19        MR. HOFFMAN:  Your Honor, you just sustained the

20  objection; correct?

21        THE COURT:  I overruled it.  Changed my mind.

22        THE WITNESS:  I can answer that?

23  BY MR. COOK:

24  Q.   Yes.

25  A.   Yeah, we went to Mike Monaco's office.

1   Q.   And he's a lawyer?

2   A.   Yeah, he's a lawyer in Chicago.

3   Q.   You went with him?

4   A.   I was with him, yeah.

5   Q.   And the discussion was whether you were allowed to sell

6   MDPV; correct?

7   A.   Just overall, he had checked in with some people.  Dave

8   somehow -- his mom went to school with him or something.  So

9   he didn't charge us or nothing.  We went there and told him

10  the whole spiel of what we did and --

11       MR. HOFFMAN:  Your Honor, I'm sorry to interject

12  again, but there's a court order, pretrial court order,

13  directly on this issue.  I believe if the Court is

14  considering going further, we should discuss that court order

15  with the Court.

16       THE COURT:  Let's recess until tomorrow morning at

17  9:30, and we'll stay in the courtroom.

18       (Jury left courtroom.  Proceedings continued as

19  follows:)

20       MR. HOFFMAN:  If I may, Your Honor, this is the

21  Court's pretrial order, page 8.  The order is --

22       MR. COOK:  The document number on that?

23       MR. HOFFMAN:  The order is dated 6/13/17.  The docket

24  is 419.

25       Reading on page 8, it says:  "The defendants are not

1    permitted to argue that they did not know their conduct was

2    illegal, and the Court orders that if the defendants plan to

3    present any evidence about privileged conversations as part

4    of an advice of counsel defense, they must provide the

5    government with the names of any such attorneys on or about

6    June 14, 2017."

7           The government never received any notice by this date

8    or any date that there was going to be conversations with

9    lawyers.  So in the spirit of this order, we assumed this was

10   not going to come up.  Otherwise, we would have gone and

11   potentially investigated this further in compliance with the

12   court order.

13          THE COURT:  What do you say about the order?

14          MR. COOK:  Of course, the advice of counsel defense

15   would be if my client went to a lawyer and received advice.

16          THE COURT:  You signed -- well.

17          MR. COOK:  This goes more -- this is a special sort

18   of case, Judge, because this is under McFadden.  There's

19   certain --

20          THE COURT:  Wait.  What about the court order telling

21   you if you're going to present this evidence, you had to

22   notify the government?

23          MR. COOK:  We don't intend to present the advice of

24   counsel defense, Judge.

25          THE COURT:  This is not relevant to the

1   cross-examine  -- it's not proper cross-examination.  The

2   subject wasn't brought up on direct.  The fact that this -- I

3   think this is in violation of the order -- the spirit of the

4   order.

5          MR. COOK:  Thank you.

6          THE COURT:  Anything else before tomorrow morning?

7          MR. COOK:  Judge, while we're here -- and I don't

8   know if the witness needs to be here for this.  We had early

9   on talked about finding out who the jurors -- the alternate

10  jurors would be, and I don't think we've ever gone through

11  that process.

12         THE COURT:  Why do you need to know?

13         MR. COOK:  I think just so we know who they

14  are and --

15         THE COURT:  Any reason you need to know?

16         MR. COOK:  I think we're entitled to know.

17         THE COURT:  I just want to know why you need to know

18  but I don't have any problem -- I mean, the -- if the clerk

19  knows who they would be, the clerk may say so.

20         MR. COOK:  Thank you.

21         THE COURT:  I don't want to make it public anyway.

22         Obviously, you can tell the lawyers.

23         MR. COOK:  Thank you.

24         THE COURT:  Y'all can approach.

25         (Side bar discussion off the record.)

1    We'll recess.

2    (Proceedings adjourned at 5:00 p.m.)

<u>**INDEX**</u>

<u>**WITNESS FOR GOVT.**</u>

Robert Schroeder
 Cross-Examination by Mr. Nagy.......................3
 Cross-Examination by Mr. Cook.......................70

"I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.