1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
2                       Charlottesville Division

3    UNITED STATES OF AMERICA,          Criminal No. 3:16cr50008

4                    Plaintiff,

5           vs.                         Charlottesville, Virginia

6    JASON BRADLEY, NAYNA TAYLOR,
     and EDWARD TAYLOR,                 9:30 a.m.
7
                     Defendants.        June 27, 2017
8

9    TRANSCRIPT OF CONTINUED CROSS-EXAMINATION OF ROBERT SCHROEDER
                 BEFORE THE HONORABLE NORMAN K. MOON
10             UNITED STATES DISTRICT JUDGE, and a Jury

11   APPEARANCES:

12   For the United States:        GRAYSON HOFFMAN
                                   U.S. Attorney's Office
13                                 116 N. Main St.  Room 130
                                   Harrisonburg VA 22802
14
                                   KARI MUNRO
15                                 U.S. Attorney's Office
                                   310 First St. SW, Room 905
16                                 Roanoke VA 24011

17   For Defendant Bradley:        AARON L. COOK
                                   Cook and Cook Attorneys
18                                 71 Court Square
                                   Suite B
19                                 Harrisonburg VA 22802

20   For Deft.  Nayna Taylor:      LOUIS K. NAGY
                                   590 E. Market St.
21                                 Harrisonburg VA 22801

22   For Deft.  Edward Taylor:     DAVID L. PARKER
                                   333 Neff Ave. Suite A
23                                 Harrisonburg VA 22801

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
25
     APPEARANCES (Cont'd):

Court Reporter:                    Sonia Ferris, RPR, OCR
                                   U.S. Court Reporter
                                   116 N. Main St.  Room 314
                                   Harrisonburg, VA 22802
                                   540.434.3181.  Ext. 7

1          MR. NAGY:  Your Honor, Mr. Cook ran to the restroom

2     about three minutes ago.  He should be right back.

3          THE COURT:  I just came in before the jury because

4     some of the jurors have said sitting as long as they are,

5     they're getting stiff, and they wanted to know if it was okay

6     to stand occasionally, and I told them it would be.  So if

7     you see somebody stand up, don't be alarmed.

8          Are y'all ready to recall the jury?

9          MR. COOK:  Yes, sir.

10          MR. HOFFMAN:  We are, Your Honor.

11          (Jury returned to courtroom.)

12          THE COURT:  You may be seated.  Welcome back.  Glad

13     to see you.

14          Mr. Cook, you may resume.

15          MR. COOK:  Good morning.

16                    CROSS-EXAMINATION (Continued)

17     BY MR. COOK:

18     Q.   I believe you testified that in late 2011, you attended

19     an engagement party celebrating the engagement of Dave Scholz

20     and Jasmine Glover; is that correct?

21     A.   Yes, it is.

22     Q.   I believe you testified that that was after three or

23     maybe four purchases from Jason Bradley; is that right?

24     A.   Yeah, that would be about correct.

25     Q.   And that was the first time that you met Jason Bradley;

1   correct?

2   A.   Correct.

3   Q.   Just to be fair, at that time, you were clean-shaven; is

4   that right?

5   A.   Yes, I was.

6   Q.   You were clean-shaven; correct?

7   A.   Yeah.

8   Q.   You were in a shirt and tie?

9   A.   Correct.

10  Q.   You testified that you talked to Jason Bradley, but I

11  think you said he was reluctant to talk; is that right?

12  A.   Reluctant, yeah.  I mean, he was reclusive.

13  Q.   Now, you were in a -- you testified to a limousine ride;

14  is that right?

15  A.   Correct.

16  Q.   Limousine took you to a club in downtown Chicago; right?

17  A.   Yeah, one of a couple.

18  Q.   Do you remember it was raining really hard that night?

19  A.   Yes, it was.

20  Q.   One of the clubs you ran into, everybody had to go to

21  the bathroom and get their shirts dried off in the dryer and

22  that sort of thing.

23  A.   Yes, sir.

24  Q.   And in the limo ride was, I think you said, Jason and

25  Debbie; correct?

1    A.    Correct.

2    Q.    Nick Purintun; correct?

3    A.    I don't remember if Nick was there that night.

4    Q.    Okay.  Dave Scholz?

5    A.    Dave.

6    Q.    Jasmine Glover?

7    A.    Jasmine.

8    Q.    I think you said cousin or cousins of hers?

9    A.    Possibly.  There was people there that I wasn't too

10   familiar with -- Melissa O'Reilly, Josh Rowdybush.

11   Q.    So there were at least seven or eight, nine people in

12   this limousine; is that right?

13   A.    Yeah.

14   Q.    You indicated that during this limousine ride that Jason

15   Bradley said something to you about liking real drugs better

16   than synthetic drugs; is that right?

17   A.    We got on the topic of the synthetics.  He brought up

18   that he had tried -- at the time, I would take it to be MDPV.

19   And he said that, you know, while packaging it, too, he got,

20   you know, under the influence, per se, of the chemical and

21   that he didn't like the effects, that he preferred the

22   methylone, which is, you know, something that's considered to

23   be a substitute or something like the drug Molly, ecstasy.

24   Q.    Okay.

25         Now, do you remember when you were first arrested

1  October 15th talking to Agent Smith and some others about

2  this case?

3  A.   Yes.

4  Q.   I think this is whenever you actually met with them,

5  like, on three different days and had plenty of time to tell

6  them about this case; right?

