1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF VIRGINIA
2                      Charlottesville Division

3    UNITED STATES OF AMERICA,          Criminal No. 3:16cr50008

4                   Plaintiff,

5           vs.                         Charlottesville, Virginia

6    JASON BRADLEY, NAYNA TAYLOR,
     and EDWARD TAYLOR,                 11:53 a.m.
7
                    Defendants.         June 29, 2017
8

9          TRANSCRIPT OF TRIAL TESTIMONY OF BRIAN LISTER
                BEFORE THE HONORABLE NORMAN K. MOON
10            UNITED STATES DISTRICT JUDGE, and a Jury

11   APPEARANCES:

12   For the United States:        GRAYSON HOFFMAN
                                   U.S. Attorney's Office
13                                 116 N. Main St.  Room 130
                                   Harrisonburg VA 22802
14
                                   KARI MUNRO
15                                 U.S. Attorney's Office
                                   310 First St. SW, Room 905
16                                 Roanoke VA 24011

17   For Defendant Bradley:        AARON L. COOK
                                   Cook and Cook Attorneys
18                                 71 Court Square
                                   Suite B
19                                 Harrisonburg VA 22802

20   For Deft.  Nayna Taylor:      LOUIS K. NAGY
                                   590 E. Market St.
21                                 Harrisonburg VA 22801

22   For Deft.  Edward Taylor:     DAVID L. PARKER
                                   333 Neff Ave. Suite A
23                                 Harrisonburg VA 22801

24   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
25
     APPEARANCES (Cont'd):

1

2    Court Reporter:                    Sonia Ferris, RPR, OCR

3                                        U.S. Court Reporter
                                         116 N. Main St.  Room 314
                                         Harrisonburg, VA 22802
4                                        540.434.3181.  Ext. 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. MUNRO:  Your Honor, the government will call

2    Brian Lister.

3      BRIAN LISTER, CALLED AS A WITNESS BY THE GOVERNMENT, SWORN

4                            DIRECT EXAMINATION

5    BY MS. MUNRO:

6    Q.   It's still technically morning by about five minutes.

7    How are you this morning?

8    A.   Good.  Yourself?

9    Q.   Doing well.

10        Would you please state your full name for the record?

11   A.   Brian Gregory Lister.

12   Q.   How do you spell Lister?

13   A.   L-I-S-T-E-R.

14   Q.   Mr. Lister, how old are you?

15   A.   30.

16   Q.   Where are you from currently?

17   A.   Palatine, Illinois.

18   Q.   Where is Palatine?

19   A.   Palatine.  It's about 35 minutes outside of Chicago,

20   northwest suburbs.

21   Q.   Can you spell that?

22   A.   P-A-L-A-T-I-N-E.

23   Q.   How long have you been in Palatine?

24   A.   One year and two months.

25   Q.   Where did you live prior to that?

1    A.    Streamwood, Illinois.

2    Q.    How long have you been in Illinois?

3    A.    Since 1992.

4    Q.    Where were you raised?

5    A.    I was born in Raleigh, North Carolina.  I was there for

6    five years, and I moved to Illinois and stayed within

7    basically a 15-mile radius ever since.

8    Q.    Thanks.

9          Tell me a little bit about your education.  Where did

10   you go to high school?

11   A.    Stevenson, Illinois, in Stevenson, Lincolnshire,

12   Illinois.

13   Q.    Do you have any education beyond high school?

14   A.    I do.  I have an associate's degree.

15   Q.    What's your degree in?

16   A.    Criminal justice.

17   Q.    Where did you get your degree?

18   A.    College of Lake County, Illinois.

19   Q.    In Illinois?

20   A.    Yes.

21   Q.    When did you get your degree?

22   A.    2007.

23   Q.    Is that an associate's of science or associate's of art?

24   A.    Liberal arts.

25   Q.    Do you have any other education beyond the associate's

1   degree?

2   A.   I do.  Well, I started a bachelor's degree in business

3   management also, but I didn't complete it.

4   Q.   When was that?

5   A.   2012.

6   Q.   Let's talk a little bit about your criminal history.  Do

7   you have any felony convictions?

8   A.   I do.

9   Q.   How many?

10  A.   Two.

11  Q.   When did you receive your first felony conviction?

12  A.   2006 -- no -- 2007.

13  Q.   How old were you then?

14  A.   18 or 19.  I want to say -- 19.

15  Q.   What is the nature of the felony conviction?

16  A.   They're both for the same thing.  It was for selling

17  ecstasy.

18  Q.   What do you mean they're both for the same thing?

19  A.   The two convictions that I have are both for the same

20  charge of selling ecstasy.

21  Q.   Does that mean that they stem from the same incident?

22  A.   No.

23  Q.   Okay.

24  A.   I was caught twice.

25  Q.   Can you explain?

1   A.   Well, the first time, I was helping a friend get it, and

2   she, unfortunately, encountered some law enforcement, and

3   then they set me up to get a sentence.   The second time was

4   actually my own brother.   Spitefully set me up with the

5   police.

6   Q.   When did that happen?

7   A.   2007.

8   Q.   Both in the same year?

9   A.   Yeah.   I think one was in February and one was in

10  September, as I recall.

11  Q.   Mr. Lister, were you charged in this case?

12  A.   Yes -- or indicted.

13  Q.   In general, do you know the nature of your charges?

14  A.   Yes.

15  Q.   What were they?

16  A.   One for drug conspiracy, one for money laundering.

17  Q.   Have you entered a plea in this case?

18  A.   Yes, I have.

19  Q.   What kind of a plea?

20  A.   Guilty.

21  Q.   I'm going to show you what's marked as Government's

22  Exhibit 80.   Can you see it?

23  A.   I can.

24  Q.   Do you recognize this document?

25  A.   I do.

1   Q.   What is it?

2   A.   It's my plea agreement.

3   Q.   Did you sign this plea agreement?

4   A.   Those are my initials on the bottom, yes.

5   Q.   On the bottom of which page?

6   A.   Page 1 of 14, on the bottom left.

7   Q.   Did you initial any other pages of the agreement?

8   A.   Every single one.

9   Q.   Every single one?

10  A.   Three times for the three copies.

11  Q.   Mary, could we see page 14?

12       Do you recognize that page of your plea agreement?

13  A.   I do.

14  Q.   Did you sign it?

15  A.   I did.

16  Q.   When did you sign it?

17  A.   February 7, 2017.

18       MS. MUNRO:  Your Honor, government moves to admit

19  Exhibit 80.

20       THE COURT:  It will be admitted.

21       (Government Exhibit No. 80 was marked for

22  identification and admitted into evidence.)

23  BY MS. MUNRO:

24  Q.   Mr. Lister, when you signed this plea agreement, did you

25  go over it in detail?

1   A.   I did.

2   Q.   I'm going to review some of the provisions of your plea

3   agreement.

4        Mary, could we go to page 1?  Can we focus in on the

5   second-to-the-bottom paragraph?

6        Can the jury see it?

7        It says:  "Count 1 charges me with conspiring to

8   distribute and possess with the intent to distribute" --

9   chemical for shorthand MDPV, and another chemical for

10  shorthand, alpha-PVP -- "controlled substance analogues as

11  defined by 21 U.S.C. Section 802, Subsection 32, and intended

12  for human consumption as provided by 21 U.S.C. Section 813,

13  in violation of 21 U.S.C. Sections 846 and 841(B)(1)(c).  The

14  maximum statutory penalty is a fine of $1 million and

15  imprisonment for a term of 20 years, plus a term of

16  supervised release of at least three years."

17       Did I read that correctly?

18  A.   Yes, you did.

19  Q.   What does that provision of the plea agreement mean to

20  you?

21  A.   The maximum sentence that I could receive.

22  Q.   Is what?

23  A.   20 years and a million dollar fine, plus three years of

24  supervised release.

25  Q.   And what is the nature of the charge to which you

1    pleaded?

2    A.    Drug conspiracy to distribute.

3    Q.    So what about the money laundering charge?  What's your

4    understanding about that charge?

5    A.    That the funds were illegally obtained and --

6    Q.    I just mean the nature of the charge itself.  Did you

7    plead to that charge as well?

8    A.    Yes.

9    Q.    If you look at that provision right there, do you

10   understand that you pled to the drug conspiracy or the drug

11   conspiracy and the money laundering?

12   A.    Just the drug conspiracy.

13   Q.    Could we go to page 2?  Focus in on the second paragraph

14   from the top.

15        This states:  "I am pleading guilty as described above

16   because I am, in fact, guilty, and because I believe it is in

17   my best interest to do so, and not because of any threats or

18   promises.  There has been no promise made whatsoever by

19   anyone as to what the final disposition of this matter will

20   be."

21        Did I read correctly as well?

22   A.    Yes, you did.

23   Q.    What does that provision mean to you?

24   A.    It means that I haven't been promised anything.

25   Q.    Did you plead guilty because you believe that you are

1    guilty of the offense?

2    A.    Yes.

3    Q.    Lower down on page 2, the last paragraph.

4         With regard to the dismissal of counts, this states that

5    if you comply with your obligations under the plea agreement,

6    the United States will move, at sentencing, that you be

7    dismissed as a defendant in any remaining counts.

8         "I stipulate and agree the United States had probable

9    cause to bring all the counts in the indictment which are

10   being dismissed under this agreement.  These charges were not

11   frivolous, vexatious or in bad faith, and I am not a

12   prevailing party with regard to these charges."

13        What do you understand from that language?

14   A.    That if I agree with the plea agreement, the other

15   charges will be dismissed.

16   Q.    Okay.  And page 4, paragraph 3.

17        This provision of your plea agreement states:  "I

18   understand the United States retains all of its rights

19   pursuant to Federal Rule of Criminal Procedure 35B, United

20   States sentencing guidelines 5K1.1 and 18 U.S.C. Section

21   3553(e).  I understand even if I fully cooperate with law

22   enforcement, the United States is under no obligation to make

23   a motion for the reduction of my sentence.  I understand if

24   the United States makes a motion for a reduction in my

25   sentence, the Court, after hearing the evidence, will

1    determine how much of a departure, if any, I should be

2    given."

3         What do you think that means?

4    A.   That even with this plea agreement, there's still really

5    no promises I might receive a reduction, and it's entirely up

6    to the Court.

7    Q.   Based on the plea agreement, what is your understanding

8    of the government's disposition with respect to any motion

9    for substantial assistance?  What do you need to do?

10   A.   Tell the truth.

11   Q.   Finally, Mary, page 7, the bolded paragraph.

12        "I agree to a forfeiture money judgment in the sum of

13   $6,500.  I agree to remit funds in the sum of $6,500 to the

14   United States in full satisfaction of the forfeiture money

15   judgment."

16        The provision goes on to state that you will remit these

17   payments to the U.S. Attorney's Office at least ten days

18   prior to your sentencing hearing in this case.

19        Is that what you understand from this agreement?

20   A.   Yes.

21   Q.   What kind of impact will that money judgment have on

22   your financial condition currently?

23   A.   Not much.  I set it aside a while ago when I found out I

24   needed to put it back.

25   Q.   So outside of this plea agreement, has anyone made any

1  promises to you at all --

2  A.   No.

3  Q.   -- about what will happen to you in this case?

4  A.   No.

5  Q.   What do you think would happen if you were to testify

6  untruthfully at trial?

