```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF VIRGINIA
 2                 Charlottesville Division

 3   UNITED STATES OF AMERICA,         Criminal No. 3:16cr50008

 4              Plaintiff,

 5        vs.                          Charlottesville, Virginia

 6   JASON BRADLEY, NAYNA TAYLOR,
     and EDWARD TAYLOR,               11:32  a.m.
 7
                Defendants.           June 28, 2017
 8

 9      TRANSCRIPT OF TRIAL TESTIMONY OF CHRISTOPHER MORGAN
              BEFORE THE HONORABLE NORMAN K. MOON
10          UNITED STATES DISTRICT JUDGE, and a Jury

11   APPEARANCES:

12   For the United States:      GRAYSON HOFFMAN
                                 U.S. Attorney's Office
13                               116 N. Main St.  Room 130
                                 Harrisonburg VA 22802
14
                                 KARI MUNRO
15                               U.S. Attorney's Office
                                 310 First St. SW, Room 905
16                               Roanoke VA 24011

17   For Defendant Bradley:      AARON L. COOK
                                 Cook and Cook Attorneys
18                               71 Court Square
                                 Suite B
19                               Harrisonburg VA 22802

20   For Deft.  Nayna Taylor:    LOUIS K. NAGY
                                 590 E. Market St.
21                               Harrisonburg VA 22801

22   For Deft.  Edward Taylor:   DAVID L. PARKER
                                 333 Neff Ave. Suite A
23                               Harrisonburg VA 22801

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

1    APPEARANCES (Cont'd):

2    Court Reporter:              Sonia Ferris, RPR, OCR
                                  U.S. Court Reporter
3                                 116 N. Main St.  Room 314
                                  Harrisonburg, VA 22802
4                                 540.434.3181.  Ext. 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. MUNRO:  Your Honor, the government will call

2    Chris Morgan.

3      CHRISTOPHER MORGAN, CALLED AS A WITNESS BY THE GOVERNMENT,

4                              SWORN

5                        DIRECT EXAMINATION

6    BY MS. MUNRO:

7    Q.   Good morning.

8    A.   Good morning.

9    Q.   Would you please state your full name for the record?

10   A.   Christopher Paul Morgan.

11   Q.   How are you currently employed?

12   A.   I am a special agent with the Drug Enforcement

13   Administration, currently assigned to the Charlotte, North

14   Carolina, district office.

15   Q.   How long have you been with the DEA?

16   A.   I've been employed with the DEA since 1999, so

17   approximately 17-and-a-half years.

18   Q.   Have you been a special agent the entire time?

19   A.   Yes, ma'am.

20   Q.   Assigned to the Charlotte division?

21   A.   Charlotte has been one of the offices that -- I've been

22   in Charlotte since approximately 2002.

23   Q.   Where else have you worked?

24   A.   Coming out of the academy, I worked on the southwest

25   border of Mexico and the U.S. in McAllen, Texas, for

1   approximately three years.  Transferred to Charlotte on a

2   special enforcement team and acted in that capacity for

3   approximately three years and then was fortunate enough to

4   get an assignment to the district office as a special agent

5   out of the Charlotte office since 2005.

6   Q.   Just by way of background, what was that special

7   enforcement team?

8   A.   It was a regionalized enforcement team.  We were, I'd

9   say, approximately ten agents.  We had a couple intel

10  analysts, a couple support staff, supervisory staff.  We're a

11  fully housed team, budgeted separately from the DEA, and we

12  would get requests from officers throughout the country that

13  had high-profile cases or needed additional support,

14  manpower, funding, equipment.  We would go to those

15  particular areas, and we would assist cases in those

16  particular areas.  So for that three-year time frame, we

17  worked on an out-of-area deployment schedule.  We'd work ten

18  days out of the area and came home for four at a time,

19  assisting at whatever offices submitted a request for us.

20  Q.   So back in 2013, were you part of this enforcement team,

21  or were you on just a regular rotation at the Charlotte

22  office?

23  A.   I was an agent out of the Charlotte office just working

24  within the Western District of North Carolina, primarily.

25  Q.   Were you working any particular kinds of cases?

1    A.   At that particular time, we were working whatever was --

2    whatever was needed at that particular time.  We were having

3    a lot of problems with a methamphetamine issue that had come

4    into the area.  Then the beginning of 2013, end of 2012 we

5    started receiving a lot of complaints in regard to the bath

6    salts and synthetic cathinone epidemic that had started.

7    Q.   Where were those complaints coming from?

8    A.   They were coming from a lot of local informants, a lot

9    of local business owners, individuals that were -- that had

10   store fronts located next to head shops, as we refer to them,

11   novelty shops, smoke shops that were selling a lot of these

12   suspected products.

13   Q.   What are head shops?

14   A.   Tobacco shops.  Sell a lot of glassware, smoke-type

15   paraphernalia, rolling papers, that type of thing.

16   Q.   Where do you see head shops cropping up in the

17   communities in which you operate?

18   A.   Most of the ones in our particular area are in strip

19   mall locations.  Just small brick-and-mortar-type businesses

20   in strip malls at various areas throughout the city.

21   Q.   Why exactly had you identified them as a problem at that

22   time?

23   A.   We started having a lot of issues with individuals going

24   in and obtaining bath salts and the synthetic marijuana or

25   synthetic cathinones, as they're referred to.  We started

1   having a lot of complaints from local store owners that there

2   were a lot of customers that were lining up prior to the

3   businesses opening --

4           MR. COOK:  Objection.  Hearsay.

5           THE COURT:  Sustained.

6   BY MS. MUNRO:

7   Q.   So from your own personal experience working some of

8   these cases, why had the DEA identified these as an

9   enforcement priority at that time?

10  A.   We took the information that was given to us by

11  informants, and then we conducted our own surveillance

12  operations.  I was out on multiple occasions when we actually

13  observed numerous individuals waiting on stores to open.  We

14  observed numerous individuals in what we referred to or

15  commonly called the zombie state -- tweaking out or

16  whatever -- and waiting or needing for the location to open

17  up so they could go in and purchase whatever particular

18  product they needed to get their next fix to calm them down.

19  Q.   Why were they able to get these products at a head shop

20  located in a strip mall?

21  A.   There were a lot of different locations, and for

22  whatever reason, I guess the store owners or whoever were

23  manning the products inside the businesses had decided that

24  there was enough of demand that they began handling these

25  products and started selling them to the general public.

1   Q.   Did you work some of these cases back in 2013?

2   A.   Yes, ma'am.

3   Q.   Did you work them solely through the DEA?

4   A.   No, ma'am.  We worked closely with our counterparts, our

5   local police department in Charlotte.  That's the Charlotte

6   Mecklenburg Police Department or CMPD for short.

7   Q.   Are you familiar with Queen City Smoke Shop?

8   A.   Yes, ma'am.

9   Q.   How are you familiar with that name?

10  A.   It was one of the tobacco shops or head shops, as

11  they're referred to, that's located off one of the main

12  highways in Charlotte that we had received a lot of

13  complaints in regard to it being one of the locations that

14  were selling some of these suspected products.