7  A.   Yeah, I had plenty of time.  There was also -- you know,

8  they were talking about a two-year span, a lot of

9  information.  They're not only asking me information but

10 asking me questions to go deeper into certain things.

11 Q.   But you told them about this limousine ride, didn't you?

12 A.   Yes.

13 Q.   You told them that you inquired of Jason Bradley, "Are

14 you the cousin from China"; is that correct?

15 A.   I was already told he was the cousin from China, but

16 that was a small fact to get the conversation started.  Me

17 and Jason were the only ones in the car that probably didn't

18 know too many people, so we kind of -- well, from what I take

19 of it -- took to each other.

20 Q.   You told the police in October of 2015 that he denied

21 being the cousin from China; right?

22 A.   At first he did, yeah.

23 Q.   And you told the police -- Agent Smith -- in

24 October 2015 that based on kind of his mannerisms and the way

25 he responded to you, you believed he was lying about that;

1    correct?

2    A.    Well, I knew he was the cousin because Dave had already

3    told me he was the cousin.

4    Q.    I'm talking about your interview in October of 2015.

5    A.    Correct.

6    Q.    With Agent Smith.

7    A.    Yeah.

8    Q.    You told him that based on his response, you believed

9    Jason Bradley was lying about that; correct?

10   A.    Lying about being what, the cousin?

11   Q.    About being the cousin from China.

12   A.    Yeah, because I knew he was.  But, yes, that's what I

13   testified to, yes.

14   Q.    And that's -- and in that October 2015 interview, you

15   didn't tell them about this conversation about being exposed

16   to the drugs; correct?

17   A.    I don't recall.

18   Q.    Okay.  In fact, all you told the police in that

19   interview was you asked him if he was the cousin from China.

20   He denied it, and you thought he was lying; correct?

21   A.    Yeah, that's fair to say.

22   Q.    Okay.

23        And it was only after you realized they wanted you to go

24   after Jason that you made up this story about him, Jason,

25   having taken the drugs; correct?

1    A.   No, I wouldn't say that.  They asked deeper into that

2    conversation what was said.

3    Q.   It was only after you knew they wanted you to go after

4    Jason Bradley that you made up this line about he prefers

5    real drugs over synthetics; right?

6    A.   I would not say -- that's not my words, sir.  Those are

7    yours.

8    Q.   It was only after you realized they needed you to go

9    after Jason Bradley you made up this line about he was

10   packaging it, it got in the air and he felt the effects of

11   it; correct?

12   A.   Again, those are not my words.

13   Q.   Now, I think you testified to an order -- or some orders

14   in the spring of 2012, maybe like March; correct?

15   A.   Yeah.

16   Q.   Okay.

17        After that order, it's true, isn't it, that Jason

18   returned 10 or -- 10 or $15,000 to you; correct?

19   A.   Yes, yeah.  There was a reimbursement of sorts.

20   Q.   In fact, that order was for something like a hundred

21   thousand dollars, and y'all paid him $130,000, roughly; is

22   that correct?

23   A.   I don't know specific numbers, but, I mean, it well

24   could be.  I'd have to see the numbers.

25   Q.   But you remember overpaying him; correct?

1   A.   Dave took care of most of that.

2   Q.   Okay.

3        And you remember he tried to wire or transfer 15,000 to

4   you, and somehow the bank rejected it; correct?

5   A.   I remember the payment, but I don't remember a

6   rejection, but it could have happened by different wire

7   numbers or something, yeah.

8   Q.   And then Jason had to resend it again like a month or

9   two later; correct?  Do you remember that?

10  A.   Yeah, that's ringing a bell a little bit.

11  Q.   What was going on there, isn't it, was that you and Dave

12  were ripping off Ryan Buchanan; right?

13  A.   We weren't -- this goes into something a little bit

14  that's never been talked about, which is kratom.  We had

15  ordered some kratom from Jason.  What that was -- we told

16  Ryan it was a thousand dollars per kilogram, and it was only

17  actually, I believe, $500 per kilogram.

18  Q.   So you and Dave got money reimbursed and Ryan didn't;

19  correct?

20  A.   Yeah, that's correct.

21       (Counsel conferred.)

22       MR. COOK:  Heidi, I'd like to show the document to

23  the witness only, please.

24  BY MR. COOK:

25  Q.   Sir, I'd like for you to silently read this portion of

1   this document.  When you're done, let me know, and I'll move

2   it to a different portion.

3   A.   (Witness reviewed said document.)

4        I'm done.

5        (Counsel conferred.)

6   Q.   Have you read that?

7   A.   Yes, sir.

8   Q.   I'm going to slide it up, and there's one more.

9   A.   (Witness reviewed said document.)

10       I have read that one, too.

11       MR. HOFFMAN:  Your Honor, just before we continue

12  with this, while the witness is just reviewing the email, may

13  we approach briefly?

14       THE COURT:  Sure.

15       (Side bar discussion held on the record.)

16       MR. HOFFMAN:  I thought that we would have a little

17  more time before this issue came up, and I was going to try

18  to talk to Mr. Cook to try to learn a little more about this,

19  but as the Court knows, in this investigation, the government

20  conducted many email search warrants, and we got many

21  responses back.

22       THE COURT:  Many what?

23       MR. HOFFMAN:  Email search warrants.

24       Tens if not hundreds of thousands of emails.

25       THE COURT:  Okay.

1        MR. HOFFMAN:  This email, I don't believe came back

2   from the government.  It's from an email account that we

3   searched and we -- search warrant terms were very, very

4   broad.  I don't believe we received this email back.