7  A.   The outcome would not be in my favor.

8  Q.   In what way?

9  A.   Well, obviously, I'm hoping for a reduction of some sort

10  of sentencing to keep my freedom, to maintain my business and

11  provide for my family, and if I don't help that, that doesn't

12  help anyone else.

13  Q.   Do you understand the oath that you took today when you

14  sat down?

15  A.   I do.

16  Q.   All right.  Thank you very much, Mary.

17       Getting back to you.  Tell me a little bit about your

18  family history.

19  A.   When would you like me to start?

20  Q.   Where are your parents?

21  A.   Both are located at Memorial Garden Cemetery in

22  Arlington Heights, Illinois.

23       THE COURT:  I don't think this is proper examination.

24  It doesn't go to anything about this case.

25       MS. MUNRO:  I'll move on, Your Honor.  Happy to.

1   BY MS. MUNRO:

2   Q.   Growing up in Illinois, do you have any history of

3   substance abuse yourself?

4   A.   I do.

5   Q.   What kinds of substances have you used?

6   A.   I started off with marijuana at about age 13.  Probably

7   alcohol around a similar age.  Smoked marijuana throughout

8   high school pretty frequently.  Later in high school, I tried

9   ecstasy, acid, 'shrooms, cocaine.

10  Q.   Did you use all throughout high school?

11  A.   Yes.

12  Q.   Have you ever received any drug treatment?

13  A.   Yes.

14  Q.   When?

15  A.   In high school, I was caught one time.  Went to an Omni

16  Youth Center.  Kind of a drug counseling for children.  Also

17  did some when I was incarcerated.  Then also have done some

18  on this pretrial probation as well.

19  Q.   Was that court-ordered drug treatment?

20  A.   Which one?

21  Q.   Most recently.

22  A.   No, it was optional.  I chose to do it.

23  Q.   So was your other drug treatment program court ordered?

24  A.   The first one when I was younger, yes, before I was

25  incarcerated.  The ones while I was incarcerated was

1    volunteer, and the one just recently for this pretrial was

2    voluntary.

3    Q.   Are you still using?

4    A.   No.

5    Q.   Since when?

6    A.   About October, right before the most previous drug

7    treatment.

8    Q.   Are you employed?

9    A.   I am.

10   Q.   Where are you employed now?

11   A.   I'm self-employed.  I have a business called BTL

12   Management, LLC, and I work for a company called American

13   Quality Home Improvement.

14   Q.   Do you work for American Quality Home Improvement --

15   A.   On a 1099 through by business, my LLC.

16   Q.   I see.

17        What kind of work do you do?

18   A.   I'm a sales manager, and we do all handling of insurance

19   claims, storm restoration.

20   Q.   What is that?

21   A.   Basically, when an area get hits with a catastrophe --

22   hail or wind -- I have guys I trained to go out, helping

23   homeowners process the insurance claims and walk through the

24   entire thing.  I train them how to talk to the homeowners and

25   get it done, meet with the insurance adjustor and get it

1    processed, and review the work orders, review the materials,

2    deal with service calls, invoicing.

3    Q.    How long have you been working there?

4    A.    At this company?

5    Q.    How long has it been since you formed your LLC?

6    A.    I'm saying at this company, August, but I've been doing

7    the exact same line of work for the last five years.

8    Q.    Okay.

9    A.    Kind of bounced around between a few companies trying to

10   find the best pay structure.

11   Q.    Let's shift to talk a little bit about this case.

12         Do you know someone by the name of Robert Schroeder?

13   A.    I do.

14   Q.    When did you first meet Robert Schroeder?

15   A.    I want to say it was sometime in 2009, in Taylorville

16   Prison, Illinois.

17   Q.    Were you incarcerated at the time?

18   A.    Yes, I was.

19   Q.    How did you meet Robert Schroeder?

20   A.    He was in the same cell house as me.

21   Q.    What was the nature of your association while you were

22   both incarcerated?

23   A.    We were prisoners together and just kind of noticed we

24   lived in the same area and had similar business interests.

25   Q.    What does that mean?

1    A.   Well, we both wanted to make money when we got out and

2    tried to find a legal way to do it.

3    Q.   Okay.

4         What do you mean you lived near each other?  Does that

5    mean your family homes were nearby or your current homes were

6    nearby?

7    A.   I don't know where his family was from, but he said he

8    lived in Lisle, and I lived in Buffalo Grove at the time, and

9    they're about half an hour away from each other.

10   Q.   Okay.  When were you released from prison?

11   A.   Entirely, 2011 -- November 4, 2011.

12   Q.   We'll get back to the word "entirely" in a minute.

13        When was Robert Schroeder released?  Do you know?

14   A.   I want to say late 2009, well before I was.

15   Q.   So he got out before you did?

16   A.   Yes.

17   Q.   So did you maintain a connection with one another while

18   you were still in?

19   A.   Technically, under the care of the state, yes.

20   Q.   What does that mean?  "Under the care of the state"?

21   A.   In June of 2011, I was granted work release, and

22   basically, we were somewhat out in public, but still I have

23   to stay overnight in what's still considered prison.  But

24   while I was out at work, I was able to get access to a cell

25   phone, and that's when I was able to make contact with him in

1    2010 and 2011.  That's when I say released entirely in 2011.

2    Q.   What were the terms of your work release?

3    A.   I was allowed to go out and get a full-time job, and I

4    did, and while I was out, I contacted people I was old

5    friends with, and he was one of them.

6    Q.   Did you have to report back at certain times during the

7    day?

8    A.   Every night, yes.

9    Q.   And how long were you in work release?

10   A.   June 2010 to either August or September 2011.  So a

11   little bit over a year.

12   Q.   Do you know if Robert Schroeder was in a work release

13   program?

14   A.   No, he was not.  He was directly released.  I want to

15   say he got out September 2009.

16   Q.   So during this period in your life, were you still using

17   substances?

18   A.   In work release?

19   Q.   Yes.

20   A.   Yes.

21   Q.   What kind of substances were you using?

22   A.   The synthetic ones that Robert Schroeder gave me.

23   Q.   When did Robert Schroeder start giving you substances to

24   use?

25   A.   Early 2011, maybe like February, March, somewhere around

1    there.   I remember it was just getting warm, so maybe April,

2    somewhere around there.   I know there wasn't snow on the

3    ground, if I recall.

4    Q.   What exactly was he giving you?   Did you know?

5    A.   There was three kinds.   One was synthetic marijuana

6    called Juicy Fruit.   One was synthetic cocaine called Crystal

7    Bubbly, and another was synthetic ecstasy called Delight.

8    Q.   Why do you call Juicy Fruit "synthetic marijuana"?

9    A.   Because that's what it was supposed to replicate.

10   Q.   How did you know that?

11   A.   At the time, synthetic marijuana was becoming popular.

12   The work at the center I was at was in a not-so-friendly

13   neighborhood in the west side of Chicago, and it was -- the

14   synthetic marijuana was already being sold at many multiple

15   gas stations and very popular with other inmates there.   It

16   was just another source, in a sense.   So.

17   Q.   And you described Delight, I believe, as synthetic

18   ecstasy; is that correct?

19   A.   Yeah, or MDMA.

20   Q.   What is MDMA?

21   A.   It's a methamphetamine drug that is supposed to produce

22   a euphoric high.

23   Q.   How did you know that Delight was supposed to simulate a

24   synthetic ecstasy?

25   A.   Robert Schroeder told me, and the way it was written, it

1   was a "D" and a very much larger "E," and the rest were

2   light.  So emphasis on "E," and the rest was ecstasy, and it

3   was like he told me.

4   Q.   Did you know when you were taking that substance at the

5   time exactly what chemicals were in it?

6   A.   Not the specific chemicals, but I knew it was supposed

7   to mimic ecstasy, and it certainly was very close.

8   Q.   How do you know that?

9   A.   Because I had taken ecstasy.  Used to sell it, and his

10  stuff was very potent.

11  Q.   The Delight?

12  A.   Yeah.  One of my friends actually almost overdosed in

13  the work release unit.

14  Q.   I'll get back to that in a minute.

15       How was the Delight packaged?

16  A.   It was a black package.  I want to say white and blue

17  writing, if I recall.

18            MR. COOK:  Object to the relevancy, Judge.

19            MS. MUNRO:  He was obtaining the substances from Mr.

20  Schroeder.

21            THE COURT:  Overruled.

22            THE WITNESS:  Who?

23  BY MS. MUNRO:

24  Q.   You can go and describe the packaging.

25  A.   I want to say black with white and blue writing on it.

1  Q.   When you used the Delight, how much of it were you

2  using?

3  A.   Well, they came in either a half-gram or gram packages

4  and -- half-gram packages, and it started maybe like a third

5  of the package.  So almost like .1, .2.

6  Q.   How about the first substance, which I believe you

7  described as synthetic cocaine; is that correct?

8  A.   Yeah.  Crystal Bubbly.

9  Q.   Is that its full name?

10 A.   Crystal Bubbly hookah cleaner.  It was marketed -- or he

11 told me it was like synthetic cocaine, but to my, I guess,

12 knowledge and experience with drugs, I'd call it closer to

13 crystal meth.  It kept you weak.  Had a very different

14 feeling than cocaine.

15 Q.   What kind of quantity were you using of the Crystal

16 Bubbly?

17 A.   Well, that was either in half-gram or gram packages but

18 it -- the amount was probably like .05 to get a very intense

19 high, which is a tenth of a half-gram bag.  It was

20 significantly stronger than the usual dosages from cocaine.

21 Q.   So would you be able to use, then, out of one packet

22 multiple times?

23 A.   Oh, yeah.

24 Q.   How frequently were you using when you were on work

25 release?

1   A.   You mean individual doses or times of using it

2   throughout the week?

3   Q.   Times of using it throughout the week.

4   A.   Depended on the week or what I was doing, but I'd say

5   maybe three to four times a week.

6   Q.   I think you indicated earlier, if I'm not wrong, that

7   there were others in the work release program that had access

8   to the same substance; is that right?

9   A.   The synthetic marijuana -- other inmates were getting it

10  from stores around there.  The synthetic cocaine and ecstasy,

11  some of the people had access to it.  The other people in

12  there had it because I gave it to them.

13  Q.   Did you give it to them, or did you sell it to them?

14  A.   Sold it to them.

15  Q.   How did you do that while you were on work release, as a

16  practical matter?

17  A.   Well, I snuck it in. We had cash in there.  So.

18  Q.   So were you using it at the facility when you had to

19  check back in?

20  A.   Yeah, but the drug test we got -- it didn't show up on

21  it, because it was synthetic.

22  Q.   So is that why you were using them?

23  A.   Yes.

24  Q.   And all of the Crystal Bubbly hookah cleaner that you

25  were using during work release was coming from where?

1    A.    Robert Schroeder.

2    Q.    Was he your only source?

3    A.    Yes.

4    Q.    How frequently do you think you saw him during that

5    period of time?

6    A.    Maybe once or twice a month.

7    Q.    And based on what you stated earlier, this would have

8    been from sometime in February of 2011?

9    A.    Yeah, until about August.  So like a six-month span.

10   Q.    And were you selling to others during that entire period

11   of time?

12   A.    Yes.

13   Q.    Let's talk for a minute about your experience using the

14   substance.