15  Q.   Were you, yourself, involved in any operations

16  concerning that location back in 2013?

17  A.   Yes, ma'am, I was.

18  Q.   Can you describe for the jury the nature of your

19  involvement in that case?

20  A.   Yes, ma'am.

21       We worked closely with the Charlotte Mecklenburg Police

22  Department in identifying multiple locations, Queen City

23  Smoke Shop being one of them.  With the assistance of

24  undercover officers with the local police department, we

25  conducted several different operations where we sent

1    undercover officers in to purchase a variety of different

2    products inside the store.  Those products were then taken in

3    and submitted to laboratories for testing and analysis, and

4    once the analysis came back that they contained illegal

5    substances or illegal chemicals, we followed that up with

6    additional controlled purchases.  And, then, on most

7    occasions, we then followed that with a state search warrant

8    for that particular facility, and in this particular

9    instance, that's what we did.  CMPD officers or detectives

10   did the controlled undercover purchases, and that was

11   followed up with a state search warrant at that particular

12   business.

13   Q.   Do you remember when that was?

14   A.   It was in 2013.

15   Q.   Which agency obtained the search warrant?

16   A.   The Charlotte Mecklenburg Police Department.

17   Q.   How were you involved with that search warrant or

18   search?

19   A.   Myself and another agent in my office -- or another task

20   force officer in my office were called to assist.  So we

21   briefed and arrived at the scene during the execution of that

22   search warrant, and so I helped go through the store and

23   identify various different products.  I helped with the

24   evidence techs in pointing out things that needed to be

25   documented, things that needed to be photographed, and

1    various different items that we were interested in that

2    needed to be collected.

3    Q.    So do you know who the suspects were in that particular

4    operation?

5    A.    It was Edward and Nayna Taylor.

6    Q.    And you were part of the entry team and the execution of

7    that search warrant?

8    A.    I was not part of the actual entry team, but I was part

9    of the team that followed up and conducted -- assisted with

10   conducting the search and the collection of the evidence.

11   Q.    Special Agent Morgan, I'm going to show you a couple of

12   photographs.  I'm going to show you what's marked as

13   Government Exhibit 76.

14         Do you recognize that?

15   A.    Yes, ma'am, I do.

16   Q.    What is that?

17   A.    It's a photograph of some of the inventory items within

18   the Queen City Smoke Shop as they were displayed when we

19   conducted the search warrant.

20   Q.    Do you know who took this photograph?

21   A.    Evidence technician, at my direction, was taking the

22   photographs for us.

23   Q.    So was that photograph taken at the time that you were

24   in the shop?

25   A.    Yes, it was.

1  Q.   Is that a fair and accurate depiction of what you saw on

2  that day?

3  A.   Yes, ma'am.

4       MS. MUNRO:  Your Honor, the government seeks to admit

5  Exhibit 76 into evidence.

6       THE COURT:  Be admitted.

7       (Government Exhibit No. 76 was marked for

8  identification and admitted into evidence.)

9  BY MS. MUNRO:

10 Q.   Can you describe for the jury what they're looking at?

11      Can we publish?

12      Go ahead.

13 A.   Yes, ma'am.  This is -- as you walk into the front door

14 of this particular business, you can see in the bottom left

15 corner the glass counter or display counter items.  Behind it

16 on the wall is just shelving with additional inventory items

17 that were inside the store at the time.  I mentioned earlier

18 some smoke-type apparatus and so forth.  You can see those up

19 on the top right corner.  Those are utilized for vaping or

20 for other types of smoking activities.

21 Q.   Okay.  So in connection with the execution of this

22 search warrant, did law enforcement officers retrieve

23 anything that they considered to be contraband at the time --

24 or that you did?

25 A.   Yes, ma'am, we did.  As a matter of fact, through the

1   undercover purchases of the particular products that tested

2   positive, we specifically --

3          MR. NAGY:  Judge, I'm going to object.  That's

4   hearsay.  I object to any characterization about anything

5   testing positive for anything.  He's trying to testify about

6   substances testing positive, and it's hearsay.

7          THE COURT:  Sustained.

8   BY MS. MUNRO:

9   Q.   Let's talk about what you considered at the time you saw

10  these items.

11  A.   Based on the controlled purchases of particular items by

12  the undercover officers, those were products of interest to

13  us whether or not there was more inventory in the store.  So

14  when we conducted our search, we initially were looking for

15  those same type of substances or items.

16         Then, in these particular types of cases, what makes it

17  extremely difficult for law enforcement is that we do not

18  have any idea what substances are in a lot of these packages,

19  whether some substance contains illegal chemicals, or whether

20  they did not.  So in these particular situations, we actually

21  had to seize the majority of the packets and what we alleged

22  or thought at the time could possibly be illegal narcotics.

23  So coming out of a head shop or a tobacco shop or an

24  inventory store of this sort, we seized hundreds of exhibits,

25  hundreds of packets of suspected items at that time.

1    Q.   So from this photograph, are you able to direct the jury

2    to anything in particular that you seized or considered to be

3    problematic when you executed the search warrant?

4    A.   In this particular photograph, it's hard to tell, but in

5    the glass display cases, there are lots of packets of what we

6    believed to be synthetic marijuana at the time, and they're

7    packaged in various different colors of packages, various

8    different flavors of packaging.  So we took those items at

9    that time during the search warrant.

10   Q.   I'm going to show you what's marked as Government's

11   Exhibit 70.

12       Do you recognize that?

13   A.   Yes, ma'am, I do.

14   Q.   I know it's sideways.

15   A.   Yes, ma'am, I do.

16   Q.   How do you recognize it?

17   A.   This is an actual picture of the cash register drawer

18   opened, pulled out, from behind the counter.  I noticed

19   several things in this particular picture.  In the top

20   portion of the picture are two little blue canisters.  That's

21   actually a product that was called "Blue" being sold as a

22   pipe cleaner.  It was one of the items that was purchased

23   during the undercover purchases and later submitted to a

24   laboratory for analysis.

25       Then on the bottom portion of this particular photograph

1    are some tan or -- excuse me, orange or brown-type packages

2    that were -- packages that were also sold as a hookah

3    cleaner.  These are Crystaal or Crystal Bubbly packet

4    cleaner, and those were also submitted for evidence.

5         MS. MUNRO:  Your Honor, the government would move to

6    admit Exhibit 70 into evidence.