5   Mr. Cook and I talked, and he concedes it didn't come from

6   our discovery.  It comes from his own client.  We can't find

7   it, so I have some significant authentication concerns about

8   it.

9        THE COURT:  Okay.

10        MR. HOFFMAN:  So I don't know the best way to

11   approach this, but I just wanted the Court to know that

12   Mr. Cook --

13        THE COURT:  If he says he got it, that would

14   authenticate it, wouldn't it?

15        MR. HOFFMAN:  I think that that would get us a long

16   way there.  My only concern is we have taken the steps to

17   authenticate them through business record certifications.

18        THE COURT:  His case -- he's got to authenticate it,

19   and it doesn't make any difference what you did, as long as

20   he obeys the rules of evidence.

21        MR. HOFFMAN:  Sure.

22        I just don't know if simply Mr. Schroeder saying, "I

23   kind of remember this email" is enough to authenticate it.

24   That's our concern.

25        MR. COOK:  Let me ask the questions.

1        MR. HOFFMAN:  That's the only concern.  I just want

2   to put it on the record, Your Honor.  It could very well be

3   buried in one of the responses we did receive, and the

4   government just hasn't found it yet.

5        THE COURT:  Just ask him if he got it.  That's all.

6        MR. COOK:  Thank you.

7        (Conclusion of side bar.)

8   BY MR. COOK:

9   Q.   All right, sir.  Without reading the contents, do you

10  recognize what this document is?

11  A.   Yes.

12  Q.   What sort of document is it?

13  A.   It's an email from me to Jason, but the one -- the reply

14  on April 22nd is I believe to be Dave responding to him, just

15  using my email address.

16  Q.   But you've seen this exchange before?

17  A.   Yeah, yeah, I remember it.

18  Q.   You remember this?

19  A.   Yeah.

20  Q.   And it accurately depicts that email exchange; is that

21  correct?

22  A.   Correct.

23       MR. COOK:  Judge, we would like to offer this into

24  evidence as Defendant Bradley No. 4.

25       MR. HOFFMAN:  Your Honor, may I voir dire before the

1    Court makes its decision?

2            THE COURT:  Yes.

3            MR. HOFFMAN:  Did you just say you believe you did

4    not draft this response and that it was actually someone else

5    using your email account?

6            THE WITNESS:  The response on April 22, 2012, at 9:50

7    p.m. -- I believe that was Dave because I wouldn't address

8    Mr. Bradley in a manner like that -- disrespectfully -- over

9    an email or phone call.  I barely knew the guy.

10           MR. HOFFMAN:  So the April 22 portion -- you do not

11   believe you wrote.

12           THE WITNESS:  The April 22, but this one here from

13   Bradley to me, I read, and I know what it's about.

14           MR. HOFFMAN:  Your Honor, perhaps the solution here

15   is to redact the portion he can't authenticate and let the

16   jury see the rest.

17           MR. COOK:  Which date and time?

18           MR. HOFFMAN:  The April 22nd, the big paragraph.

19           Mr. Schroeder, are you referring to the 9:50?

20           THE WITNESS:  I'm sorry.  I didn't know the question

21   was for me.

22           April 22, 2012, 9:50.  "Okay."

23           MR. HOFFMAN:  Don't read anymore.

24           Your Honor, our suggestion would just be that any

25   portion he cannot authenticate, just redact.

1          THE COURT:  Just a minute.

2          You say you don't remember writing it but --

3          THE WITNESS:  No, Your Honor, I do not.

4          THE COURT:  Who else could have done it?

5          THE WITNESS:  Well, Dave and Ryan both have access to

6    my email, but that would be a Dave response, because we

7    wouldn't want Ryan to know about that.

8          THE COURT:  Well, it's all part of this whole thing.

9    I mean, what one said -- it's all in furtherance of the

10   alleged conspiracy, so I think what one says -- it's all part

11   and parcel of the same conspiracy.

12         MR. HOFFMAN:  That's true, Your Honor, but as the

13   Court knows, the coconspirator statements can't be admitted

14   in through the defense, through a government witness.  It has

15   to come in through their witness.  That's our only concern,

16   Judge.  We'll defer to the Court.

17         THE COURT:  There's no objection, so let's proceed.

18         (Defendant Bradley Exhibit No. 1 was marked for

19   identification and admitted into evidence).

20   BY MR. COOK:

21   Q.   I'd like to publish to the jury, please.

22         All right, sir.  If you would read the text of the email

23   there at the bottom that starts with "okay" that you said was

24   written by Dave Scholz, probably; is that right?

25   A.   I believe it was.  Yes, I'll read it.

1       "Okay.  Wasn't sure if this email was still valid.  So

2  what's the deal then?  When can we expect a wire?  You snap

3  off when your money is not there, and we jump hoops to get it

4  to you.  I would like the same respect from you.  I'll pay

5  for your trip back."

6  Q.    And is this the money that you just testified about that

7  was to be wired to you and to Dave Scholz, from Jason?

8  A.    Yes, correct.

9  Q.    And he wasn't coming through fast enough for Dave,

10  apparently; correct?

11  A.    Dave or I.  I mean, I believe Dave wrote it.  I don't

12  think I would mouth off to the man that's making me money.

13  Q.    Now, then, there appears above there to be a reply from

14  jason@guardianimporting.com to artisticoverlay@gmail.com.