15        When you used Crystal Bubbly hookah cleaner, what would

16   happen to you physiologically?

17   A.    It would significantly increase your heart rate,

18   breathing rate.  Make you sweat.  I remember it kind of,

19   like, cramped up my muscles.  I remember when I would take

20   it, it would be very hard to write.  My fine motor skills

21   were significantly decreased.  I remember it was extremely

22   hard to write legibly, mainly because I was shaking so much.

23   Q.    Did you ever feel like you used too much of it?

24   A.    Oh, yeah.  Definitely.

25   Q.    What do you mean by that?

1    A.    It was a very strong substance and addictive, and

2    there's definitely times I wished it would end and stop

3    because it was so strong.

4    Q.    When you say "strong" or "so strong," what are you

5    comparing it to?

6    A.    Normal dosages of cocaine.  Say, if you did a .1 line of

7    cocaine, half of that of Crystal Bubbly was three times as

8    strong.  So .5 and .05 was like .2 of cocaine.

9    Q.    How many times do you think you used the Crystal Bubbly

10   hookah cleaner while you were in the work release program?

11   A.    Individual times or, like, days?

12   Q.    How many times overall do you think you actually

13   ingested it?

14   A.    I mean, like, if you're asking me did I drink last

15   night, that's a yes.  How many drinks I had might be four.

16   Are you asking for the one or the four?

17   Q.    I guess I'm asking how many individual different doses

18   do you think you consumed while you were in the work release

19   program?

20   A.    Maybe 200 or more.

21   Q.    How were you ingesting it?

22   A.    Snorting it.

23   Q.    Did you use it any other way?

24   A.    Never; although the Delight -- we did eat it.  We didn't

25   snort it.

1  Q.   Is there a reason why you used the Crystal Bubbly hookah

2  cleaner in that manner versus using the Delight by oral

3  ingestion?

4  A.   The preferred method of ingestion -- cocaine, when

5  digested, doesn't really have as much of an effect as when

6  snorted and opposite is for ecstasy.  When it's digested, it

7  has more of an effect than when it's snorted.

8  Q.   Do you know that from your own personal experience?

9  From using it?

10 A.   Yes, and that's also what Robert recommended, and it was

11 accurate.  We tried both ways with both of them, and it

12 remained true.

13 Q.   When did he make those recommendations to you about how

14 to use it?

15 A.   When I first got it from him.  He definitely told me how

16 much to use and how to do it and things like that, because he

17 warned me it was strong.  I tried it, and it was

18 significantly strong, like he said.

19 Q.   Do you have any recollection what you were paying for

20 the Crystal Bubbly at the time?

21 A.   I think at first he was giving it to me for free just to

22 try.  When I liked it and started to get more and sell it,

23 something like $5 a pack.  Not much.  He was taking care of

24 me.  He was more or less trying to help me start moving it

25 for him.

1    Q.    What do you mean by that?

2    A.    Selling it, because, obviously, he got it -- I'm

3    assuming he got it for significantly cheaper, say a dollar a

4    pack and sold it to me for five.  So it was more profitable

5    for him than for me.

6    Q.    Did he approach you about doing that?

7    A.    Yeah.  We didn't know about the synthetic substance when

8    we were in prison, and when I got to work release and got

9    access to a phone, I was basically reaching out to anybody to

10   talk to, communicate with and meet up with.  When I first

11   talked to him is when he mentioned it to me, and me being in

12   prison and being drug tested in the work release, that was an

13   opportunity that piqued my interest.

14   Q.    Did you get drug tested while you were using the Crystal

15   Bubbly in work release?

16   A.    Yes.

17   Q.    Do you know for a fact whether you got tested during the

18   time it was still in your system?

19   A.    Yes.

20   Q.    What was the result of the test?

21   A.    For me, it was negative.

22   Q.    So when you spoke with Robert Schroeder after you got

23   out of your work release program, what happened then?

24   A.    I started to work for him, selling this to smoke shops

25   around the country.

1   Q.   What do you mean by working for him?

2   A.   Being a salesman, calling.  He gave me a list, a giant

3   list of, like, well over 3,000 smoke shops or head shops

4   around the country that sold bongs and bowls and things like

5   that.  He would give me certain states to call that were my

6   assigned states, and I started calling them and offering

7   samples, seeing if they wanted it.

8   Q.   Let me unpack that a little bit.

9        When exactly did you start working with him?

10  A.   Very shortly after I got out -- maybe November of 2011.

11  But I was -- I'd say I definitely started full-time in

12  January of 2011.  I think I took the first two months kind of

13  easy when I got out.

14  Q.   Did you say January of 2011?

15  A.   2012.  2012.  Excuse me.

16  Q.   Sometime between November of 2011 and January of 2012?

17  A.   Yes.

18  Q.   Were you working for him as an individual?

19  A.   Yes.  He was really the only person I primarily dealt

20  with.

21  Q.   Was he your actual employer, or was he affiliated with

22  an entity?

23  A.   He was affiliated with an entity.

24  Q.   What was it called?

25  A.   Modern Day Prophets.

1    Q.    When you started working with Modern Day Prophet, what

2    did Robert Schroeder tell you about the company?

3    A.    That it was an LLC that he and his friends had formed to

4    supply these substances to smoke shops around the country.

5    Q.    Did you know what smoke shops were then?

6    A.    Oh, yeah.   Yes.

7    Q.    How so?

8    A.    Well, those were places I used to go buy any

9    questionable paraphernalia back when I was smoking in high

10   school.   That's where you got bowls and bongs and blunts and

11   things like that.

12   Q.    What's a blunt?

13   A.    A cigar paper that's used to roll marijuana in.

14   Q.    Did you know who the friends were that he had formed

15   this company with?

16   A.    He mentioned some names.   I hadn't met them at first.   I

17   met them in passing a few times over the six months or so I

18   was there just picking up a check but never really knew any

19   of them.   Never got personable with them.

20   Q.    Is it fair to say in the beginning you didn't really

21   know who these folks were?

22   A.    Correct, just Robert.   I knew the names, but that was

23   it.

24   Q.    Then I think you indicated when you started working with

25   him, he gave you a list.

1    A.    Yes.

2    Q.    What was the list?

3    A.    It was a list of several thousand smoke shops in

4    alphabetical order by state, in the country -- of names,

5    address, phone numbers and potential owner names so that I

6    could call and ask to speak to the owner and ask if they

7    carried products like this and if they wanted a sample to try

8    ours.

9    Q.    Where did the list come from?

10   A.    Schroeder provided it to me.  I have no idea where he

11   got it.  It was a giant Excel sheet that he sent me.

12   Q.    Did he give it to you in a hard copy format or email it

13   to you?

14   A.    Email it to me.

15   Q.    What email address were you using at the time?  Do you

16   remember?

17   A.    Mr.jister420@aol or gmail.com.  This is about six years

18   ago.  I'm sorry.

19   Q.    So what were you supposed to do with the list?  I

20   believe you said you were going to make some phone calls?

21   A.    Yeah.

22   Q.    Where did you do that, exactly?

23   A.    Where did I physically make the phone calls from?

24   Q.    Uh-huh.

25   A.    My basement in Buffalo Grove, in my mother's house where

1    I was living.  That became my office.

2    Q.   At that time, to your knowledge, did Modern Day Prophet

3    have an office?

4    A.   No, they never had an office, to my knowledge.  It was

5    just Robert's house they worked out -- or apartment.

6    Q.   Excuse me?  I'm sorry.  Go ahead.

7    A.   To my knowledge, everything was done out of Robert's

8    apartment.  Every time I went there, I'd see the materials

9    lying around.

10   Q.   Were you going to Robert's apartment in this early time

11   period between November and the early part of 2012?

12   A.   Yeah.  The only place I ever went to meet him to pick up

13   supplies or the samples to send out or checks was always

14   Robert's apartment in Lisle.

15   Q.   When you were making sales calls, did you typically

16   always do it out of your house?

17   A.   Yeah.  Only out of my house.

18   Q.   How many sales calls were you making in a day, do you

19   think?

20   A.   Well, when I was really focusing on it from about

21   January, February and March, I do a few hours a day.  I mean,

22   maybe like a hundred a day.  I was pretty adamant about

23   trying to do well with it, and I ended up doing very well

24   with it for a personal matter, I thought.

25   Q.   Were the head shops that you were calling located in any

 1   particular geographic area?

 2   A.   There was other salesmen -- three, I want to say --

 3   three or four -- and they had already gotten certain states

 4   since they were already selling this for maybe close to a

 5   year at that point -- say, the large states like California,

 6   Texas, things like that, they had already, say, called dibs

 7   on, in a sense.  I was given a list of states that were mine

 8   to call that no one else had called yet.  In my eyes, they

 9   were pretty -- smaller states, I'd say.

10   Q.   Do you remember what any of your territorial states

11   were?

12   A.   Oh, yeah.  There was Oregon, Washington, Michigan,

13   Vermont, Connecticut, Indiana, New Jersey, Georgia, South

14   Carolina, Arizona.

15   Q.   Do you know at the time who the other salesmen were?

16   A.   Nick Purintun, Ryan Buchanan, Robert Schroeder, David

17   Scholz.

18   Q.   Were they all involved at the time that you started

19   selling?

20   A.   Yes.  They were more or less a close group of friends,

21   and I was one detached salesman that only knew Robert.  I

22   didn't really ever deal with any of them except for Robert.

23   Q.   We'll get to that in a minute.  In the meantime, when

24   you made your sales calls, tell me a little bit about what

25   your process was.

1    A.   Well, I would call the store and ask to speak to the

2    owner, more or less qualifying the person on the phone to

3    make sure it was a person I could pitch properly to see if

4    they carried the product and then wanted to see if they

5    carried it and then ask if they wanted to try a sample of the

6    product.  We would try to be as discrete as possible and say,

7    you know, "Do you carry party powder or hookah cleaner?"  I

8    wouldn't come right out and say, "Hey, do you carry synthetic

9    cocaine," because you don't know who's on the other end of

10   the line, and you don't want to offend them and lose the

11   sale.  So I'd basically -- I'd come off as a consumer first

12   and say, "Hey, do you guys carry" -- a lot of people didn't

13   like the term "bath salts" at the time.  So we tried not to

14   use that.  But I'd say "party powders" or "hookah cleaner" --

15   something kind of vague like that.  If they responded

16   positively, I'd say, "Well, I'm actually Brian from Modern

17   Day Prophets, and I was calling to see if you wanted a sample

18   of our product."  If they said yes, I would either -- if I

19   had the samples myself, I'd mail off one to them.  Just a

20   regular business envelope with a flier.  Or I would email

21   back to Robert and tell them, "Hey, this store wants them,"

22   and he'd send off samples.

23   Q.   Why did you not want to use the term "bath salts"?

24   A.   We knew it was kind of a gray area of morality of this

25   product.  We were all under the impression and knew that it

1    was legal at the time, but it was only a matter of time

2    before it became illegal, and due to the fact it was an

3    unethical product, some stores didn't carry it, and we didn't

4    want to offend people off the bat.  So we were just trying to

5    be careful how we worded it.

6    Q.   So back then --

7    A.   At least that's what Robert told me to do, and I'd say

8    it was a good sales move.