7         THE COURT:  Be admitted.

8         (Government Exhibit No. 70 was marked for

9    identification and admitted into evidence.)

10   BY MS. MUNRO:

11   Q.   I'm going to show you what's marked as Government's

12   Exhibit 71.

13        So just briefly, since we've been over some of the

14   detail, how do you recognize this?

15   A.   This is just a little bit more of a close-up photograph

16   of the same cash register.

17   Q.   Was this also taken at the same time?

18   A.   Yes, ma'am.

19   Q.   During execution of the search warrant?

20   A.   Yes, ma'am.

21   Q.   Do you recognize this photograph?

22   A.   I do.

23   Q.   Is this a fair and accurate depiction of what you saw?

24   A.   Yes, it is.

25        MS. MUNRO:  Your Honor, the government would move

1  into evidence Government's Exhibit 71.

2         THE COURT:  Be admitted.

3         (Government Exhibit No. 71 was marked for

4  identification and admitted into evidence.)

5  BY MS. MUNRO:

6  Q.   You mentioned a minute ago one of the things law

7  enforcement was --

8         MS. MUNRO:  Thank you, Your Honor.  Permission to

9  publish?

10        THE COURT:  It will be okay to do it.

11        MS. MUNRO:  If the jury did not see Exhibit 70, then

12  we can go back to that in a minute.

13        THE COURT:  Maybe they did.

14        THE CLERK:  They did not, Your Honor.  I didn't have

15  a chance to show it.

16  BY MS. MUNRO:

17  Q.   Let's talk about this first.  You said this is similar

18  to the photograph we just introduced as Exhibit 70; correct?

19  A.   Yes, ma'am.

20  Q.   So explain -- now that the jury is able to see the

21  screen, could you please explain what it is they're looking

22  at?

23  A.   The picture is actually turned upside down or sideways.

24  It should be rotated down to the right as if you were looking

25  down into the cash register drawer.

1      The items at the top -- the two circle-shaped canisters

2  are the Blue product that I mentioned.  As you drop down, the

3  tan -- the orangeish or brownish packages are the Crystal

4  Bubbly hookah cleaner.  You see another one just as a

5  description, the stuff that's labeled "Amp."  That's another

6  similar synthetic product sold to be smoked.  That's just a

7  different brand as opposed to the Crystal Bubbly or as

8  opposed to the Blue.

9  Q.   Mary, can we go back to Exhibit 70 so the jury can see

10 it?

11     So again, can you just briefly explain to the jury what

12 they're seeing?

13 A.   That's the same photograph.  It's just a little bit

14 wider of an angle that you're looking at.  I think the other

15 was zoomed in a little more and showed that the drawer was

16 pulled out a little more so that you could see the writing on

17 the brown packages and also the writing on the Amp product.

18 Q.   Can we go back to Exhibit 71 for a minute?

19     Zoom in.  Can we zoom in on those brown packets on the

20 right?

21     So do you see any lettering in this photograph?

22 A.   Yes, ma'am.  If you look at the top left portion, you

23 can actually see the H, the O and a part of another O.  And

24 what's significant about that is that when those items were

25 actually seized and processed for evidence -- unfortunately,

1    there's not a photograph here, but there's additional writing

2    that's descriptive on the packet that was later identified in

3    additional investigations that we were doing.  This is

4    actually a substance called Crystal Bubbly hookah cleaner

5    being sold as a pipe cleaner.

6    Q.   Can you describe that logo from memory, at all?

7    A.   No, ma'am.  I mean, I know there are additional

8    photographs.  The hookah cleaner, Crystal Bubbly, is in

9    yellow writing across the package.  Then there's a weight

10   that's -- there's various different weights associated with

11   this as far as gram packaging and so forth.  I believe, if

12   I'm not mistaken, these are 1-gram packets.

13   Q.   I'm going to show you what's marked as Government's

14   Exhibit 75.  Do you recognize that?

15   A.   Yes, ma'am.

16   Q.   How do you recognize that?

17   A.   This, again, is some of the drawing behind the cash

18   register, and this is some cash that was located in, like, a

19   grocery bag.  It was fanned out for the photograph.  If you

20   can see -- notice to the right, you see some of the cash

21   register --

22   Q.   Just a minute.  I haven't published it yet.  Let's wait.

23   You recognize the photograph?

24   A.   Yes, ma'am.

25   Q.   This is also taken at the time?

1   A.   Yes, ma'am.

2        MS. MUNRO:   Government moves to admit Exhibit 75.

3        THE COURT:   Be admitted.

4        (Government Exhibit No. 75 was marked for

5   identification and admitted into evidence.)

6        THE WITNESS:   Again, this is cash or currency located

7   inside of a grocery-style plastic bag.   It was fanned out a

8   little for the photograph.   This is another one of the

9   drawers you see a little bit on the left-hand corner.   That's

10  some more of that product Blue.   It's a powder-type substance

11  that was being sold or marketed as a pipe cleaner.   Then on

12  the right-hand side, you see some cash register receipt tapes

13  and so forth.

14       Some of the black packaging underneath the currency

15  are additional items and inventory.   I'm not even sure what

16  the one on the right is.   However, it's another one of the

17  packets sold as either a glass cleaner or a synthetic

18  herb-type substance to be smoked.

19       At the bottom of the photograph, again, you see the

20  top edging of several packets of a different-type substance

21  and then a portion of it.

22  BY MS. MUNRO:

23  Q.   I'm going to show you what's marked as Government's

24  Exhibit 77.

25       Now, before we publish, do you recognize this?

1    A.    Yes, ma'am, I do.

2    Q.    How do you recognize it?

3    A.    These are actually notebook pages photographed from a

4    notebook taken out of the cash register.

5          MS. MUNRO:   The government moves to admit Exhibit 77

6    into evidence and publish to the jury.

7          THE COURT:   Be admitted.  You may publish.

8          (Government Exhibit No. 77 was marked for

9    identification and admitted into evidence.)

10   BY MS. MUNRO:

11   Q.    Can you describe for the jury what they're seeing now?

12   A.    Yes, ma'am.

13    This is the inside cover of the notebook with the name

14   Nayna Patel Taylor and a phone number.  Then on the

15   right-hand side, you see kind of tally notes.  On column

16   number 22, if you look on the left side down the spiral

17   portion of the notebook, you see:  Blue, half gram, 263.  You

18   see some other notations of CB or A Bomb or pure amp.  Those

19   are just different inventory items that they had.

20    The 22nd represents -- as we look through and analyze

21   it, represents the date.  If you look at the notation beside

22   the Blue of 4/27 --

23         MR. NAGY:   Objection.  He's interpreting data in a

24   notebook, and that's speculation.