15  A.    That wouldn't be a reply.  The, "Okay, wasn't sure" was

16  the reply to the email on April 22, 2012, at 10:12 a.m.  The

17  other one is April 22, 2012, at 9:50 p.m.

18  Q.    Can you read what jason@guardianimporting.com wrote?

19  A.    "The money is sitting in a country that I won't be back

20  to in the foreseeable future, and they don't allow

21  international wire transfers online.  I have to walk into the

22  branch.  I'll be gone for the next month so a trip back, even

23  if you pay for a trip, it's not an option until after.  Let's

24  not forget, bud, I didn't ask for you to send the money to me

25  to cheat your partner.  I'm doing you and Dave a favor by

1   accepting and sending back to your personal accounts.  And

2   every time I required payment was because payment was due on

3   an order that was placed and delivered, not for anyone doing

4   me a favor.  So let's not act like it's the same thing.  Your

5   money is sitting there, and when I get back from vacation in

6   the end of May, if you want to pay the thousand dollars for

7   me to fly there and stay to do another transfer, then I'll be

8   happy to do so.  Otherwise, you will have to wait until I go

9   back for another reason to do the transfer."

10        Sorry for my reading.

11  Q.   That's fine.

12        So when it says, "Let's not forget, bud, I didn't ask

13  you to send that money to me to cheat your partner," he's

14  talking about cheating Ryan Buchanan; correct?

15  A.   Yeah.  At the time, me and Dave had thought Ryan was

16  cheating us.  He was getting direct wires into his personal

17  account, so what we did to counteract that was we tried doing

18  this here.

19  Q.   Then, at the top of this email chain is, "K.  Thanks for

20  quick response."

21        Do you think that was written by you or by Dave?

22  A.   I'm not sure.  That's how Dave -- that's how he texted,

23  was "K."  But I mean, I might have picked up on that, too.

24        What time in the morning -- that's April 22nd at 7:31.

25  Q.   7:31 p.m.?

1   A.   Yeah -- I'm not sure.

2   Q.   Thank you.

3       I believe you testified about a visit to a Chicago

4   apartment building, high rise building, where you -- I

5   believe you said you handed $30,000 in cash to Jason Bradley;

6   is that right?

7   A.   Yes.

8   Q.   Did you count that, or did Dave count that and hand it

9   to you?

10  A.   Me and Dave contributed both, so we counted our portions

11  and put it in the bag.

12  Q.   From that point forward through 2012, you had no more

13  dealings with Jason Bradley; is that right?

14  A.   No, I did not.

15  Q.   And then, the next year, 2013, you had no dealings with

16  Jason Bradley; is that correct?

17  A.   Unless Dave's wedding was then.  I can't remember

18  offhand, but I didn't see Jason for a while.

19  Q.   I'm sorry.  It was an unfair question.

20      In 2013, you had no business dealings with Jason

21  Bradley; is that correct?

22  A.   Correct.

23  Q.   And then, in 2014, until the meeting in the debt

24  collection office late in the year, you had no business

25  dealings with Jason Bradley; is that correct?

1   A.    Correct.

2   Q.    Now, during that period of time, you continued to have

3   customers; right?

4   A.    I had a small customer base, yes.

5   Q.    Justin Johnson?

6   A.    Justin Johnson, here and there.

7   Q.    He was getting bulk?  He was buying bulk from you; is

8   that right?

9   A.    He was buying bulk, yeah.  That goes all the way back to

10  Bonsai.

11  Q.    BJ was buying bulk from you; is that right?

12  A.    "BJ"?

13  Q.    I'm sorry.  RJ.

14  A.    RJ was buying bulk, yeah.  That goes back to Bonsai.

15  Q.    But through 2013, early 2014, both those guys are buying

16  from you?

17  A.    2013.  2014, not so much.

18  Q.    But some.

19  A.    Maybe an order.

20  Q.    All right.  Now, I believe you testified to an event in

21  2012 -- I'm sorry.  I'm skipping back.  I skipped something I

22  want to go back to.

23        You testified you met Jason Bradley.  You were each in a

24  car on a street in Chicago.  Do you remember testifying to

25  that?

1   A.   Yeah.  I testified --

2   Q.   I believe you testified that you were the passenger in

3   the car; is that right?

4   A.   I was the passenger in the car, yes.

5   Q.   And was Scholz driving the car?

6   A.   Correct.

7   Q.   You didn't have a driver's license at this time;

8   correct?

9   A.   Correct.

10  Q.   And you testified yesterday or Friday -- I think

11  yesterday -- that you handed the money out the window to

12  Jason Bradley; is that right?

13  A.   Correct.  That was the money owed from the Atlanta trip.

14  That was late 2012.

15  Q.   So now you've totally fabricated that story, haven't

16  you?

17  A.   No, I have not.

18  Q.   Do you remember talking to Special Agent Smith about

19  that story?

20  A.   Yeah.  I mean, I talked to Mr. Smith plenty of times.  I

21  mean --

22  Q.   Let me ask you this.  On the Chicago street, you all

23  were driving in opposite directions; correct?

24  A.   It would have been -- yeah.  It might have been a

25  one-way street.  I don't know.  There are lots of those in

1  Chicago.

2  Q.   You told Special Agent Smith you were driving in

3  opposite directions; correct?

4  A.   We met on a side street.  I mean, I guess it could have

5  been opposite directions.  It could have been we pulled up --

6  Q.   You told Agent Smith that Scholz handed the money out

7  the driver's side; correct?

8  A.   Scholz handed the money out -- he could have.  I was

9  pretty sure I handed him the money.