9    Q.   Robert told you to do that, specifically?

10   A.   Basically not come out and say, "Hey, do you want bath

11   salts, synthetic cocaine" -- to be more vague, discrete.

12   Q.   When you say you knew at the time the substance was

13   legal, what do you mean by that term?

14   A.   That it wasn't illegal.

15   Q.   Okay.  What does that mean to you?

16   A.   That I couldn't get arrested for selling it.

17   Q.   Why not?

18   A.   Because it wasn't illegal.  At least that was my

19   understanding and knowledge.  I was fresh out of prison.  I

20   didn't want to get in trouble.  I was trying to make money.

21   That just happened to be a new hot commodity in the market

22   people wanted.  I could get it cheap, and it was a good

23   product, and as a businessman perspective, it was a good

24   move.

25   Q.   Did Robert Schroeder ever talk to you about whether the

1    substances were controlled?

2    A.   He did mention that there were certain synthetic

3    substances that were not legal or were now controlled, and he

4    mentioned to me that the place he got it from -- basically,

5    he could specifically request whatever illegal analogue not

6    be in the substance.

7    Q.   So whichever substance was not controlled could be in

8    there, and something that was controlled could not?  Is that

9    what you're trying to say?

10   A.   Yeah.  He even provided me lab reports showing that

11   whatever was a known controlled substance was specifically

12   not in the substance we were selling so that I could provide

13   it to the store owners if they asked for it.

14   Q.   Where does the term "party powder" come from?

15   A.   That's specifically something Robert Schroeder told me

16   to say.

17   Q.   Okay.  And "hookah cleaner" -- did that come from the

18   product itself?

19   A.   That's what they called the Crystal Bubbly.

20   Q.   Is that what you were selling back then?

21   A.   Primarily.  That was definitely the top seller.

22   Q.   What else were you selling?

23   A.   The Delight, and also the synthetic marijuana, the Juicy

24   Fruit.

25   Q.   What was your understanding of the reason Crystal Bubbly

1    was the top seller?

2    A.   Probably because it was the most addictive.

3    Q.   What was the intended use of the product?

4    A.   For human consumption -- to snort it, to mimic cocaine,

5    in my experience.

6    Q.   In your experience in this market, did most end users

7    snort it?

8            MR. COOK:  Calls for speculation.

9            MS. MUNRO:  Only answer if you know.

10           THE WITNESS:  Yes.

11           THE COURT:  He's speculating.

12   BY MS. MUNRO:

13   Q.   Did you instruct people how to use the products?

14   A.   Yes.

15   Q.   What did you tell people when you sold the substances?

16   A.   To snort it.

17        Some business owners had asked me the best way to do it,

18   and I informed them, especially since I was sending them

19   samples, you know.

20   Q.   Do you remember whether you used any other kind of terms

21   when you would initially contact head shop owners and other

22   customers?

23   A.   I mean, there's bath salts, party powders, hookah

24   cleaner.  That's all that really comes to mind right now.

25   Q.   You said that sometimes when you would mail off a

1    sample, you would include a flier.  What was that flier?

2    A.   Of the different products that we offered.

3    Q.   Can you describe it, generally?

4    A.   The flier or the products?

5    Q.   The flier.

6    A.   Well, there was one for the three -- two or three

7    different kinds of synthetic marijuana.  Then there's another

8    one for the Crystal Bubbly and the Delight.

9    Q.   Who provided you with the fliers?

10   A.   Robert Schroeder.

11   Q.   Who made the fliers?

12   A.   No idea.  I never got involved in any of the

13   magnetization materials, packaging, distribution.  I was just

14   told, "Hey, here's the product.  Sell it."  So I tried.

15   Q.   You said earlier you would go to Robert Schroeder's

16   house or apartment?

17   A.   Apartment.

18   Q.   Apartment.  To pick up supplies.

19   A.   Yes.

20   Q.   What do you mean by that?

21   A.   Envelopes, stamps, samples, fliers.  Or I'd pick up a

22   check if I was owed it.

23   Q.   When you say sample, are you talking about product

24   samples?

25   A.   Correct, yeah.

1  Q.   Of all three types of products?

2  A.   Uh-huh.

3  Q.   How much of that product would you tend to keep at home

4  in order to send out yourself?

5  A.   Well, in the beginning, within the first month of me

6  doing it, I found very quickly the market was significantly

7  flooded with the synthetic marijuana, so there was probably

8  just a couple of sales made of that.  So I -- I remember I

9  only picked up samples like one time.  Other than that, I

10 probably would say maybe 5 percent of the people bought the

11 synthetic marijuana and 5 percent bought Delight, and the

12 other 90 percent bought the Crystal Bubbly.  So it was

13 primarily always the Crystal Bubbly I was picking up, and I'd

14 pick up 25 to 50 packets at a time and then send out one or

15 two samples to a store owner when they wanted it.

16 Q.   How often do you think you were sending out samples,

17 would you guess?

18 A.   Maybe a few a weeks.  I'd get ten built up before I'd

19 send it out.

20 Q.   Did you send them regular mail?

21 A.   Yes.  Just a regular business envelope with a stamp on

22 it.

23 Q.   How did you address the envelope when you sent it out?

24 A.   To the store.  I honestly don't remember if I put a

25 return address on there or not.  Probably not, just for the

1   fact that, obviously, it was an unethical thing, and I didn't

2   want it coming back to my mother's house.

3   Q.   Is that where you were living at the time?

4   A.   Yes.  I was on parole at my mother's house.

5   Q.   So were you the only one sending out samples to your own

6   customers?

7   A.   To my own customers, yes.  Yeah.  My customers never

8   dealt with anyone but me.

9   Q.   Did you have regular customers?

10  A.   I did.  Several.

11  Q.   I think you said a minute ago -- and correct me if I'm

12  wrong, please -- that Robert Schroeder told you that the

13  place where he was getting this product could design the

14  product in some way that it would not contain substances that

15  were controlled.

16  A.   Yes.

17  Q.   Is that fair?

18  A.   Yes.

19  Q.   Did he tell you, then, where he was getting them?

20  A.   China.

21  Q.   Did he tell you from who?

22  A.   Dave Scholz's brother or family member, friend.  I don't

23  fully recall the exact relationship, but it was someone very

24  close to Dave, and he basically said that Dave was more or

25  less the connect with the guy in China.

1  Q.   Did you ever meet this person in China?

2  A.   Never.

3  Q.   Did you ever travel to China?

4  A.   Never.

5  Q.   Did you ever have anything to do at Modern Day Prophet

6  with the acquisition of that product from China?

7  A.   Never.  The only time I ever saw it was when it was

8  already packaged and given to me in samples.

9  Q.   Does that mean you never saw it in a raw form?

10  A.   Never.  I never shipped any orders other than my own

11  samples, either.

12  Q.   So at the time that you're selling the Crystal Bubbly

13  hookah cleaner, can you describe the substance itself that

14  was inside the packet?

15  A.   It was usually a white powder.  Sometimes it was yellow,

16  depending on the batch.

17  Q.   Is that the same way that the substance presented itself

18  when you were using it in the work release program?

19  A.   It was white at first, and then I want to say maybe in

20  March, April or so, the yellow started popping up.  I think

21  they were cutting it or a slightly different batch due to

22  maybe a chemical becoming illegal.  I didn't really question

23  it much.  I was just trying to sell it and make money.

24  Q.   Is this also when you were using it?

25  A.   No.  I didn't really use it when I was out.  It was more

1    or less -- the only time I really used it when I was in work

2    release was kind of a state of mind -- "Hey, I'm locked up,

3    and I don't have much to do."  When I got out, I didn't

4    really want to feel that way, actually.

5    Q.   Did you use the Crystal Bubbly at all when you got out?

6    A.   Maybe very occasionally.  Maybe once a month.  It wasn't

7    quite enjoyable.

8    Q.   So at the time that you started selling it, how about

9    the packaging for Crystal Bubbly?  What did it look like?

10   A.   Kind of an orangeish yellow.  Kind of had a little shine

11   on it.

12   Q.   How big was the packet, would you say?

13   A.   Maybe the size of a pack of cigarettes, but just the

14   perimeter on the outside.  Not the depth of it, though.

15   Q.   Did those packets have any ingredients listed on them?

16   A.   No.  Absolutely not.

17   Q.   Were they printed packets?

18   A.   Yeah, there were graphics on them.

19   Q.   What kind of graphics?

20   A.   I think it had a hookah on it because it said hookah

21   cleaner.  I know it definitely said "not for human

22   consumption" on it.

23   Q.   Now, why did you say definitely not when I asked you if

24   there were ingredients on the packet?  What do you mean by

25   that?

1   A.   Well, one, from a business perspective, you don't ever

2   put your materials on there -- what it is, because someone

3   could copy it.  Two, we were selling it as hookah cleaner,

4   and we knew it wasn't.  So it was for intoxication.

5   Q.   Do you know why the packets were printed with "not for

6   human consumption"?

7   A.   Legality purposes, kind of like marketing.  Kind of

8   like, say, a bong is for tobacco use when nobody uses it for

9   tobacco.

10  Q.   During this period of time when you came on at MDP, did

11  you have any direct interaction with the other salesmen?

12  A.   The only time I ever saw the other -- Nick, Ryan or Dave

13  was at Robert's house, in passing.  Dave was there most

14  commonly.  I'd say I probably met him almost ten times, but

15  it was more or less, again, just in passing and picking up

16  materials, picking up a check.  "Hey.  How you doing?"

17  "Fine."  In and out.  Ten minutes or less.

18       Ryan -- I think I only met him maybe twice.

19       Nick -- I met him once in July when we went to go to the

20  bank to become signers.  And that was it.

21  Q.   We'll come back to the bank in a little bit.

22       I believe you testified a moment ago that you never went

23  to China in connection with your work with MDP; is that

24  correct?

25  A.   Correct.

1   Q.   Did you ever have to travel at all for business?

2   A.   From my house in Buffalo Grove to Lisle, Illinois, to go

3   to the bank.  I never went beyond that.

4           THE COURT:  We'll stop and recess for lunch for one

5   hour.  So 1:45.

6           (Recess at 12:45 p.m. to 1:45 p.m.)

7           Someone have a question?

8           MR. HOFFMAN:  Yes, Your Honor.  I did.

9           As the Court will recall, pretrial, the Court agreed

10  to take judicial notice of the dates when MDPV came a

11  Schedule I controlled substance and when alpha-PVP did.  The

12  government's intention is -- after this witness testifies --

13  is to read those two facts to the jury before the next

14  witness, with the Court's indulgence.

15          THE COURT:  Okay.

16          Remind me if I forget.

17          (Jury returned to courtroom.)

18  BY MS. MUNRO:

19  Q.   Mr. Lister, when we dropped off for the lunch break, I

20  think we were talking a little bit about your travel

21  patterns.  Now, correct me if I'm wrong, but I believe you

22  indicated that you never traveled outside the state of

23  Illinois for any purpose relating to your business with

24  Modern Day Prophet; is that right?

25  A.   That's correct.

1    Q.    Why?

2    A.    Never needed to.

3    Q.    Why is that?

4    A.    Because I did everything from my phone and my house.

5    Also, I was on parole and wasn't allowed to leave the state.

6    Q.    Was that true for the entire time you were with Modern

7    Day Prophet?

8    A.    Yes.  I was on parole for three years from November 4,

9    2011.