25         THE COURT:   Sustained.

 1  BY MS. MUNRO:

 2  Q.   Mary, before we continue, can we zoom in on the right

 3  side of that notebook?

 4       Go on.  Without speculating as to what those numbers

 5  might be, can you explain, again, what you were seeing in

 6  that notebook, and where did you find it?

 7  A.   This was in the cash register -- one of the cash

 8  register draws.

 9  Q.   So this is the one you were referring to?

10  A.   Yes, ma'am.

11  Q.   Go ahead.

12  A.   You see columns with numbers reflecting 22nd, 23rd,

13  24th, 25th on the top.  And then as you drop down to the

14  bottom, you see reference of 4/27 on the left-hand side.

15  Then the column of 27, 28, 29, 30.  These represent --

16            MR. COOK:  Objection.  Speculation.

17            MR. PARKER:  Objection.

18            MR. NAGY:  Objection.

19            THE COURT:  Sustained.

20  BY MS. MUNRO:

21  Q.   Do some of the substances you pulled out of the smoke

22  shop on that day bear the same name as some of the items

23  listed in this notebook?

24  A.   Yes, they do.

25  Q.   Can we zoom in on the left side of the notebook?

1    I believe you indicated earlier that the suspects at

2 that time were Nayna and Edward Taylor?

3 A.   Yes, ma'am.

4 Q.   Were you present on scene at any point that day when

5 they were also present?

6 A.   Yes, ma'am, I was.

7 Q.   Are you able to identify them?

8 A.   Yes, I am.

9 Q.   Can you identify them for the jury?  Are they here?

10 A.   Yes, they are.  Edward Taylor is the gentleman sitting

11 to the right of the individual in the tan suit, wearing a

12 dark-colored jacket, red tie and glasses.  Gray hair.

13 Q.   Thank you.

14 A.   Nayna Taylor is sitting to his right, wearing a blue

15 blouse, glasses and a black sweater or cardigan.

16 Q.   So --

17         THE COURT:  Did you say to his right?

18         THE WITNESS:  To my right; to his left.  Thank you,

19 sir.

20 BY MS. MUNRO:

21 Q.   So while you were on scene that day, you assisted with

22 the collection of evidence.  Were you responsible for

23 actually taking any of this physical evidence away from --

24 A.   No, ma'am, I was not.

25 Q.   So in connection with that execution of that search

1    warrant, did you have occasion to go anyplace else on that

2    day in relation to the investigation?

3    A.   Yes, I did.  On that particular day, there was also a

4    second search warrant that was conducted at the residence of

5    the Taylors.  Pretty much simultaneously or at the same time

6    we did the search warrant at the retail store, I was at the

7    retail location.  So other officers and agents were at the

8    residence.  They conducted the initial entry and started a

9    search at that particular location.  Then myself and my

10   partner were called over to that particular residence to

11   conduct more follow-up investigation.

12   Q.   Who were you with?

13   A.   I was with Task Force Officer David McGuirt.

14   M-C-G-U-I-R-T.

15   Q.   So were you present at the Taylors' home?

16   A.   Yes, ma'am, I was.

17   Q.   How soon after they executed and made the initial entry

18   were you there?

19   A.   I would say it was an hour or hour-and-a-half after.

20   Q.   What did you understand at the time was your

21   responsibilities when you got to the house?

22   A.   I was aware that they had located some items that were

23   of interest, and my intention was to go to try to see if I

24   could talk to the Taylors.

25   Q.   I'm going to show you what's marked as Government's

1    Exhibit 74.

2        Before I ask any questions about this photograph or try

3    to authenticate it, did you actually see these items or

4    what's depicted in this photograph in place at the house?

5    A.   Yes, I did.  These are actual photographs that I took

6    myself.

7    Q.   So you took these photographs.

8    A.   Yes, ma'am.

9    Q.   Did you take them at the time that you entered the

10   house?

11   A.   At the time that I got there, yes, ma'am.

12            MS. MUNRO:  Government seeks to admit Exhibit 74.

13            MR. NAGY:  Judge, we'd ask for a side bar with the

14   Court.

15            THE COURT:  Approach.

16            (Side bar discussion held on the record.)

17            MR. NAGY:  Your Honor, none of these photographs that

18   are picked or shown -- that I can recall looking at them.

19   None of these items depicted the substance we're here about

20   today, the Crystal Bubbly hookah cleaner.  None of the

21   photographs depict that.  I don't recall seeing any Crystal

22   Bubbly hookah cleaner in any of the photographs, which would

23   mean what they're intending to introduce are photographs of

24   other potential criminal conduct, which would be 404-type

25   information that would be far more prejudicial than it is

1   probative at this point.  So I'm going to object to all these

2   photographs coming in at this point because I don't believe

3   that they are relevant.  If they are relevant, they're far

4   more prejudicial than they are probative.

5           MR. PARKER:  Join the objection, Your Honor.

6           MR. HOFFMAN:  Your Honor, it's all relevant because

7   they're drug-smoking devices.  It's circumstantial evidence

8   of drug trafficking.  They're selling the bongs and pipes

9   that drug traffickers use to smoke those type of things.

10          THE COURT:  Will there be evidence of that?  That

11  people smoke bath salts?

12          MR. HOFFMAN:  I believe that's already in evidence,

13  Your Honor, as a means of ingestion.  Smoked, snorted, drank.

14  It's called, as the Court knows, hookah cleaners.  Those are

15  hookah types, some of those there.

16          MR. NAGY:  The government has already introduced

17  photographs from the store, the items they are concerned with

18  and were taken from the store.  My concern is in this

19  particular instance that there are no photographs of the

20  hookah cleaner at the residence, and if there's going to be

21  evidence presented that somebody found something at the

22  residence, that's one thing.  But if they're just introducing

23  photographs that don't link up what's found at the residence

24  versus what is found in the store, then I still think it's

25  404.

1          MR. HOFFMAN:  Your Honor, this is the equivalent, in

2    any drug case -- drug scales, drug paraphernalia.

3          THE COURT:  I think it is admissible.  I think it's

4    probative evidence.  I don't think the prejudice outweighs

5    the probative value.

6          Overruled.

7          (Conclusion of side bar.)

8    BY MS. MUNRO:

9    Q.   Can I confirm that Exhibit 74 was admitted?

10          THE COURT:  Admitted.

11          (Government Exhibit No. 74 was marked for

12    identification and admitted into evidence.)

13          MS. MUNRO:  Permission to publish to the jury?

14    Q.   Now, Special Agent Morgan, can you explain to the jury

15    what they're seeing in this photograph?

16    A.   Yes, ma'am.  This is actually located in the basement of

17    their residence.  This appears -- or this is items that were

18    similar to inventory items that were also located in the

19    Queen City Smoke Shop.

20    Q.   What are these things?

21    A.   The majority of the glass-type devices are smoking

22    apparatuses utilized for smoking various types of substances.