10  Q.   You really don't even remember this incident, do you?

11  A.   I remember it pretty well but not the specifics.  It was

12  just a quick meeting.  He was in a Mazarati, nice car, I

13  remember.

14  Q.   You leaned out the passenger window, and Dave handed it

15  out the driver window.  Is that what you're testifying to?

16  A.   I'm saying it may have been misunderstood.  I mean, I

17  can't, per se -- all I know is we transferred money, whether

18  it be Dave or me.

19  Q.   All you can testify to is you transferred money; right?

20  A.   I remember giving the money.

21  Q.   All right.

22  A.   It was in a makeup bag.  He was in a Mazarati.  The

23  specific details of one-way streets or driving up, I can't

24  remember.  I know it was a quick exchange.

25  Q.   Or whether you handed the money out the window to some

1  guy in a Mazarati or Scholz handed the money out the window

2  to some guy in a Mazarati?

3  A.   It wasn't "some guy."  I saw his face.

4  Q.   But you're testifying here today you don't know if you

5  handed it out the passenger side window or Scholz handed it

6  out the driver side window?

7  A.   I'm pretty sure I passed the money.  Me and Dave were --

8  not that this is an excuse, but we were stoners, and we had

9  smoked pot all the time while driving around.

10 Q.   Do you remember seeing Jason Bradley at Dave Scholz's

11 wedding?

12 A.   Yes, I do.

13 Q.   And you briefly asked him something like, "Are you

14 selling anything right now," and he said no; is that right?

15 A.   Correct.

16 Q.   I want to fast forward to October-ish -- fall, early

17 winter of 2014, okay, and the meeting you testified that

18 occurred in a debt collection office.  Do you remember that?

19 A.   Yes.

20 Q.   As far as you know, that meeting was set up by Dave and

21 Debbie; correct?

22 A.   I mean, I don't know who did the communication, but it

23 had to be Dave or Debbie.

24 Q.   You were aware Jason Bradley had been out of selling

25 these chemicals for a long time -- for a couple years; right?

1    A.    I believe he was, yeah.  I don't know.

2    Q.    I'm sorry?

3    A.    I don't know what he was doing in the last.  I know he

4    was running a debt collection business.  I didn't have a

5    personal relationship with him like that.

6    Q.    You went in and asked about chemicals; correct?

7    A.    Me and Dave did, yeah.

8    Q.    And Jason didn't have really any current pricing or

9    current products or supply lists; right?

10   A.    Correct.

11   Q.    And the result of that meeting was that he would reach

12   out and get an updated price list; correct?

13   A.    Not even updated.  I mean, he was going to see if it was

14   even possible, you know, to get in contact with his

15   interpreter.

16   Q.    So he wasn't even sure if he could get in contact with

17   her; right?

18   A.    Correct.

19   Q.    And you and Dave were supposed to leave that meeting and

20   research the law and see what the current status of things on

21   different chemicals were; correct?

22   A.    I mean -- no, we were researching the law over there

23   with Jason.

24   Q.    Okay.

25         At that meeting, you asked about a-PVP; correct?

1   A.   Correct.

2   Q.   And Jason told you no, it's now banned; correct?

3   A.   No.  That was methylone.

4   Q.   Was methylone part of the debt collection meeting, or

5   was that part of the later apartment meeting?

6   A.   I think that actually was the apartment meeting.

7   Q.   Okay.  At the debt collection office meeting, do you

8   recall Jason telling you that you couldn't do a-PVP because

9   it's now banned?

10   A.   I don't recall that.

11   Q.   Okay.

12        At the debt collection office meeting, it was you and

13   Dave and Jason that were present; correct?

14   A.   Yeah.  Deborah was there as well.  She was running

15   around doing like --

16   Q.   She wasn't part of the conversation; correct?

17   A.   No.

18   Q.   And this was late in the evening, I think you testified

19   to, or something like that?

20   A.   Yes, it was.

21   Q.   Okay.

22        Now, I think you testified, too, and there was a

23   recording about you being a wannabe Jason.  Do you remember

24   that phone conversation?

25   A.   Yeah.  We listened to that yesterday.

1    Q.    Correct.  And what that means is your perception of

2    Jason was he was always kind of researching the law to see

3    what was legal and what wasn't; correct?

4    A.    Well, yeah.  By that phone conversation, I meant more

5    into going to research court cases and people's background

6    and so forth and so on.

7    Q.    I think you talked about transcripts yesterday --

8    reading transcripts?

9    A.    Yeah.

10   Q.    Where do you get transcripts of court testimony online?

11   A.    It was an Ohio case, and I don't know -- I don't know if

12   it was what you call transcripts but court records, like

13   people filing motions.  You could see every lawyer's -- what

14   actions he was taking.

15   Q.    So it wasn't testimony of witnesses that you were

16   reading.

17   A.    I don't think the case made it that far.  I think it got

18   thrown out of court.

19   Q.    So you're looking at Ohio State cases that were getting

20   thrown out on this issue of controlled substances; right?

21   A.    Correct.

22   Q.    So it was sometime later, let's say a week or two or

23   three weeks later.  You end up at Jason's apartment; is that

24   right?

25   A.    About two weeks.  Two to three weeks, yeah.  That's

1   fair.

2   Q.    This is a different apartment than the one from summer

3   of 2012; is that right?

4   A.    Yeah.  Every time he seemed to have a different place he

5   stayed at.

6   Q.    And at this time, he had in his possession a very long

7   list of chemicals; correct?  Did you see that?