10   Q.    Through, then, 2014?

11   A.    Yes.

12   Q.    Did you ever have occasion to meet with any of your

13   customers in person?

14   A.    Never.

15   Q.    Did you, in fact, ever meet with customers of yours in

16   person?

17   A.    Never.

18   Q.    Sitting here today, could you identify any of your

19   customers by sight?

20   A.    Never.  No.

21   Q.    I believe you also indicated you never traveled to

22   China, and at the risk of being redundant, could you, sitting

23   here, identify any person who may or may not have been a

24   source in China for MDPV?

25   A.    No, I cannot.

1    Q.   When you were working with Modern Day Prophet, did you

2    know anything about the controlled substance schedules?

3    A.    No.

4    Q.   Did you know what they were?

5    A.    Yes.

6    Q.   What was your understanding of the schedules at that

7    time?

8    A.    That whatever substance we were selling was not on them.

9    Q.   When you say "not on them," do you mean that they were

10   not banned?

11   A.    Correct.  I personally didn't do any research on it.  I

12   just took Robert Schroeder's word because he told me that he

13   religiously researched it online.

14   Q.   So it wasn't one of your job responsibilities to keep up

15   with which substances were banned and not banned?

16   A.    No, because Robert assured me he was constantly looking,

17   and basically, the reason we stopped is when he found out.

18   That's when I stopped and walked away.

19   Q.   When you had communications with customers about the

20   products you were selling, is that how you discussed the

21   concept of legality with them -- whether or not they were

22   banned?

23   A.    Yes.

24   Q.   So let's get back to your sales process a little bit.  I

25   believe you testified earlier that you would contact a

1   potential customer and have some kind of an exchange wherein

2   you would try to determine whether or not they sold those

3   substances; is that correct?

4   A.   Yes.

5   Q.   Once you made the determination that a head shop or a

6   smoke shop wanted to either purchase or sell those

7   substances, how did your conversation develop from there?

8   A.   I would ask them -- basically just ask if they sold it

9   already, and if they said yes, I would introduce myself as

10  Brian from Modern Day Prophets and that we have a new product

11  that has been really popular, and I wanted to send them a

12  sample to see if they'd like to carry it.

13  Q.   Did you ever hear the term "mimicking" or "mimic" when

14  you were having those conversations with head shop owners?

15  A.   Yes.

16  Q.   In what capacity were you using that term?

17  A.   It just referred to which drug the synthetic bath salts

18  or whatever would mimic, whether it be ecstasy, cocaine,

19  methamphetamine.

20  Q.   Did you provide that information when you were asked to

21  do so?

22  A.   Yes.

23  Q.   What was the demand like for Crystal Bubbly by the time

24  you were three or four months into your relationship with

25  Modern Day Prophet?

1  A.   Very high.

2  Q.   Do you have any sense of the volume that you were

3  selling in a week or a month?

4  A.   The first three months that I was essentially full time,

5  January, February, March, it wasn't very many sales

6  happening.  It was more or less just me calling and sending

7  out samples.  Throughout April, May, June is when it was --

8  more or less, I was just picking up my phone for orders.  It

9  was very busy then.  I'd say maybe a couple hundred packs a

10  week I'd sell, in, usually, half-gram packets.

11  Q.   So are you testifying that in the April, May and June

12  time frame, you would receive calls with requests to

13  purchase?

14  A.   Yes.

15  Q.   Who were you getting those calls from?

16  A.   The stores that I had sent samples to that had liked it.

17  Q.   Did you ever sell to any kind of customer or entity

18  other than a smoke shop or a head shop?

19  A.   No, because I didn't have their name or number, because

20  I was only calling the list Schroeder gave me of legitimate

21  businesses.

22  Q.   When you got an order for Crystal Bubbly, what would you

23  do with the order?

24  A.   We would determine how much they wanted and whatever

25  their set price was, and then I would email over to Robert

1   Schroeder -- or occasionally, Ryan Buchanan -- the amount,

2   the store, the address and confirm with the store owner that

3   we'd do a Cash on Delivery or COD deal.  Basically, they had

4   to have a certified check or cashier's check for X dollars,

5   and the courier they used dropped it off -- the courier would

6   take that check with them so that neither one of us could

7   essentially be screwed and not get payment or product.

8   Q.   Do you know which courier Modern Day Prophet would use?

9   A.   I believe he used DHL and FedEx.

10  Q.   When you say "he," what do you mean?

11  A.   Schroeder.  I never had anything to do with it.  I

12  remember seeing FedEx boxes at his house, and I remember him

13  saying FedEx and DHL, but at the time, to me, it was an

14  irrelevant detail.  I had nothing to do with shipping.

15  Q.   You never shipped product out of your apartment or

16  house?

17  A.   I never shipped orders.  I did send samples a couple

18  times, yes.

19  Q.   Did you ever have anything to do with any other aspect

20  of the operation other than sales at this point in time at

21  Modern Day Prophet?

22  A.   No, not until Platinum Prophet.

23  Q.   We'll talk about that in a minute.

24       Can you talk a little bit about how your pricing worked

25  as far as your transactions with customers goes?

A.   I was given a set cost price that Modern Day Prophets

wanted.  I want to say it was close to about maybe $7 a pack.

Anything over that that I sold it for, I got.  So if I sold

it for $9 a pack, I got $2 a pack in my profit.

Q.   When you say your profit, does that mean what you were

paid out of that transaction?

A.   Yes.

Q.   So at what prices were you typically selling Crystal

Bubbly to your customers?

A.   It varied, but I -- jogging my memory, like six years

ago, but I believe somewhere around 9 to $15 per pack is what

I was aiming for.  But a lot of the stores were already

carrying the products from another price, so they wanted the

competitive price that they were already getting it for, so

it varied per place.  I just kept notes on what the agreed

price was per shop.

Q.   Who got to determine what the agreed-upon price was?

A.   The store owner and I.  We would negotiate it.

Q.   That wasn't dictated by anyone at Modern Day Prophet?

A.   No.  I was given what they wanted, and anything over it

was my commission.  It was strictly up to me what I agreed

to.

Q.   Do you know whether or not your cost varied at all with

volume, or was it consistent?

A.   Yes, it does vary with volume.  I think for up to ten

1  packs, it was, say, $8.  Up to a hundred packs, $7.  And say,

2  up to 500 packs, $6.  Something along those lines.

3  Q.   So based on your testimony a minute ago, you were making

4  from maybe a dollar to up to $8 a pack.  Does that sound

5  about right?

6  A.   Yes.

7  Q.   Do you have any idea at what price your customers were

8  then turning around and reselling the Crystal Bubbly?

9  A.   Yes, anywhere from 20 to $40 a pack.  They were making

10  some pretty good money off of it.

11  Q.   How did you get compensated, then, out of these

12  transactions?

13  A.   When the check arrived -- the COD check that came

14  back -- I would wait until a few of them built up, and then I

15  would go down and pick up a check from Robert, and we would

16  go to the local Chase bank, where he would write a cashier's

17  check, and I would cash it.  Just written in my name.

18  Q.   How often would you go?

19  A.   It depended on how often check orders came in, but maybe

20  once a week to anywhere -- two to four times a month.

21  Q.   Who kept the records of what you were owed by Modern Day

22  Prophet?

23  A.   I did, in detailed emails, so that we both had the same

24  record.

25  Q.   At the time, was that your only job?

1    A.   At the time, until June, yeah.  I started this line of

2    work I'm doing right now in June.

3    Q.   When you say June, you mean June of what year?

4    A.   2012.  I think it was about June 12th I started.

5    Q.   Started with which company?

6    A.   It was called Dynamic Exteriors.

7    Q.   Completely different industry?

8    A.   Yeah, the roofing industry I'm in now and have been for

9    the last five years.

10   Q.   And I believe you also stated you would submit orders to

11   Modern Day Prophet in the form of email?

12   A.   Yes.

13        MS. MUNRO:  Your Honor, I believe Exhibit 585 is

14   admitted.

15        THE CLERK:  It is.

16   BY MS. MUNRO:

17   Q.   Mary, could we just zero in at the very top of the page

18   on the address blocks?

19        Do you see your email address there?

20   A.   I do.

21   Q.   What is the date of the email?

22   A.   Monday, May 12, 2012.

23   Q.   Do you recognize the email addresses to which you sent

24   that message?

25   A.   Yes, I do.

1    Q.   Just for the record, whose email addresses are those?

2    A.   The evolutionmarketing9 is myself.  Moderndayprophetbiz

3    is the email that was set up for Modern Day that, to my

4    knowledge, Robert Schroeder, Ryan Buchanan and Dave Scholz

5    had access to.  Then the next one, ryanbuck13, is Ryan

6    Buchanan, who occasionally -- if Rob was busy or out of town,

7    he told me to send it there to get the order processed.  The

8    last one, artisticoverlay, is Robert Schroeder's personal

9    business.  He had a concrete customization business.

10   Q.   Thank you, Mary.

11        Could we actually just try to focus a little bit on the

12   body of the message on page 1?

13        So can you tell the jury what this email is?

14   A.   These are all various orders that I had obtained and

15   were sending over to be shipped out from Robert or the

16   business.

17   Q.   Is this how you typically submitted your orders to

18   Modern Day Prophet?

19   A.   Every time.

20   Q.   You never did it any other way?

21   A.   Occasionally text message, so yeah, there were more text

22   messages other than emails, yes.

23   Q.   So for example, if you look at the second entry down,

24   just by way of example, can you interpret that order for the

25   jury?

1   A.   For Hookah Connection?

2   Q.   Correct.

3   A.   Hookah Connection was the name of the store.  The store

4   owner was Ahmed.  So that's who it was to the attention to.

5   1188 Glenwood Avenue Southwest, Suite B, was his address.

6   Atlanta, Georgia -- city and state -- zip.  Then the date of

7   the order was May 21st.  He ordered 40 packs of 500mg, which

8   is a half gram, Crystal Bubbly.  Total of the order was $430.

9   He asked for second-day delivery, meaning if this was a

10  Monday, he was going to get it on Wednesday so he would be at

11  the store to sign for it and give the check to the courier.

12      We always picked a specific day like that because the

13  owners weren't in the stores at all times.

14      Secured funds means yes, it is a cashier's check and not

15  a personal check.  And there you go.  Ship it on Tuesday so

16  he gets it on Thursday, just like I said.

17  Q.   If you go down to the next entry, can you interpret your

18  comments in the middle there regarding yellows and whites?

19  A.   She is returning her 25 1,000-milligram yellows, and we

20  are sending her back 45 500-milligram whites.

21      There was a time -- the majority of the time in the

22  beginning, the Crystal Bubbly was a white powder, and that's

23  when it was most potent.  At some point in time, they started

24  shipping out this yellow, which was unknown to me, and

25  apparently, it turned out that it was kind of a cut or less

1   strong, less potent formula.  A lot of customers didn't like

2   it, and this is one of a handful of return emails that we

3   got.  So I was actually kind of upset when I found this out

4   because they were basically screwing over my customers and

5   pissing them off when I talked to them and didn't even tell

6   me about it.