23    Q.   Do they go by any names that you know of?

24    A.   They're commonly referred to as marijuana bongs or

25    bongs.

1    Q.    Have you ever heard them referred to as hookahs?

2    A.    I have.  Typically, a hookah pipe has hosing off of it

3    as opposed to just a glass apparatus.

4    Q.    I'm going to show you what's marked at Government's

5    Exhibit 73.

6          Do you recognize this photograph?

7    A.    Yes, I do.

8    Q.    Who took this photograph?

9    A.    I took this paragraph.

10   Q.    When and where did you take it?

11   A.    This photograph was taken at the time that I was at the

12   residence, but it's a backpack, and I believe there are

13   additional photos that show a larger picture.  It's a

14   backpack inside the master bedroom.

15         MS. MUNRO:  The government moves to admit Exhibit 73.

16         THE COURT:  Be admitted.

17         (Government Exhibit No. 73 was marked for

18   identification and admitted into evidence.)

19         MS. MUNRO:  Publish to the jury, please?

20         THE COURT:  You may.

21   BY MS. MUNRO:

22   Q.    Again, what is this?

23   A.    This is the top opening of a backpack containing a large

24   amount of -- undetermined amount of U.S. currency.

25   Q.    Where was this in the house?

1    A.    It was located in the master bedroom.

2    Q.    Did you find it, or was it already located by the time

3    you got there?

4    A.    It was already located at the time I got there and

5    pointed out to myself and my partner.

6    Q.    I'll show you what's marked as Exhibit 72.

7          Did you also take this photograph?

8    A.    Yes, ma'am.

9    Q.    Where and when did you take it?

10   A.    Again, at the same time when I was there at the

11   residence.  This is also in the master bedroom.

12         Do you want me to describe what I'm looking at?

13             MS. MUNRO:  Government seeks to admit Exhibit 72.

14             THE COURT:  Be admitted.

15             (Government Exhibit No. 72 was marked for

16   identification and admitted into evidence.)

17             MS. MUNRO:  May we publish to the jury, Your Honor?

18             THE COURT:  You may.

19             THE WITNESS:  Starting with the backpack -- this is a

20   wider angle of the backpack that we just viewed with the top

21   flap open so you can see the currency and photograph we just

22   talked about.  Then you see two cash register-style or

23   aluminum plastic-type containers that are full of U.S.

24   currency that were taken out of a larger safe inside of the

25   master bedroom.

 1   BY MS. MUNRO:

 2   Q.   So at this point, has the currency been removed from the

 3   backpack that's depicted in the front of the photograph?

 4   A.   No, ma'am.

 5   Q.   There's still cash in there?

 6   A.   Yes, ma'am.

 7   Q.   I believe you testified the remaining currency came out

 8   of a safe in the house.  Where was that located?

 9   A.   It was a large safe also in the master bedroom.  The two

10   boxes and the backpack came out of the safe.

11   Q.   Mary, can we zoom in on the middle box on the cash

12   specifically?

13       Do you know whether or not when the cash was pulled out

14   of the safe it was banded in this way?

15   A.   Yes, it was.

16   Q.   Thank you.

17   A.   Yes, ma'am.

18   Q.   So did you do anything with the currency at this point

19   in time?

20   A.   At this point in time, I did not, personally.  Members

21   of the Charlotte Mecklenburg Police Department collected it

22   and transported it to the CMPD property control for

23   safekeeping.

24   Q.   Did you have any further involvement with this

25   particular evidence as the investigation continued?

1   A.   Yes, I did.   Myself and Task Force Officer McGuirt went

2   to the narcotics officers, and we took receipt of the

3   currency.   We placed it into a large evidence currency bag,

4   sealed the currency bag, labeled it, signed it, initialed and

5   dated it.   Myself and Officer McGuirt being the two witnesses

6   involved in that.

7   Q.   Why did you take custody of it?

8   A.   We took custody of it to proceed with federal forfeiture

9   on the asset.   So it's normal practice when we're going to

10  try to federally forfeit a large amount of currency to take

11  that currency into our possession and go through our proper

12  process for getting it officially counted.

13      When we seize a large amount of currency from

14  individuals, we do not count it on the scene.   We will write

15  them a receipt for an undetermined amount of currency.   As

16  you can imagine, if you're dealing with large sums of money,

17  it's very easy to count it twice and end up with two

18  different figures.   So to eliminate that possibility, we seal

19  all of it into bags, with witnesses.   We sign those

20  particular bags, and then we take it to either a bank

21  facility or, at that time, we utilized Brinks, which is a

22  money -- a money-transfer agency, in order to receive an

23  official count.   And then have it directly deposited into the

24  United States Marshal asset forfeiture fund.

25  Q.   Let's back up a minute.

1        Can you define "forfeiture" for the jury?

2   A.   Yes, ma'am.  So when we deal with asset forfeiture --

3   there are numerous laws in place that allow the United States

4   government, if they can determine that U.S. currency is

5   either a profit from illegal gain or --

6        MR. NAGY:  Your Honor, I'm going to object at this

7   point.  He's giving a legal conclusion to the jury.

8        THE COURT:  Sustained.

9   BY MS. MUNRO:

10  Q.   What is your understanding from an operational

11  perspective of forfeiture?

12       MR. NAGY:  Objection.  Relevance.  His understanding

13  is irrelevant.

14       THE COURT:  Forfeiture is a legal proceeding.  I

15  don't know why you're asking him --

16       MS. MUNRO:  Just to help explain why they seized the

17  cash and what the purpose of the seizure was and because --

18  what their understanding was at the time -- the agency -- as

19  to their reason for seizing it.

20       THE COURT:  I can instruct on the law of forfeiture

21  without --

22       MS. MUNRO:  Okay, absolutely.  All right.

23       Withdraw the question.

24  BY MS. MUNRO:

25  Q.   So after you seized the currency, why did you have to

1    package it up in the manner that you did?

2    A.   In order for us to process it through federal

3    forfeiture, it's taken because it's considered to be evidence

4    at that particular time.  The money goes through our process

5    of securing it into a plastic bag or a currency bag so that

6    it cannot be manipulated with.  Any money taken out of it is

7    sealed.  It is then stored.  Then we took it from the CMPD

8    office back to the Charlotte district office and stored it at

9    a safe in our Charlotte district office.  The following day

10   or two days later, it was removed by myself and Task Force

11   Officer McGuirt.  We then transported it to Brinks, where we

12   physically observed Brinks go through the counting process

13   and give us a denomination breakdown -- how many 10s, how

14   many 20s, how many 5s, et cetera, and a final official count.