8   A.    I remember, like, a list of five.

9   Q.    You don't remember, like, a list of 20 or so that you

10  all reviewed together?

11  A.    I mean, it could have been, yeah.

12  Q.    And from that list, do you recall requesting a couple

13  cannabinoids, synthetic marijuana-type stuff?

14  A.    Yeah.  We were looking back into that, yeah.

15  Q.    And do you recall requesting a very long name that has

16  the short name a-PHP?

17  A.    I could have put that down, because that's one of the

18  things I was trying to get.

19  Q.    Do you recall Jason not being sure what the substance

20  was and writing it at the bottom of the list?

21  A.    Do I recall that?

22  Q.    Uh-huh.

23  A.    No.

24  Q.    And this is the conversation when Dave -- I think it was

25  Dave that mentioned methylone; correct?

1   A.   Yeah.  We wanted methylone, yeah, but that was already

2   known at the debt collection.  He said now that he reached

3   out to his people and that methylone was no longer being made

4   in China.

5   Q.   Because it was banned?

6   A.   Yeah, it was even banned in China, supposedly.  I'm

7   not --

8   Q.   During this meeting at the apartment, pentylone was not

9   mentioned; correct?

10  A.   A substitute to methylone, I believe, was mentioned.

11  Q.   Was the word "pentylone mentioned?

12  A.   Pentylone, butylone, one of those two.  Just the

13  derivative of methylone.

14  Q.   Was it at that meeting or was it later that Jason

15  Bradley told you guys that you couldn't get a-PHP because it

16  was essentially a-PVP?

17  A.   I don't remember that conversation.

18  Q.   You don't remember that conversation.

19  A.   No.  He might have communicated that with Dave, but he

20  didn't communicate that with me.

21  Q.   It was probably later, after the meeting communicating

22  it with Dave?

23  A.   Yeah.  From my understanding, we were getting -- and at

24  this time, I don't know the legality, but we were to get

25  a-PVP because that's what this client that we were even

1  basically doing this order for wanted.

2  Q.   So when you left that meeting at the apartment, no money

3  had been paid to Jason Bradley; is that correct?

4  A.   No.   There was $1,200 paid at that time.

5  Q.   How was that paid?

6  A.   In cash.

7  Q.   When you left that meeting, it was still up in the air

8  as to whether you were going to get anything and what you

9  were going to get; correct?

10 A.   No.   After the meeting at his condo, we were -- the

11 process was -- had the steps.   That's why we had to pay the

12 $1,200 for his visa to go from -- I believe it's Hong Kong to

13 Shenzhen.   It was -- there's a visa fee.

14 Q.   Now, here at trial is the first time you've mentioned to

15 the government this visa fee, isn't it?

16 A.   No, I mentioned that before.

17 Q.   Now, you also told Agent Smith that you left that

18 meeting having ordered a-PHP; correct?

19 A.   That I -- I don't remember testifying to that, no.

20 Q.   Now, at some point a couple months later, y'all get two

21 packages; correct?

22 A.   I believe it was the end of December, beginning of

23 January, yeah.   We got two or three packages.

24 Q.   One went to Dave's mom's house; correct?

25 A.   I believe so.

1    Q.   And one went to your UPS store address; correct?

2    A.   No, I never received any of the packages.  Dave received

3    all these packages.

4    Q.   Now --

5    A.   I know he had one sent to his Uncle Lane, who he called

6    Weezy.

7    Q.   Do you remember in October 2015 when you first sat down

8    with Agent Smith -- do you remember asking him if two boxes

9    were seized in China or Hong Kong?

10   A.   Did I ask --

11   Q.   Uh-huh.

12   A.   -- Mr. Smith that?  This is the only thing I said was --

13   "You guys might have had the packages."

14   Q.   Do you remember Agent Smith asking you:  "What's inside

15   those packages?"  Do you remember him asking you that?

16   A.   I mean, he could have.  I mean, I answered so many

17   questions of these people, I can't remember them all.

18   Q.   Do you remember telling him what you thought was inside

19   was meth something?

20   A.   I don't remember "meth something."  That's -- I don't

21   think I would answer that like that.  It sounds like it's

22   crystal meth or something.

23   Q.   Do you remember telling him that you thought it might be

24   a legal version of methylone?

25   A.   Yeah, yeah.  I very well could have said that.

1   Q.   You didn't tell him in that October 2015 series of

2   meetings that it was a-PVP, did you?

3   A.   I mean, this goes on to yesterday.  I never got the

4   stuff.  I didn't even know what we had when I did get it, so

5   how am I to attest to that?

6   Q.   And you didn't tell him that a-PVP was written on the

7   packaging, did you?

8   A.   The one that we got, you're talking about?

9   Q.   Yes.

10  A.   I don't know.  I mean, if it wasn't asked, I'm not

11  telling.  I mean, it's a debriefing, you know.  There's so

12  much going on.  He's asking me questions.  Then there's other

13  gentlemen there.  There was a lady there asking me questions.

14  There's a lot going on, you know.  It's kind of all over the

15  place.  So.

16  Q.   The first package you all received as far as you know

17  was packaged in a nail dryer; correct?  In that -- still

18  talking about these two shipments?

19  A.   Yeah.  There was a nail dryer that we got that Dave came

20  by with, and there was makeup bags.

21  Q.   So after the nail dryer, there was a makeup bag

22  shipment; correct?