7   Q.   Who's "they"?

8   A.   Whoever shipped it:  Robert, Dave, Ryan.  This lady

9   ordered 25 gram packages, which is milligrams, so we're

10  sending her back 45 half-gram.  Why there's five missing, I

11  don't know, but it's just what we agreed upon.  But she

12  wasn't able to sell it because people who bought it didn't

13  like it.

14  Q.   Did you field a lot of requests for returns of product

15  like this?

16  A.   I want to say maybe like 5 or 10.  It was a handful of

17  them, yeah.

18  Q.   Were those requests for returns clustered around any

19  particular time frame or just disbursed throughout your time

20  at MDP?

21  A.   No.  They definitely were, from what I recall, April to

22  June area.  I don't recall specifically -- probably mainly in

23  May like this is.  I know there was a handful of them.

24  Q.   So can you verify by looking at this excerpt from the

25  email that all of these were customers of yours?

1    A.    Absolutely.

2    Q.    Did you ever cover sales calls for any of the other

3    salesmen?

4    A.    There was one time for Nick, whose name was Tom -- when

5    he did it that I don't remember why, but I was either asked

6    to call him, or for some reason, it was a store that Tom had

7    dealt with, and when I called and introduced myself, he said,

8    "I only deal with Tom," and there was a time that that guy

9    wanted a return order also.

10   Q.    Mary, could we zoom in on the bottom of that page?

11         Do you recognize the names of these customers?

12   A.    I do.

13   Q.    Can you interpret them for the jury?

14   A.    First one.  Queen City Smokes and Novelties was the

15   store.  Nayna Taylor was the store owner.  The rest is the

16   address.  The order was on 5/21.  She ordered 100 packs of

17   half-gram Crystal Bubbly.  Total was $1,030.  Secured funds.

18   So she was going to have a cashier's check.  Send it Tuesday.

19   There's a two-day delivery, so she'd get it Thursday.  That's

20   the day she agreed to be at the store.

21   Q.    Based on that, how much were you selling the Crystal

22   Bubbly to Nayna for?

23   A.    $10 a pack and $30 for shipping.

24   Q.    And then finally?

25   A.    Blue Moon Tattoo is another store.  Brett was the owner.

1    The rest is the address.  California.  Then May 21st order.

2    40 packs, 500.

3        This guy had gotten a less price.  He was one that

4    negotiated with me, and this is what I was referring to when

5    I didn't get into the big states first.  California.  This

6    guy would pay a lot less.  He's paying about $9 or $8 a pack.

7    40 times 8 or 9 is where the 335 came up.

8        Secured funds.  Ship Tuesday so he gets Thursday.  Same

9    thing.

10   Q.  Why did you make a face when you looked at the address

11   in California?

12   A.  Because like I said, I really didn't get California

13   much, but I think at one point, they gave me California to

14   call, and that's when I had gotten that return order from

15   somebody else's customer, because at first, I don't remember

16   calling California.

17   Q.  Thank you, Mary.

18       Can we please pull up admitted Exhibit 591, I think?

19   Can we just zoom in on that block of text?

20       Can you recognize this, looking at it?

21   A.  I do.

22   Q.  Who's this email from?

23   A.  It's from myself to moderndayprophetbiz.  It says Ryan

24   Buck, but it looks like it's the general business, but my

25   guess is it was for Ryan at this point.

1  Q.   What is this email?

2  A.   This was me requesting, I guess, my last check.  I'm

3  assuming it could be the last one or maybe my most recent

4  check.  These were all the dates and stores that made orders

5  and my commission like I was owed.

6       Like I said, I would wait until a handful built up, and

7  basically, in this one check, I was owed $2,970 at the

8  bottom.  The commission off each store very widely ranged

9  from $50 to 1,070.

10 Q.   Is this how you always communicated your check request

11 to Modern Day Prophet?

12 A.   Yes, or, occasionally, text messages.

13 Q.   If you remember, who was your biggest customer when you

14 were selling for Modern Day Prophet?

15 A.   It was a store in Atlanta.  I don't recall the name of

16 it, but the store owner's name was Serena Burkhart.

17 Q.   How often did you deal with her?

18 A.   She only made three orders, but she bought the most.

19 Q.   What do you mean by that?

20 A.   Well, I remember her very first order -- I sent her the

21 samples.  She liked it so much, her first order was $16,000.

22 The next two after that were $70,000 each.

23 Q.   Do you know who actually did the shipping on that order?

24 The large order?

25 A.   Robert and Dave and Ryan.  I know the first one they did

1    COD.  The next two -- well, do you want me to go into the

2    details of the agreement I had with her?

3    Q.   Sure.

4    A.   She -- after the first order that she made, that $16,000

5    one, she told me that she owned four of the largest and

6    busiest smoke shops in the downtown Atlanta area of Georgia,

7    and she was so happy with the product and liked it so much

8    that she wanted to make an agreement of whatever amount she

9    had to buy where I would promise not to sell to any other

10   store in the state of Georgia.  The amount that we agreed

11   upon was 10,000 packs at $70,000 every 60 days.  She made

12   that order twice.  I believe both times, Robert, Dave and

13   Ryan -- I think the first time it might have been just Robert

14   and Dave, and the second time, the three of them went down to

15   Atlanta to do it in person.

16   Q.   Do you know why?

17   A.   Because it was such a large order and they didn't want

18   to be out of product and not have the right money, and she

19   didn't want to go to the bank and write a $70,000 cashier's

20   check.  It was a very large transaction that we didn't want

21   to raise eyebrows at.

22   Q.   Thank you.

23        Let's go back a minute to the way you were compensated

24   by Modern Day Prophet.  Were you paid in gross?

25   A.   Can you clarify?

1   Q.   Did they take payroll taxes out of anything they paid

2   you?

3   A.   No.   I was essentially a 1099, but it was never reported

4   to taxes.   I never got a W-9 from them at the end -- 1099

5   from them at the end of the year that they claimed what they

6   paid me.   Nor did I report it.   So it was more or less cash

7   deals.

8   Q.   Do you remember whether you always got your checks

9   written off the same account?

10  A.   I believe so.   I didn't really pay attention to the

11  account number, but there were a few times I was paid in

12  cash, such as the Serena Burkhart large deals.

13  Q.   For how long were you actively selling on behalf of

14  Modern Day Prophet?

15  A.   From roughly the first of the year, 2012, until -- I

16  want to say sometime in July.   Whenever I found out it became

17  illegal, I stopped.   I'm not 100 percent of the time frame,

18  whether it was July or August.   But as soon as we found out

19  it became illegal, and specifically when Serena Burkhart was

20  busted -- that's when I stopped and walked away because I

21  didn't want to get in trouble.

22  Q.   When you say legal, are you referring to substances that

23  are banned, or are you referring to something else?

24  A.   I'm referring to the fact that the substance I was

25  selling was not illegal.   If it became illegal, then I could

1    get in trouble for it.  So yes, something that is banned.

2    Q.    Okay.

3    A.    The whole premise of selling it was the fact that at

4    that time, it was legal or not banned.

5    Q.    Not banned, meaning on the schedules; is that correct?

6    A.    Yeah.

7    Q.    During the time you were selling the product, were you

8    aware of anyone using Crystal Bubbly hookah cleaner for any

9    purpose other than human consumption?

10   A.    No.

11   Q.    Was there any purpose for Crystal Bubbly hookah cleaner

12   other than hookah cleaner?

13   A.    Maybe a paper weight.  That's about it.

14   Q.    Did the substance itself have any other use?

15   A.    Not that I know of.

16   Q.    At some point, did you take on any additional roles in

17   Modern Day Prophet?

18   A.    In Modern Day Prophet, no.

19   Q.    What do you mean by that statement?

20   A.    In early July, they wanted to start a different company

21   called Platinum Prophet, and they asked me to be part -- I

22   guess quarter owner -- and, I guess, get quarter profits.  At

23   the time, as far as business structures went, I was extremely

24   naive, and they had asked me for basically a $10,000 buy-in

25   to get more of the product from China, and it secured my

1    25 percent owner of Platinum Prophets, and it was literally

2    written on a piece of notebook paper and signed by Robert

3    Schroeder and I that my $10,000 buy-in secured me 25 percent

4    of the new company.

5    Q.   At that time, did Modern Day Prophet still exist as an

6    entity?

7    A.   Again, I was business-structure naive.  I don't know

8    that they dissolved it legally, but I'm pretty sure that they

9    stopped operating under it and doing any transactions under

10   that name.

11   Q.   Do you remember approximately when you got your last

12   check or payment from Modern Day Prophet for any kind of

13   sale?

14   A.   Probably in June sometime.

15   Q.   June of what year?

16   A.   2012.

17   Q.   2012.

18        As you moved through the spring and into the summer of

19   2012, out of which location is Modern Day Prophet operating?

20   A.   There was only one location -- just Robert's apartment

21   in Lisle.  There was never another location for business, at

22   least that I knew of.

23   Q.   Do you know why they wanted you to become a partner in

24   Platinum Prophet?

25   A.   Probably because I was doing very well and had a lot of

1    large sales.  This was around the time that Serena was buying

2    the very large amounts.  The $70,000 revenue deal that was

3    recurring -- that was impressive to them.

4    Q.   When you paid in the $10,000 for your ownership

5    interest, did you pay it in cash?

6    A.   I don't think I necessarily paid it in cash.  It was

7    more like commissions that were kept that were coming from

8    me.  So essentially, yes.  But I didn't withdraw $10,000 from

9    my bank account.

10   Q.   And when you became a part owner of Platinum Prophet,

11   did you continue selling product?

12   A.   Yes.

13   Q.   I believe you testified earlier that when you would

14   place an order via email, you would indicate in the email on

15   what day the parcel needed to arrive at the customer's shop;

16   is that correct?

17   A.   Yes, absolutely.

18   Q.   Why was it so important for the shop owner to be present

19   when the package came in?

20   A.   Because a lot of shop owners were not there all day,

21   every day, like a normal employee.  They came in to do

22   bookkeeping, maybe accounting, stocking, and they wanted to

23   be present for when the order arrived to not only verify they

24   were getting what they wanted to purchase but also to be

25   there to give us the check and sign for it because it was

1  going specifically to them.  It was basically a signature and

2  cash-on-arrival deal.  It was never just dropped and -- "Hey,

3  send us payment later."

4  Q.   So through the use of that procedure, did Modern Day

5  Prophet or Platinum Prophet ever lose product that you're

6  aware of?

7  A.   There were occasional times, but I don't remember it

8  happening on my orders, because I did it all COD where it was

9  secured like that, but I do remember them talking about,

10  "This guy stills owes," and things.  But I don't know.

11  Q.   That's fair.

12       When you say that you had a 25 percent interest in

13  Platinum Prophet, what did that mean to you?

14  A.   That 25 percent of the profits would go to me and along

15  with that, 25 percent of the expenses of the company.

16  Essentially, we started a new bank account in which the four

17  of us -- myself, Nick Purintun, Dave Scholz and Robert

18  Schroeder -- went to Chase, opened a new business bank

19  account and all four of us were signers on the account and

20  got our own business debit cards.  So that $10,000 that I put

21  in is what went towards the purchase of the product of

22  Platinum Prophet, being their product of sale.  Anything that

23  was sold -- the profits would go directly in that account and

24  would be split four ways.

25       By that same token, any of the business expenses of the

1   account would also come out of that and be split four ways,

2   such as any flights, car rentals, food while they were out,

3   things like that -- packaging, payment of purchases.