15   Then Brinks fills out a deposit ticket with that amount and

16   does an actual wire or electronic deposit into the U.S.

17   Marshal asset forfeiture fund pending the investigation and

18   possible civil forfeiture of that money.

19   Q.   What is Brinks?

20   A.   Brinks is just a -- you see a lot of the armored trucks

21   that go around.  Brinks is one of the companies that goes

22   around to various businesses and collects their currency,

23   collects their money and deals with bulk cash and coins and

24   handles just the sheer volume of currency.  It was a company

25   at that time that we contracted with for large seizures

1   because banks got tired of having to utilize too many of

2   their employees for very extended periods of time, because it

3   takes a long time to count large amounts of money.  The

4   Department of Justice contracted with Brinks at that

5   particular time, and that was the company that we used when

6   we had substantial seizures.

7   Q.   And what is your understanding of the reason that the

8   DEA doesn't count currency when it seizes it?

9   A.   Again, it's very easy if you've got $300 to have two

10  different individuals count it and one possibly miss a bill

11  or not give you an accurate count.  When you're dealing in

12  hundreds of thousands of dollars, it's very more common -- or

13  very common that you could possibly have two individuals

14  physically counting it right next to each other and have a

15  miscount.  So in order to avoid those discrepancies so that

16  agents are not held reliable or integrity is attacked in any

17  particular way, there's not an official count done.  The

18  money is collected, it's seized, and we have witnesses that

19  see all of the money going into a particular evidence bag.

20  That's sealed so it cannot be tampered with, and then that

21  entire bag is taken to either the bank or, in this particular

22  instance, Brinks.  At that particular location, the Brinks

23  employee is the one that opens the bag and is the only

24  individual that is actually putting hands on the currency as

25  it's going through the counting process.  Then we're

1    ultimately given the official final tally.

2    Q.    I'm going to show you what's marked as Government's

3    Exhibit 78.

4          What is this?

5    A.    This is a copy of the deposit slip that was conducted by

6    or that was filled out and prepared by Brinks that was

7    submitted into the -- you can read.  I'm not sure -- they

8    haven't seen it yet.  I'm sorry.  It's just the deposit

9    ticket documenting the final amount and also the denomination

10   breakdown.

11   Q.    You indicated, I believe, earlier that Brinks would fill

12   out some kind of an inventory or a tally of what they were

13   counting?

14   A.    Correct.

15   Q.    Is this it?  Is this what you were referring to?

16   A.    Yes, ma'am.

17   Q.    So were you present when this was filled out?

18   A.    Yes, ma'am.  We actually take -- we have the deposit

19   book in our office.  We actually take the deposit book with

20   us with the currency to Brinks, and they actually go through

21   the filling-out process.

22   Q.    Is this a deposit slip that Brinks filled out for this

23   particular currency?

24   A.    Yes, it is.

25          MS. MUNRO:    The government moves to admit Exhibit 78

1    into evidence.

2              THE COURT:  Be admitted.

3              (Government Exhibit No. 78 was marked for

4    identification and admitted into evidence.)

5              MS. MUNRO:  Your Honor, may I have just one minute?

6              (Government counsel conferred.)

7              May we publish Exhibit 78 to the jury?

8              THE COURT:  You may.

9    BY MS. MUNRO:

10   Q.   Based on that deposit slip, what was the total amount of

11   currency seized from the Taylors in connection with that?

12   A.   $295,351.91.

13   Q.   Again, where was this currency deposited?

14   A.    Into the U.S. Marshal Service asset forfeiture fund or

15   asset forfeiture account.

16             MS. MUNRO:  Your Honor, the government would also

17   move to admit Government's Exhibit 79, which is the 90211 for

18   the deposit slip.

19             THE COURT:  Be admitted.

20             (Government Exhibit No. 79 was marked for

21   identification and admitted into evidence.)

22   BY MS. MUNRO:

23   Q.   Special Agent Morgan, I believe you testified earlier

24   that when those search warrants were originally executed, the

25   primary focus was on a substance called Blue; is that

1    correct?

2    A.   It was one of the substances that were involved in the

3    undercover purchases.

4    Q.   Okay.

5    A.   Prior to ascertaining the search warrant.

6    Q.   So how much Blue did law enforcement seize from that

7    facility on that day?

8          MR. NAGY:  Objection.  Relevance.

9          THE COURT:  What is the substance "Blue"?

10         MS. MUNRO:  It's one of the items that Special Agent

11   Morgan testified that they had pulled out of the shop that

12   were suspected bath salts.

13         THE COURT:  Okay.

14         He can testify as to the packaging and the volume and

15   that sort of thing but not -- it's not a -- it's in a blue

16   package; right?

17         MS. MUNRO:  Just curious if he had a sense --

18         THE COURT:  He can testify as to what he saw, but he

19   cannot testify as to any analysis of the product.

20   BY MS. MUNRO:

21   Q.   Correct.

22        Did you count what was pulled out on that particular

23   date?

24   A.   Yes, ma'am.  There was blue product that was located at

25   Queen City Smoke Shop, and there were also cases of Blue

1   product that were located in the master bedroom of the

2   residence.

3   Q.   Do you know how many packets of hookah cleaner were

4   pulled out of either the shop or the Taylors' home on the

5   date of the search warrant?

6   A.   Specifically, the Crystal Bubbly hookah cleaner?

7   Q.   Correct.

8   A.   There were approximately 110 packets taken out of the

9   Queen City Smoke Shop, and there were an additional

10  approximately 100 of the packets taken out of the residence

11  as well.

12          MS. MUNRO:   I have no further questions.

13                       CROSS-EXAMINATION

14  BY MR. NAGY:

15  Q.   Good afternoon.

16  A.   Good afternoon.

17  Q.   Now, when law enforcement and yourself entered into

18  Queen City Smokes back in 2013, you identified several

19  different pictures that we saw previously; correct?

20  A.   That's correct.

21  Q.   If I could show Government's Exhibit 76 to the witness?

22       Now, you described a couple minutes ago -- let me stop

23  and ask you a different question.

24       One of the previous government exhibits that had

25  photographs -- you went into a description about the

1   difference between bongs and hookahs; is that correct?

2   A.    That's correct.

3   Q.    You specifically talked about the fact there was often

4   tubing that would come off of the bongs, things of that

5   nature, that you would use to differentiate tubing from

6   bongs.

7   A.    Tubing is utilized more commonly with the hookah-type

8   apparatus as opposed to --  just glassware is more common

9   with a marijuana-type bong.

10  Q.    Is it fair to say in the photograph you're looking at

11  right now, which is Government's 76, the items in the upper

12  right-hand corner would be better characterized as hookah

13  cleaner?  That would be a better characterization of what you

14  were describing before.  Is that a fair statement?