23  A.   Correct.

24  Q.   Let's talk about the nail dryer shipment first.  Do you

25  recall telling Agent Smith in October of 2015 that in one box

1   was two different substances:  A 1200-gram synthetic

2   methylone replacement -- do you remember that?

3   A.   Yeah.  That's quote/unquote "the bunk," but I thought it

4   was 1800 grams.  I don't remember 1200.

5   Q.   So you're saying it's "bunk" because it was -- it wasn't

6   very effective, was it?

7   A.   No, it wasn't.  No.

8   Q.   I believe you said that you used some of it, and it felt

9   like Adderall?

10  A.   Yeah.  I believe I would attest to that, yeah.

11  Q.   Also in that package was another about 400 grams of a

12  substance packaged separately; correct?

13  A.   Yeah, the one that had a-PVP written on it.

14  Q.   And October 15th, you told Agent Smith that you believed

15  that to be a-PHP; correct?

16  A.   Mr. Smith might have written it like that, but I believe

17  I told him it was a-PVP.  All we're missing is an H and a P.

18  I mumble when I talk, so it could have been misentered.

19  Q.   And you ended up using the bunk as cut, I think you

20  said; right?

21  A.   Yes, we did.  Yeah.

22  Q.   Then, after the nail dryer package, you got a makeup bag

23  package; correct?

24  A.   Correct.

25  Q.   Do you recall telling Agent Smith that there were two

1    different substances -- chemicals, substances in there?  One

2    was about 500 grams of the bunk; correct?

3    A.    Yeah.

4    Q.    And one was about 500 grams that you believed to be

5    a-PHP; correct?

6    A.    I mean, I don't remember this a-PHP.  You know, there

7    was a lot of questioning going on.  They were asking me a lot

8    about these chemicals.  To me, these chemicals are letters,

9    you know.

10   Q.    Also in that interview, you told Agent Smith, "I don't

11   believe it was a-PVP, because a-PVP was illegal, and Bradley

12   wouldn't send it if it was illegal"?  Does that sound about

13   right?

14   A.    I'd have to see his notes, but from what I remember, it

15   was a-PVP.

16   Q.    In that October 2015 series of interviews with Agent

17   Smith, you never told him that the Hong Kong shipment was

18   a-PVP; is that correct?

19   A.    I mean -- the Hong Kong shipment -- which one are you

20   talking about?  There are like three of these things that are

21   supposedly seized, so I don't know.

22   Q.    This shipment that was ordered --

23   A.    That Dave received.

24   Q.    -- in the debt collection and then the apartment

25   conversation and then arrived in late December, January and

1   some was seized.  So that whole transaction.  You never told

2   Agent Smith that you expected that to be a-PVP; correct?

3   A.   That I never expected that to be a-PVP -- no.  I thought

4   it was a-PVP.

5   Q.   Also in that series of interviews, you never mentioned

6   the word pentylone, did you?

7   A.   I -- I mean, I can't remember if I did or not.  You're

8   talking about three days of questions, you know.  I don't

9   know, you know.

10  Q.   Those names were supplied to you later by the police,

11  weren't they?

12  A.   No, I knew those names before that.

13  Q.   But in relation to this shipment -- in relation to this

14  shipment, those names were provided to you by law

15  enforcement; is that right?

16  A.   They never provided.  I saw some of the discovery.

17  Q.   Okay.  So you got the name from discovery; is that

18  right?

19  A.   No, that's not right.  I knew those names even before.

20  This is back in 2013.  I knew what those were.

21  Q.   I'm not saying you learned the names.  I'm saying that

22  you applied those names to this shipment only after you read

23  it in discovery.  Is that correct?

24  A.   No.  I mean, I wouldn't say that.  No.

25  Q.   You understand that you need to say these things in

1   order to get your sentence reduction motion; correct?

2   A.   No, I don't.  I mean, under the Analogue Act, I mean,

3   you know, if it acts like and looks like, it is.

4   Q.   All right.

5        Do you remember telling your mom on the phone that half

6   the things you told the police are lies?

7   A.   No, I never said that.  I said that I will say that if I

8   have to.

9   Q.   Do you remember telling your mom that what you told the

10  police is literally made up, fabricated?

11  A.   No, I don't remember that.  I'd have to hear that.

12  Q.   Do you remember telling your mom:  "I'm not testifying

13  unless they guarantee me that I'm getting out of jail"?

14  A.   I know that ain't going to happen, so I'd have to hear

15  that one.

16  Q.   Do you remember telling her:  "They'll ask were you

17  promised anything by the government, and I got to say no"?

18  A.   I haven't been promised anything, I mean.

19  Q.   Were you promised anything by the government?

20  A.   Not at all, no.  I mean, a lot of these phone calls, I'd

21  be venting, but I can't even attest to those phone

22  conversations.  I'd have to hear those, and maybe I can

23  explain a little bit better, but maybe you're misinterpreting

24  my anger for different things.

25  Q.   Last Thursday, some people came and visited you at jail

1   and played some of these tapes; is that right?

2   A.   Yeah.

3   Q.   Just last Thursday, just a couple days ago; correct?

4   A.   Yeah.  It wasn't any of those -- I mean, to that nature,

5   but --

6   Q.   How many phone calls did they play for you?

7   A.   Three.

8   Q.   Did they tell you why they were playing them for you?

9   A.   They said, you know, just, you know, "Why is this --

10  what does this mean?  What does this mean to you?"