4   Q.   Where was Platinum Prophet's bank?

5   A.   Chase, on Ogden.

6   Q.   Is that where you went to sign the signature card?

7   A.   Yeah.  Yes.

8   Q.   You said that all of the profits or proceeds from the --

9   A.   Actually, just to back up on that.  There was two Chase

10  banks on Ogden.  The one we normally went to when I would

11  cash my checks for Modern Day Prophet and when we opened

12  Platinum, for some reason, we went to a different one the

13  opposite direction down the street from where Robert lived.

14  I don't know if it was to get away from the other bank, but I

15  recall that detail.  We did specifically go to a different

16  bank -- different Chase bank.

17  Q.   You indicated that all the profits were going into that

18  bank account.  Are you aware of any other source of income

19  going into that account, other than from product sales?

20  A.   No.  And to be honest with you, it was maybe like within

21  two or three weeks after we opened that account, that

22  business, that we pretty much shut down because we found out

23  it became illegal.  So the entire time in Platinum Prophet

24  was, "Hey, we have this company," but nothing ever actually

25  happened.

1   Q.   You say "it" became illegal.  What is "it"?

2   A.   The substance that was inside of the Crystal Bubbly,

3   they found out, became a scheduled or controlled substance.

4   So it was not okay for us to sell anymore.  So I walked away

5   and stopped selling.

6   Q.   How did you find that out?

7   A.   Robert Schroeder told me.  He told me that Serena

8   Burkhart got busted, and he started doing a lot of research

9   online and mentioned Operation Log Jam, which I guess was

10  some national, like, DEA bust of a lot of stores selling

11  it -- things like that.

12  Q.   Did you have any independent knowledge of Operation Log

13  Jam outside of what you got from Robert Schroeder?

14  A.   No.  Honestly, I was very naive about the whole thing

15  and didn't research or do anything.  I took Schroeder's word

16  for it.  He pretty much said he was sitting on the computer

17  all day searching for stuff, and I just took his word.

18  Q.   Do you recall when all this conversation was ongoing

19  about Operation Log Jam and the bust?

20  A.   I want to say late July, early August 2012.

21  Q.   And at this point, you're a partner in Platinum Prophet.

22  A.   Yes.

23  Q.   Just stepping back for a minute before we move through

24  that timeline -- did you have any responsibilities with

25  respect to managing the bank account of Platinum Prophet?

1    A.   Just the fact that I can view it.  That was it.

2    Q.   And did you?

3    A.   I did.  I remember printing out something one time

4    because I was, like, questioning them -- "What the hell you

5    guys spending here?"

6    Q.   Why did you want to become a partner in Platinum

7    Prophet?

8    A.   Because I saw there was a lot of profit to be made in

9    this business, because I knew they were getting it for

10   significantly cheaper than what they were allowing me to pay

11   for it.  For my $7 a pack or whatever I owed them, I knew

12   they were selling it a lot cheaper.  Before I got an

13   opportunity to make more money, it became illegal, so I

14   walked away.

15   Q.   Just to understand your profit motivation, it was

16   because while you made profit over the cost that was quoted

17   to you by the company -- is it fair to say you also wanted to

18   share, then, in the profit between the company's cost and the

19   quoted, sort of, wholesale price?

20   A.   You said it perfectly.

21   Q.   When you sold to customers, did you use your own name?

22   A.   Yes.

23   Q.   Did everyone else associated with Modern Day Prophet use

24   their own names?

25   A.   For the most part.  I remember Dave, Rob and Nick

1    occasionally saying they used different names.  I remember

2    specifically that Nick Purintun always used the name Tom.

3    It's about -- it's my understanding.  Ryan -- I think he

4    occasionally used a fake name.  Honestly, I didn't really ask

5    them about their sales practices, because it didn't matter to

6    me.  I was so detached.  I just wanted my money, and up until

7    Platinum Prophets, I was only responsible to myself.  I made

8    my money, and that was it.  What they made was irrelevant to

9    me because it didn't affect me -- and how they got it.

10   Q.   Was that still true for you after you became a partner

11   in Platinum Prophet?

12   A.   Yeah.  I didn't really ask.

13   Q.   Mary, could we show the witness admitted Exhibit 578?

14        Do you recognize this?

15   A.   Yes.

16   Q.   Can you explain this to the jury?

17   A.   This was the one I was talking about for when I had

18   gotten the customer in California.  On the bottom right, it

19   says "California."  Because I wasn't ever given that city --

20   that state to call.  It was one of the busier, bigger states,

21   and a lot of stores carried it.  For some reason, they let me

22   start calling it and when I got to the store, this guy had --

23   like, you can read the message.  "This is Tom's fuck-up in

24   Cali.  Dude still has 100 1,000-milligram bags of the

25   yellowish Crystal sitting around 'cuz no one wants it.  Might

1  be interested in trading back.  I don't know.  He wants

2  samples of the white crystal to confirm it is back to the

3  original batch.  Please send them to him ASAP.  He wants his

4  order ASAP also.  I spoke extensively with Dave Scholz about

5  this."  Then the store name.  His name was Paul, and that's

6  where he was.  So.

7  Q.   And who is Tom?

8  A.   Nick Purintun.

9  Q.   Did you consider this yellowish substance to be a

10 problem for you, outside of the fact customers were

11 complaining about it?

12 A.   Considering I was in this only for the business and the

13 money, yes, that is a problem, because upset customers means

14 less business.

15 Q.   Thank you, Mary.

16      You testified earlier, I believe, that at some point in

17 the spring of 2012, customers started contacting you for

18 product?

19 A.   Yes.

20 Q.   On what number did they contact you?

21 A.   My personal cell phone is the only number I ever used.

22 Q.   Did you use the same number the entire time you were

23 working with Modern Day Prophet?

24 A.   Yes.

25 Q.   Was that true when you were with Platinum Prophet as

1    well?

2    A.   Yes, and I still think I have that number today.

3    Q.   Did you ever use any other number or phone while you

4    were working there?

5    A.   Never.

6    Q.   Did you know any of the other partners or salesmen for

7    Modern Day Prophet to use any other types of phones?

8    A.   Yes.

9    Q.   Can you explain to the jury?

10   A.   At some point in it, they substantiated using burner

11   phones.  I never really saw the importance, because, like I

12   said, we thought it was legal, and it wasn't banned, wasn't

13   illegal.  So I didn't see a significance in using a burner

14   phone, because it wasn't a problem.  But the other guys did

15   use burner phones to not trace their normal phone.

16   Q.   Did any of your business associates in Modern Day

17   Prophet do anything else that kind of struck you as being

18   unnecessary or curious in the way they conducted their

19   business?

20   A.   No.

21   Q.   Nothing you can think of?

22   A.   Not that I can think of.

23   Q.   Go ahead.

24   A.   I mean, to me, a burner phone wasn't a farfetched idea.

25   We knew that we were walking a gray line of an unethical

1    product and, essentially, illegally selling drugs.  I have a

2    history of selling drugs in the background, so burner phones

3    weren't a farfetched idea.  So for the fact it was legal in

4    my mind or wasn't illegal, I didn't feel it was important

5    enough to go get a phone.

6    Q.  And you thought it was legal because you thought they

7    weren't banned?

8    A.  Correct, yeah.

9    Q.  I also asked you earlier if you were aware of any other

10   source of income at Platinum Prophet.  While you were working

11   with Modern Day Prophet, were you aware that company had any

12   other source of income?

13   A.  No.  Like what?

14   Q.  I don't know.  Anything.

15   A.  No.  I'm not aware of it.

16   Q.  Were you aware that Modern Day Prophet was engaged in

17   any other type of business while you were affiliated with the

18   company?

19   A.  No, not at all.

20   Q.  How about for Platinum Prophet?

21   A.  No, not at all.

22   Q.  Did Robert Schroeder ever say anything to you or provide

23   you any information about the importation of the chemicals

24   into the United States?

25   A.  Yes.

1    Q.   What did he tell you?

2    A.   I remember them saying that they used nail-filing

3    machines or something like that -- some way to hide it

4    instead of basically coming in one container of a powder.

5    They put it inside something, and I remember them saying they

6    would put different names on it.  Like, one of them was Ryan

7    Buchanan Beauty Supplies, because it was a nail light

8    machine -- not nail-filing machine.  Sorry.  I don't really

9    know too much about cosmetology, so I didn't ask what the

10   hell it was.  They said it was a way they disguised it, so I

11   said okay.  They said they had lost a couple packages from

12   shipping them from China.

13   Q.   What do you mean "they lost them"?

14   A.   They were seized by customs.  Luckily, it didn't affect

15   me at all because I wasn't part owner.  I didn't pay for it.

16   Q.   Did it change the price they quoted to you for the

17   product?

18   A.   No.

19   Q.   You mentioned Ryan Beauty Supplies as being one name

20   that Robert Schroeder and others at Modern Day Prophet would

21   use.  Why did they use that name?

22   A.   Just because it was a nail-related product, and instead

23   of -- having Modern Day Prophet getting a nail machine

24   doesn't quite make sense.  It was just trying to be a logical

25   coverup.

1    Q.   When you sent samples to your customers, did you tend to

2    send them directly to the shop, or did you send them to some

3    alternative address?

4    A.   I want to say about 95 percent of the time, I sent it

5    directly to the shop, but there were a couple of store owners

6    who -- I don't remember specifically -- but did have me ship

7    it to a different address.  Either a P.O. Box or their

8    personal house.

9    Q.   Do you know whether Robert Schroeder had any preference

10   for the way he shipped products out of Modern Day Prophet

11   with regard to service?

12   A.   No.

13   Q.   Were you ever involved in any way with the shipping

14   of --

15   A.   Are you referring to -- previous question.  Are you

16   referring to, like, DHL, FedEx or UPS?

17   Q.   Do you know whether the company used one particular

18   service?

19   A.   I think I answered this before -- that they mainly used

20   FedEx or DHL.  I remember them saying, like, one of them

21   doesn't require a warrant because it's a privately held

22   company.  I don't remember which one.  But I do remember the

23   couple times that I picked up a bunch of samples from Robert

24   Schroeder, he had put it in more of those boxes that you can

25   buy from the United States Postal Service and sealed it,

1    because he said, like, "On your way home, if you get pulled

2    over, they can't open it unless they have a warrant."

3    Q.   Why was he concerned about that?  Did he tell you?

4    A.   I'm guessing because it was a --

5              MR. COOK:  Calls for speculation.  Objection.

6              THE COURT:  Sustained.

7    BY MS. MUNRO:

8    Q.   Did he say anything to you about it that you remember?

9    A.   He didn't -- no, he didn't say why but --

10   Q.   That's fine.  If you don't know, don't answer the

11   question.  That's perfectly fine.

12        A little bit earlier, we looked at an email that you

13   testified indicated that you had a business relationship with

14   someone named Nayna, or Nayna at Queen City Smokes?