15  A.    Yes.

16  Q.    I'm done with that exhibit.  Thank you.

17        Now, you indicated that when law enforcement entered in,

18  you were, in fact, directing photographs to be taken of lots

19  of stuff.  Is that a fair statement?

20  A.    Yes, sir.

21  Q.    And as you're taking photographs, there were, you had

22  indicated, multiple different types of products, the Crystal

23  Bubbly being simply one of the different types of products

24  that were for display or in the store one way or another.  Is

25  that a fair statement?

1   A.    That's correct.

2   Q.    And as you went through, you indicated that there were a

3   lot of different items of evidence that were seized; is that

4   correct?

5   A.    That's correct.

6   Q.    Some of the other items that were seized included

7   paperwork; isn't that correct?

8   A.    Yes, sir.

9   Q.    There are all --

10  A.    Invoices, ledgers, that sort of thing.

11  Q.    Correct.

12        The ledger that the government showed us previously and

13  that you identified -- and that was, I believe, government --

14  it doesn't matter.

15  A.    The notebook?

16  Q.    Yeah, the notebook.

17  A.    Yes, sir.

18  Q.    That was just one of many pieces of paper taken out of

19  Queen City; isn't that correct?

20  A.    That's correct.

21  Q.    There were actually multiple invoices seized from

22  multiple different distributors of multiple different

23  products that were inside of the store; correct?

24  A.    Correct.  There was a back stockroom that had file

25  cabinets full of paperwork.

1  Q.   And that included the Blue that you talked about; right?

2  A.   Invoices that reflected the Blue?

3  Q.   Yep.

4  A.   Yes, sir.

5  Q.   And other products that were in there.

6  A.   That's correct.

7  Q.   The other question that I had about that was -- is it

8  also accurate to say that there were seized from Queen City

9  what I'm going to refer to as lab certificates or purported

10 lab certificates?  Isn't that accurate?

11 A.   That is correct.

12 Q.   And those often matched up with lab certificates that

13 were located within Queen City Smoke Shop as well; isn't that

14 correct?

15 A.   Are you referring to AOI Biotech lab?

16 Q.   That's what I'm referring to.

17      I see you smiling.  Is it fair to say those lab

18 certificates are not particularly reliable?

19 A.   That's correct.

20 Q.   But those are routinely provided to smoke shops by these

21 distributors; isn't that correct?

22 A.   It's a pay-for-fee service.

23 Q.   By the distributors.

24 A.   Or shop owners, depending on the products that you are

25 going to sell.

1    Q.   But it's not uncommon, in your experience, for folks

2    that are selling the product to provide these types of these

3    lab certificates, if you want to call them that, to their

4    shop owner or to their prospective client; isn't that

5    correct?

6    A.   The client being the shop owner or individual customer?

7    Q.   The customer being the shop owner.

8    A.   Is it common for that to take place?

9    Q.   You've seen it.

10   A.   Yes, I have.  I've seen it.

11   Q.   Just a couple things I wanted to clear up.

12        You indicated, number one, that the Taylors were

13   present -- or at least one of the Taylors was present at the

14   search warrant at the store.  That's not accurate, is it?

15   They were at the home.

16   A.   That's not what I said.  Yes, sir.  They were at the

17   residence.  Both were at the residence.

18   Q.   That's what I wanted to clear up.

19   A.   They had been seen at the shop during the surveillance

20   operation and prior to the execution of the search warrant,

21   but at the time of the search warrant at Queen City Smoke

22   Shop, they were not present.

23   Q.   They were present at the house?

24   A.   Correct.

25   Q.   And you indicated that the money -- the photographs of

1  the money that we saw -- all that money came out of a safe;

2  is that correct?

3  A.   Correct.

4  Q.   Including the money that was in the backpack that we

5  saw.  That also came out of the safe.  Isn't that also

6  correct?

7  A.   Correct.

8  Q.   Were you present when that safe was cracked open?

9  A.   No, I was not.

10  Q.   So when you testified a minute ago that the bands were

11  in place, you don't know what happened -- let me rephrase the

12  question.

13      That's how you saw it when you arrived; isn't that

14  accurate?

15  A.   And how it was explained to me, yes.

16  Q.   You're basing that on what somebody else told you?

17  A.   Other officers that located that currency, yes.

18  Q.   Now, I want to talk about a couple other items with you.

19      The government attorney said a second ago -- was talking

20  about forfeiture with you.  I want to talk about this.  You

21  guys seized approximately $295,000, and that was the amount

22  that was seized out of the safe; is that correct?

23  A.   That is correct.

24  Q.   And again, that included the money that was in the

25  backpack that was in the safe.

1    A.    That's correct.  And just to correct myself, I believe

2    there was also possibly 50 or something dollars on Mrs.

3    Taylor that was included in the property sheet for the

4    Charlotte Mecklenburg Police Department as well.

5    Q.    Again, that was, like, on a nightstand or a drawer or

6    dresser?  In her purse?  Don't know?

7    A.    On her person, I believe, is how it was depicted on the

8    inventory sheet.

9    Q.    Fair enough.

10        In these types of procedures, it's also common, is it

11   not, to take a look at other sources of revenue -- for

12   example, bank accounts -- for purposes of attempting to

13   seize; isn't that also correct?

14   A.    That is correct.

15   Q.    It's true in this case that Queen City Smoke Shop had a

16   bank account; isn't that correct?

17   A.    I believe so.

18   Q.    And as far as you're aware, there was not a move made to

19   seize and forfeit any of the money in that bank account, was

20   there?

21   A.    Not from my standpoint, no, sir.

22   Q.    And again, that was the Queen City bank account.

23   A.    That's correct.

24   Q.    You just seized the cash that was found at their house,

25   and that's it, isn't it?

1  A.   Because it was almost dollar for dollar based on the

2  invoices we located for the substances that were in question.

3  Q.   Almost dollar for dollar.

4  A.   Almost.

5       MR. NAGY:  I have no more questions.

6                    CROSS-EXAMINATION

7  BY MR. PARKER:

8  Q.   Good afternoon, Agent.

9  A.   Good afternoon, sir.

10 Q.   I just wanted to ask you a couple quick questions.

11      You were not at the residence -- I think you answered

12 Mr. Nagy's question earlier.  You weren't at the residence

13 when the money was taken out of the safe; correct?

14 A.   No, sir, I was not.

15 Q.   Did you ever see the safe?

16 A.   Yes, I did.

17 Q.   Are you sure it wasn't in the basement?

18 A.   The money?

19 Q.   No, the safe.

20 A.   There was a safe inside the master bedroom.

21 Q.   That was the only one that you can recall?

22 A.   That's the only one that I recall.

23 Q.   Now, you also testified just a few minutes ago that

24 there was numerous amounts of paperwork that was taken from

25 the shop -- Queen City Smoke Shop; isn't that correct?