11  Q.   Who came and played these tapes for you?

12  A.   Grayson, Rob -- I'm drawing a blank.

13  Q.   The guy on the left.

14  A.   The guy on the left.

15  Q.   Three people here in the courtroom came and played some

16  tapes for you and asked you to explain them?

17  A.   Ross.

18  Q.   They played some tapes of you talking to your mom;

19  right?

20  A.   Yeah.

21  Q.   And they helped you -- what -- figure out how to explain

22  them?

23  A.   No.  They asked me what they were about, why -- they

24  said, you know -- I said, "Well if I have to, I mean, you

25  know, if I feel comfortable.  If I don't feel comfortable --

1   and you know, I would say that everything I said was a big

2   lie."  But I mean, obviously it's not because, you know, my,

3   you know -- my proffer sessions have been, you know, things

4   that have been, you know -- I let it all out before I even

5   knew what was all out there that the government even had

6   because that's what my attorney told me to do.

7   Q.   Did you ever tell your mom that your attorney forced you

8   to sign your plea agreement?

9   A.   I don't remember saying "forced," but I felt at the time

10  that I was -- again, I didn't know how much the government

11  had.  My lawyer had said he had reviewed this, but I had

12  never seen it for my own eyes, so there's times I feel -- and

13  this happens in court cases -- that your lawyer is working

14  with the government.

15  Q.   Uh-huh.

16  A.   And, you know, I felt that I was, you know, owning up to

17  too much weight.

18  Q.   Do you remember telling your mom, "I pled guilty to

19  something I'm not even guilty of"?

20  A.   I'm sure I said that.

21  Q.   All right.

22       So, Modern Day Prophets was an agreement between you and

23  Schroeder -- I'm sorry -- you and Scholz and Buchanan;

24  correct?

25  A.   Yes.

1    Q.    It was a company on paper; right?

2    A.    Yes.

3    Q.    The three of you had access to bank accounts; correct?

4    A.    Yes.

5    Q.    You split the profits; correct?

6    A.    Correct.

7    Q.    You made the decisions together; correct?

8    A.    Correct.

9    Q.    And you did the work, too -- the packaging and

10   distribution.  You did the work of that agreement; correct?

11   A.    I didn't do too much packaging.  Neither did Ryan.

12   Q.    But you were on the sales end; correct?

13   A.    Yes.

14   Q.    Later, Nick Purintun and Brian Lister joined that

15   agreement; correct?

16   A.    Yeah.  They were salesmen for Modern Day Prophet.

17   Q.    Now, let's talk about, just roughly speaking, the

18   pricing.  I think you testified that Jason was charging you

19   3,000 a kilogram there at the beginning for product?

20   A.    Yeah.

21   Q.    About $3,000 a kilogram?

22   A.    (Indicating yes.)

23   Q.    You assume, don't you, that he had to buy the product to

24   begin with; correct?

25   A.    Yes.

1   Q.   And he had to pay for shipping; correct?

2   A.   He had to pay for all that; correct.

3   Q.   So that's not 3,000 profit to him, but that's the price

4   you paid for the product; right?

5   A.   Correct.

6   Q.   I believe you testified yesterday that you were charging

7   customers around $10 per 500 milligrams; correct?

8   A.   Correct.

9   Q.   So if I'm doing my math properly, that's about $20,000

10   for a kilogram; correct?

11   A.   Correct.

12   Q.   And that's not counting any cut you add in.  So if you

13   can add in some cut, you can get even more than that out of a

14   kilogram of product; correct?

15   A.   Correct.

16   Q.   So that $20,000-plus is, after you've paid Jason, down

17   to $17,000-plus.  That's the profit that you guys split;

18   correct?

19   A.   Well, there's the -- I mean, there's other costs that go

20   into it.  You have to buy the packaging.

21   Q.   You might pay some employees for packaging?

22   A.   Correct.  Now we bought the insurance from Jason, too.

23   So the 3,000 -- it would be up to 4,000.  But if we bought X

24   amount, 10 kilograms, the price would drop, and it would be,

25   with the insurance, down to about 35.

1   Q.   And that would be more profit to you once he dropped the

2   price down; correct?

3   A.   Yeah; correct.

4   Q.   You didn't pass that price break on to your customers,

5   did you?

6   A.   Some customers I took over from Bonsai, and we were

7   competing for the same customer.  We were price-fighting for

8   them, so they were at low as 7 or $8.  But that's not here or

9   there.

10  Q.   Now, this profit, whatever you guys split up, was

11  between whoever was in Modern Day Prophets at the time;

12  right?  You didn't share that with Jason.

13  A.   No.

14  Q.   Jason got paid for his product; right?  For his

15  services?

16  A.   Yeah.

17  Q.   You know, if there was a month went by, for example,

18  where he didn't make a sale, he didn't get any money;

19  correct?

20  A.   Correct.

21  Q.   Okay.  Now, so he was essentially a vendor for your

22  company; correct?  He was a seller.

23  A.   Yeah, he was the connection.

24  Q.   He was a seller, and y'all were the buyer; correct?

25  A.   Yeah.

1          MR. COOK:  That's all the questions I have.  Thank

2   you.

3          (Conclusion of all cross-examination of this

4   witness.)

1                              **INDEX**

2    **WITNESS FOR GOVT.**

3    Robert Schroeder (Continued)
      Cross-Examination by Mr. Cook......................3
4

5    **EXHIBIT NO.**              **Marked**        **Admitted**

6    Deft. Bradley No. 1           14                14

7

8

9

10

11   "I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
12

13

14

15

16

17

18

19

20

21

22

23

24

25