15   A.   Uh-huh.

16   Q.   What is Queen City Smokes?

17   A.   A store.  A smoke shop.

18   Q.   Do you remember where it was located?

19   A.   South Carolina, I think.

20   Q.   Who was Nayna?

21   A.   One of the owners that I spoke to -- or the owner.

22   Q.   Male or female?

23   A.   Female.

24   Q.   Do you remember how she pronounced her name?

25   A.   Nayna.

1    Q.   How often did you deal with Nayna?

2    A.   I don't remember the specific number of times I spoke to

3    her, but I talked to her on the phone 15 or 20 times.  But

4    that could be between, "Hey, where's my order?  I'd like

5    one."  I would say she ordered five or ten times.  I don't

6    recall a specific number, though.  But she did stick out in

7    my memory.  I do remember that name, mainly because I

8    remember her accent.

9    Q.   Can you describe her accent in general?

10   A.   I couldn't tell if it was Indian or Asian, but it stuck

11   out, and she kind of had a loud, annoying voice.

12   Q.   Do you remember what she purchased from you?

13   A.   Crystal Bubbly.

14   Q.   Always?

15   A.   Yes.

16   Q.   Do you remember what kind of prices you tended to quote

17   her?

18   A.   Not specifically.  I could look at the email and figure

19   it out.

20   Q.   Do you know who at Modern Day Prophet or Platinum

21   Prophet would ship products to Nayna?

22   A.   Not specifically.  I would send the order over to

23   Schroeder.  And who boxed it, I don't know.  I just know it

24   got shipped.  That was it.

25   Q.   Just one moment, Your Honor.

1          Mary, can we please look at admitted Exhibit 590?

2          Why don't we focus in on just the top address block?

3          Again, do you recognize those email addresses?

4     A.   Yes.

5     Q.   What is the subject of the email?

6     A.   "Last orders."

7     Q.   Do you know what that means?

8     A.   I'm guessing this is probably the last orders of Modern

9     Day Prophet before we switched to Platinum Prophets.  I don't

10    specifically remember, no.

11    Q.   Okay.

12    A.   Due to the time of June 2012 -- and I know we started

13    Platinum Prophets in early July, and I kind of remember the

14    reason of it, considering it's going to Ryan -- I remember

15    one of the reasons we started Platinum Prophets was because

16    Ryan wanted out.

17    Q.   Do you know why he wanted out?

18    A.   Not specifically, but I remember something about him

19    having a kid and just was done with it.

20    Q.   Mary, could we zoom in on --

21    A.   Actually, let me take that back, because in addition to

22    that, I remember Rob and Dave saying he was getting annoying,

23    and they were also kind of kicking him out.  So multiple

24    reasons.

25    Q.   I just want to clarify something.

1      Could we please look at Exhibit 585 that we looked at

2  previously?

3      When you dealt with these customers, I believe you

4  testified you never saw them directly?

5  A.   Never.

6  Q.   Did any of your customers ever visit you in Illinois?

7  A.   Never.  It was strictly over the phone.

8  Q.   So for Queen City Smokes specifically, I just want to

9  clarify what you understood about the location at that time.

10  A.   North Carolina, not South Carolina.  Sorry.

11  Q.   Around the time that you and everybody else sort of got

12  out of Platinum Prophet, was that happening all at the same

13  time, or did you decide that you needed to exit that business

14  at any particular juncture?

15  A.   Can you rephrase the question?

16  Q.   Well, I believe you indicated that there was just a very

17  short while after Platinum Prophets was formed that certain

18  substances became banned?

19  A.   Yes.

20  Q.   Let's start there.  Do you remember which substances?

21  A.   No, not specifically what substances.  But the only

22  reason I would have wanted to stop was because Schroeder told

23  me that the ones we were dealing with were possibly banned or

24  customers that we had were banned.

25  Q.   Would you have gotten that information from Robert

1   Schroeder?

2   A.   Yes.  And I also had a customer -- one or two -- tell me

3   that he had been arrested or detained or something of that

4   also, and when that happened, I stopped and walked away

5   because it was obviously getting hot.

6   Q.   Would you have communicated that information to anybody

7   that you were in business with?

8   A.   Oh, absolutely.  Yeah.

9   Q.   For how long after you became concerned about these

10  issues were you a partner in Platinum Prophet?

11  A.   Maybe a week.

12  Q.   What happened to the entity itself?

13  A.   Again, I was naive in business, and I just walked away

14  and didn't sign any paperwork saying I wanted to leave, and

15  that's what I'm realizing now:  That I didn't do it the right

16  way.

17  Q.   Do you know what happened to the entity?

18  A.   Not a clue.  I kind of stopped talking to all of them.

19  I said, "Hey, I'm done."  Collected any money I was owed and

20  that was it.

21  Q.   Did you have any understanding with anyone at Platinum

22  Prophet as to whether you were still a partner in the

23  business?

24  A.   Again, my partnership consisted of Robert Schroeder

25  writing on a piece of notebook paper, "You own 25 percent."

1   So no.

2   Q.   When you say you stopped talking to them, who do you

3   mean?

4   A.   Everyone.  But Robert Schroeder and I were friends

5   before.  We still remained in friendship communication after

6   that a little bit but nothing business related -- especially

7   related to this.

8   Q.   Did you actually, yourself, make any profit while you

9   were a partner in Platinum Prophets?

10  A.   Under that business name, yes, I'm pretty sure I got a

11  check or two.  Maybe three.

12  Q.   Do you have any sense of how much you made, yourself, as

13  a partner?

14  A.   I can pull it up in my records, but I'd say maybe 5,000

15  or less.  Again, it was only a couple weeks.  I really don't

16  recall.  It's five years ago.

17          MS. MUNRO:  Thank you.  I have no further questions.

18                      CROSS-EXAMINATION

19  BY MR. COOK:

20  Q.   So just to get the timeline down, here.  June or July of

21  2012 is where y'all transitioned into Platinum Prophets; is

22  that correct?

23  A.   Yes.

24       Do you mind if I ask who you are, first?

25          THE COURT:  He represents Mr. Bradley.

1          THE WITNESS:  Okay.  Thank you.  I don't know who

2     that is.

3     BY MR. COOK:

4     Q.   Okay.  You don't know who Mr. Bradley is?

5     A.   I remember seeing the name in the case.

6     Q.   Okay.  So around June or July of 2012, y'all

7     transitioned into Platinum Prophets; is that correct?

8     Something like that?

9     A.   Definitely in July.  But yes.

10    Q.   And Platinum Prophets was selling Crystal Bubbly hookah

11    cleaner; correct?

12    A.   Yes.

13    Q.   Packaged in that same brown -- orange-brown package;

14    right?

15    A.   Yes.

16    Q.   You came on board as a salesman roughly January of 2012;

17    is that right?

18    A.   Yes.

19    Q.   And during that period of time, you were selling Crystal

20    Bubbly hookah cleaner.  It was that same brown packaging;

21    right?

22    A.   Yes.

23    Q.   Brownish, orangeish?

24    A.   Yes.

25    Q.   Now, I believe you testified that Mr. Schroeder was the

1    one who was kind of constantly trying to keep track of the

2    laws to keep y'all legal; correct?

3    A.    Yes.

4    Q.    You weren't an employee for them in 2011; correct?

5    A.    (No response.)

6    Q.    Not really.  Can you specify what you mean by employee?

7          Salesman.  You weren't a salesman.

8    A.    Legal documentation, no.  I never signed a W-2 or 1099

9    or anything like that, no.

10   Q.    So you don't know if they provided -- if Modern Day

11   Prophets provided any W-2s, 1099s to their -- in 2011 --

12   on-the-record-employees; right?

13   A.    As far as I know, no.  The whole thing was very --

14   Q.    Like, it was the beginning -- the first six months of

15   2011 that you were on work release; isn't that right?

16   A.    The first six months of 2011.

17   Q.    Something like that?  February to July?

18   A.    I was on work release all of 2011 until maybe around

19   September when I got kicked out and went back to prison for

20   my last 45 days and was released in September of 2011 on

21   parole.

22   Q.    So it was February or so 2011 to July or August of 2011

23   you were actually a user of this Crystal Bubbly hookah

24   cleaner; correct?

25   A.    Correct.

1  Q.   In that same orange, brownish package.

2  A.   Correct.

3  Q.   And my understanding is while you were a salesman for

4  Modern Day Prophets, you were paid, basically, this

5  commission you described, above and beyond some given number;

6  correct?

7  A.   Yes.

8  Q.   And that commission was paid to you usually in a check?

9  A.   Cashier's check, yes.

10  Q.   From the Modern Day Prophets Chase Bank account.

11  A.   Yes.

12  Q.   You've pled guilty to a charge in this case; is that

13  right?

14  A.   Yes.

15  Q.   And you're testifying here today in an effort to get a

16  lower sentence; right?

17  A.   Hopefully.  Nothing's been promised to me, though.

18  Q.   But they told you to keep saying that; right?  "I

19  haven't received any promises"; right?

20  A.   No, they didn't tell me to keep saying that.  That's

21  what my plea agreement says.

22  Q.   But you're hoping to get a reduced sentence; correct?

23  A.   Obviously.

24  Q.   Much like your friend did back in 2007 when she set you

25  up; right?

1    A.    Correct.

2           MR. COOK:   That's all the questions I have.   Thank

3    you.

4                         CROSS-EXAMINATION

5    BY MR. NAGY:

6    Q.    I want to talk to you about chemicals.

7    A.    Who?

8    Q.    I want to talk to you about chemicals -- chemical names.

9          After you started selling in 2012, or even before

10   that -- let's start earlier.   Before that, were any chemical

11   names discussed between you and Rob Schroeder?

12   A.    MDPV and a-PVP.

13   Q.    And how -- and how early did you hear him start using

14   terms about MDPV?

15   A.    To my knowledge, the whole time.

16   Q.    Okay.

17   A.    I wasn't really concerned with the chemical

18   compositions.   I didn't pay too much attention to it.

19   Q.    Because it wasn't important.

20   A.    No.

21   Q.    Do you recall the first time or -- do you remember the

22   first time you heard the other one, alpha-PVP?

23   A.    It was a little bit later on.   I don't remember the

24   specific date but maybe the spring of 2012.

25   Q.    You had indicated that at one point in particular, there

1   was a -- call it a different line -- that was released that

2   was yellow in color; is that right?

3   A.   Yep.

4   Q.   Were there several different color ideations throughout

5   the process that you're aware of or just the yellow?

6   A.   I don't know.  I only knew of what the customers told me

7   about because I never saw the actual product, and I wasn't

8   using it at the time, so I don't know if -- or how many

9   variations there were.

10  Q.   Okay.

11       You referenced -- Judge, I don't have any more questions

12  for this witness.

13           THE COURT:  Okay.

14           MR. PARKER:  No questions.

15           THE COURT:  Any redirect?

16           MS. MUNRO:  No, Your Honor.

17           THE COURT:  This witness may step down, then.

18           (Conclusion of requested testimony.)

19

20

21

22

23

24

25

1 <u>**INDEX**</u>

2 <u>**WITNESS FOR GOVT.**</u>

3 Brian Lister
 Direct Examination by Ms. Munro.....................3
4 Cross-Examination by Mr. Cook.......................76
 Cross-Examination by Mr. Nagy.......................80

5
 <u>**Exhibit No.**</u>                    <u>**Marked**</u>              <u>**Admitted**</u>
6
 Govt. No. 80                     7                   7
7

8

9

10

11

12

13 "I certify that the foregoing is a correct transcript from

14 the record of proceedings in the above-entitled matter.

15

16

17

18

19

20

21

22

23

24

25