1   A.    That's correct.

2   Q.    In regards to that, you don't recall Mr. Edward Taylor's

3   name on any of that paperwork, do you?

4   A.    Again, there were numerous, numerous papers.  I do not

5   recall it specifically.

6         MR. PARKER:  Thank you.

7         THE COURT:  Anything else?

8         Any redirect?

9         MS. MUNRO:  Just a couple of questions.

10                     REDIRECT EXAMINATION

11  BY MS. MUNRO:

12  Q.    You testified a moment ago about these lab certificates.

13  A.    Yes, ma'am.

14  Q.    Do those lab certificates that you saw provide for

15  what's in a substance?  Do you know?

16  A.    Do they -- no, ma'am.  They go through an explanation of

17  the fact that they allegedly or possibly tested for various

18  types of substances and it did not contain those particular

19  substances.  However, there are thousands of substances, and

20  thousands of analogue substances that contain illegal

21  narcotics.

22  Q.    So it shows what's not in them?

23  A.    Or what they claim they tested for.

24  Q.    This AO Biotech lab --

25  A.    Correct.

1   Q.    -- are you familiar with that organization?

2   A.    Yes, ma'am, I am.

3   Q.    Do you know what happened to it?  Is it still in

4   business?

5   A.    No, ma'am.  It was shut down in part of a federal

6   investigation as well.

7   Q.    Do you know why?

8   A.    For fake and false lab certificates.

9   Q.    Okay.  And I believe that a moment ago you testified

10  about invoices that were found where?  In the home or in the

11  shop?

12  A.    In the shop.

13  Q.    Okay.  What were those invoices for, exactly?

14  A.    The ones that I paid particular attention to were for

15  the various products that we knew, after testing analysis had

16  determined they contained illegal substances -- for example,

17  Blue being one of those products.  I've looked at and went

18  through those documents and conducted an analysis based on

19  the inventory that was brought in, all of the items that were

20  brought in, the total amounts along with the profit margin

21  yielded of those amounts to come up with our determination of

22  the currency.  When I mentioned before almost dollar for

23  dollar, the Blue total amounts in the profit margin was

24  approximately $400,000 in just about a three-month time

25  frame.  And again, the currency seized was approximately

 1    $295,000 in cash.

 2    Q.    And did you analyze those invoices in detail for the

 3    history of product purchases?

 4    A.    Yes, I did.

 5    Q.    Were you able to make any kind of determination as to

 6    that as to the volume of substances or products that was

 7    being purchased?

 8    A.    As it correlates to marijuana equivalencies or just

 9    those particular products?

10    Q.    What is a marijuana equivalency?

11    A.    So for --

12            MR. NAGY:  Objection.  Beyond the scope of cross.

13            THE COURT:  Sustained.

14    BY MS. MUNRO:

15    Q.    So did you make any determination based on the products

16    that were purchased as to how much product had been purchased

17    through those invoices?

18            THE COURT:  Don't answer that.

19            MR. NAGY:  This is not relevant.  We're talking about

20    Blue, for one thing.  It's also beyond the scope of what I

21    was asking also.  I don't know that it's relevant, but it's

22    clearly beyond the scope of cross.

23            THE COURT:  I don't think there's sufficient evidence

24    to support the conclusion.

25            MS. MUNRO:  Thank you, Your Honor.

BY MS. MUNRO:

Q.   Thinking back to one of the photographic exhibits that you saw earlier, you just, a moment ago, discussed that you had seen Crystal Bubbly hookah cleaner packets?

A.   That's correct.

Q.   Okay.  I'm going to show you what's marked as Government's Exhibit 112.

     Now, in connection with the search, did you have occasion to look at the front of those packets at any point in time?

A.   Yes, ma'am.

     MR. NAGY:  Objection.  It's beyond the scope of cross.

     THE COURT:  Does this exceed the scope of cross?

     MR. NAGY:  I didn't ask about the packets.

     THE COURT:  Go ahead.

     MS. MUNRO:  He asked about the substances that were pulled out during the search warrant at the house.

     THE COURT:  All right.  Go ahead.

     THE WITNESS:  I'm sorry.  What was your question?

BY MS. MUNRO:

Q.   So you had occasion to look at the logo on the front?

A.   Yes, ma'am.  That is correct.

Q.   Are you able to look at the front of the bags that are in that exhibit?

1  A.    Yes, ma'am.

2  Q.    Does that look similar to what you saw at that time?

3  A.    Yes, ma'am.  These are the same type artwork and

4  packaging that were taken from the shop and the residence

5  during the 2013 investigation.

6  Q.    But do you know whether those are the same packets?

7  A.    These are not the same packets.  These were taken from a

8  2015 Burlington, North Carolina, investigation.

9  Q.    How do you know that?

10 A.    I know that because that evidence, after it was seized

11 in an operation involving the Taylors -- I requested that

12 evidence to be forwarded to me so that I could send it to our

13 lab in Miami so that it could be analyzed.

14 Q.    So based on that, you know that they're not the same

15 substances that you saw in 2013.

16 A.    I'm not sure about the substance.  They're not the same

17 packets that were seized from 2013.  They're different

18 exhibits.

19        MS. MUNRO:  Thank you.

20        THE COURT:  Is that all?

21        Thank you, sir.  You may step down.

22        (Conclusion of testimony of Christopher Morgan.)

23

24

25

1

<u>**INDEX**</u>

2

<u>**WITNESS FOR GOVT.**</u>

3

Christopher Morgan
  Direct Examination by Ms. Munro........................3
  Cross-Examination by Mr. Nagy..........................35
  Cross-Examination by Mr. Parker.......................42
  Redirect Examination by Ms. Munro.....................43

4

5

6

7

8

9

10

11

12

| <u>**Exhibit No.**</u> | <u>**Marked**</u> | <u>**Admitted**</u> |
| --- | --- | --- |
| Govt. No. 76 | 10 | 10 |
| Govt. No. 70 | 13 | 13 |
| Govt. No. 71 | 14 | 14 |
| Govt. No. 75 | 17 | 17 |
| Govt. No. 77 | 18 | 18 |
| Govt. No. 74 | 24 | 24 |
| Govt. No. 73 | 25 | 25 |
| Govt. No. 72 | 26 | 26 |
| Govt. No. 78 | 33 | 33 |
| Govt. No. 79 | 33 | 33 |

13

14

15

"I certify that the foregoing is a correct transcript from

16

the record of proceedings in the above-entitled matter.

17

18

19

20

21

22

23

24

25