

# The Characterization of 3,4-Methylenedioxypyrovalerone (MDPV)

**Joshua C. Yohannan[*] and Joseph S. Bozenko, Jr.**
U.S. Department of Justice
Drug Enforcement Administration
Special Testing and Research Laboratory
22624 Dulles Summit Court
Dulles, VA  20166
[Joshua.C.Yohannan -at- usdoj.gov and Joseph.S.Bozenko -at- usdoj.gov]

**ABSTRACT:**  The analysis and characterization of 3,4-Methylenedioxypyrovalerone (MDPV) is presented.  Gas chromatography/mass spectrometry (GC/MS), Fourier transform nuclear magnetic resonance (FTNMR) spectroscopy , solid phase Fourier transform infrared (FTIR) spectroscopy, and ultraviolet (UV) spectrophotometry data are presented.

**KEYWORDS:**  MDPV, phenethylamines, GC/MS, FTNMR, FTIR, ultraviolet, forensic chemistry

In March 2008, police seized a small plastic bag labeled "1-(3,4-methylenedioxy-phenyl)-2-pyrrolidin-1-yl-pentan-1-one GC/MS Sample Not for Human Consumption."  There was no lot number or manufacturer name on the bag.  The bag contained 0.4 g of a white powdery substance that provided no match to available GC/MS libraries.  The seizure was in response to a call for a vehicle off the road and stuck in the mud.  The responding officer found the driver to be incoherent and confused; the driver subsequently failed a field sobriety test.  The driver was requested to take a breathalyzer, which resulted in 0.00 Blood Alcohol Content.  The driver declined a request for a blood test.  It is not known whether the driver's condition was a direct result of MDPV intoxication.  A search of the driver provided the above mentioned bag along with pharmaceutical tablets believed to be from India.  The driver stated that he was a self-employed chemist and that was the reason that he was allowed to have the bag of white powder.  The tablets included 98 promethazine HCl, 1 triazolam, 2 risperidine, 4 methocarbamol, 10 baclofen, 6 bromazepam, and 4 quetiapine fumarate tablets.  Also recovered were a pill crusher and a prescription bottle containing residue.

MDPV and MDPK are both abbreviations for 3,4-Methylenedioxypyrovalerone (Figure 1).  MDPV was first synthesized as part of a class of stimulants in 1969.  MDPV is the methylenedioxy analogue of pyrovalerone, a Schedule V stimulant first synthesized in 1964.  Pyrovalerone, available under the trade names Centroton and Thymergix, is used as an appetite suppressant or for the treatment of chronic fatigue.

MDPV is currently unscheduled in the United States.  MDPV is found as a white or light tan powder.  Users report the development of an odor when left exposed to the air.  There are currently no known studies on the effects of MDPV on humans or on proper dosing.  MDPV is commonly described as boosting a user's libido, however it is also associated with extreme anxiety at higher dosages.  There are no known deaths due to the use of MDPV.

## Experimental

*Fourier Transform Infrared (FTIR) Spectroscopy*

The FTIR spectrum (Figure 2) was acquired using a Thermo-Nicolet Magna 560 spectrophotometer with a SensIR Durascope attenuated total reflectance (ATR) accessory.  The spec-

Figure 1 - 3,4-Methylenedioxypyrovalerone hydrochloride
Chemical Formula:  $C_{16}H_{22}ClNO_3$
CAS Number:  [24622-62-6]
Molecular Weight:  311.80 amu (as hydrochloride)
Melting Point:  238 - 239 °C with decomposition
Solubility (as hydrochloride): [Chloroform: Soluble; Methanol: Soluble; Deionized $H_2O$: Soluble]

trum was collected using 32 scans between 4000 $cm^{-1}$ and 400 $cm^{-1}$.

*Gas Chromatography/Mass Spectrometry (GC/MS)*

The mass spectrum (Figures 3a-3b) was acquired using an Agilent Model 6890N GC equipped with an Agilent Model 5973 quadrupole mass-selective detector (MSD).  The MSD was operated using 70 eV E.I.  The GC was fitted with a 30 m x 0.25 mm I.D. fused silica capillary column coated with 0.50 μm 35% phenyl, 65% dimethyl arylene siloxane (DB-35MS), and was operated in splitless mode.  The injection port was maintained at 250°C.  The oven temperature program was as follows:  Initial temperature 90°C (1 min), ramped to 300°C at 8°C/min (final hold 10 min).  Helium was used as a purge gas at a rate of 60 mL/sec.  Methanol was used as the solvent.

*Nuclear Magnetic Resonance (NMR) Spectroscopy*

[1]H- and [13]C-NMR spectra (see Table 1, Figures 4 and 5, respectively) were acquired at 25°C on a Varian Mercury *Plus* 400 MHz instrument using a Nalorac 5 mm indirect detect pulse field gradient (PFG) probe.  ([1]H parameters: Number of scans (nt) = 8, pulse width (pw) = 45°, relaxation delay

(d1) = 5 s, acquisition time (at) = 2.5 s; $^{13}$C parameters: nt = 4098, pw = 45°, d1 = 1 s, at = 1.3 s, complete proton decoupled). Spectra were processed using ACD/Labs *SpecManager* software (Advanced Chemistry Development Inc.©, Toronto, Canada). MDPV was prepared with $D_2O$ containing 5 mg/mL maleic acid (as internal standard) containing 0.05 wt % 3-trimethylsilyl-propionic-2,2,3,3-$d_4$ acid, sodium salt (TSP; Aldrich Chemical Co., Milwaukee, WI) at 16.87 mg/mL.

Chemical shifts (δ) are reported in parts per million (ppm) using TSP (0.0 ppm) as the reference standard (400 MHz, $D_2O$).

*Ultraviolet (UV) Spectrophotometry*

The UV spectrum (Figure 7) was acquired using a Hewlett-Packard 845x spectrophotometer with a 1 cm cell path length. The range scanned was 220-330 nm. The sample was dissolved in methanol.



Figure 2 - FTIR-ATR spectrum of MDPV hydrochloride.



Figure 3a - E.I. mass spectrum of MDPV.

Figure 3b - Expanded E.I. mass spectrum of MDPV.

Case 3:16-cr-50008-NKM   Document 594   Filed 11/22/17   Page 2 of 40   Pageid#: 8824



Figure 4 - 400 MHz FTNMR $^1$H spectrum of MDPV in D$_2$O with maleic acid.



Figure 5 - 400 MHz FTNMR $^{13}$C spectrum of MDPV in D$_2$O with maleic acid.

**Results and Discussion**

The MDPV mass spectrum demonstrates similarity to other amines in that it gives a low-detail mass spectral fragmentation pattern. The base ion, $m/z$ 126, however, is somewhat uncommon in drug analysis, which may prove to be of value in identifying MDPV. The resultant FTIR spectrum is very detailed with a number of sharp bands in the fingerprint region

that should enable relatively facile identification. Specifically, MDPV has proven to be an analyte that is easily distinguishable from other structurally related compounds.

**References**

1.  1-[(3,4-Methylenedioxy)phenyl]-2-pyrrolidino-1-alkanones as stimulants. (Boehringer Ingelheim Study) 1969.

Case 3:16-cr-50008-NKM   Document 594   Filed 11/22/17   Page 3 of 40   Pageid#: 8825

Table 1 - Assignments, Multiplicities, and Coupling Constants.

| Position | $^{13}$C (ppm) | $^{1}$H (ppm) | Multiplicity | $J$ (Hz) |
|---|---|---|---|---|
| Methylenedioxyphenyl - 2 | 105.71 | 6.14 | multiplet | - |
| Methylenedioxyphenyl - 4 | 110.80 | 7.47 | doublet | 1.7 |
| Methylenedioxyphenyl - 7 | 111.61 | 7.03 | doublet | 8.3 |
| Methylenedioxyphenyl - 6 | 129.76 | 7.70 | dd | 1.7, 8.3 |
| Methylenedioxyphenyl - 5 | 131.16 | - | - | - |
| Methylenedioxyphenyl - 7a and 3a | 151.50 | - | - | - |
| | 156.84 | - | - | - |
| Sidechain - 1 | 198.36 | - | - | - |
| Sidechain - 2 | 71.91 | 5.15 | triplet | 5.4 |
| Sidechain - 3 | 35.16 | 2.06 | multiplet | - |
| Sidechain - 4 | 19.94 | 1.24 | multiplet | - |
| | | 1.17 | multiplet | - |
| Sidechain - 5 | 16.00 | 0.83 | triplet | 7.3 |
| Pyrrolidine - 2 and 5 | 58.04 | 3.67 | multiplet | - |
| | | 3.03 | ddd | 11.6, 8.0, 7.87 |
| | 54.96 | 3.76 | multiplet | - |
| | | 3.32 | multiplet* | 9.5 |
| Pyrrolidine - 3 and 4 | 25.80 | 2.22 | multiplet | - |
| | | 2.06 | multiplet | - |
| | 25.63 | 2.06 | multiplet | - |

*apparent quartet



Figure 6 - Position of protons for MDPV (See Table 1).

2.  Heffe, W. Die Stevens-umlagerung von allyl-phenacyl-ammoniumsalzen. Helv Chim Acta 1964;47:1289-1292.
3.  Gardos G, Cole JO. Evaluation of pyrovalerone in chronically fatigued volunteers. Curr Ther Res Clin Exp. 1971;13(10):631-5.
4.  http://en.wikipedia.org/wiki/MDPV (cited Feb. 5, 2009)

Figure 7 - Ultraviolet-visible spectrum of MDPV in methanol.

Case 3:16-cr-50008-NKM   Document 594   Filed 11/22/17   Page 4 of 40   Pageid#: 8826



U.S. Department of Justice

Criminal Division



VAA:RT:JMO:RY:lc
DOJ No. 182-55039

*Office of International Affairs*                                    *Washington, D.C.  20530*

July 13, 2016

**To:**        Secretary for Justice
Hong Kong Special Administrative Region
of the People's Republic of China

**From:**      Deputy Director
Office of International Affairs
United States Department of Justice
Central Authority for the United States of America

### Request for Legal Assistance in a Criminal Matter
### (Jason Bradley; Deborah Ryba aka Deborah Bradley; Robert Schroeder; Nicholas Purintun; Ryan Buchanan; Nanya Taylor; Edward Taylor, Brian Lister)

The Central Authority of the United States requests legal assistance in a criminal matter from the Central Authority of the Hong Kong Special Administrative Region (HKSAR) pursuant to the Agreement between the Government of the United States of America and the Government of Hong Kong on Mutual Legal Assistance in Criminal Matters (Agreement).

## I.    PURPOSE

The purpose of this request is to obtain evidence relating to the criminal investigation conducted by the U.S. Attorney's Office for the Western District of Virginia (the prosecutor), with a view towards prosecution of the above named individuals. There are reasonable grounds to believe that the evidence requested is likely to be of substantial value to the investigation, and such evidence does not consist of items subject to legal privilege under U.S. law.

## II.  INFORMATION

### A.  Statement of Facts

The U.S. Department of Homeland Security/Homeland Security Investigations (HSI) and the prosecutor (U.S. authorities) are investigating the activities of a drug conspiracy group that is known to operate in Asia and the United States. From 2010 to 2015, Jason Bradley; Deborah Ryba aka Deborah Bradley; Robert Schroeder; Nicholas Purintun; Ryan Buchanan; Nanya Taylor; Edward Taylor, and Brian Lister engaged in a conspiracy to distribute Schedule I controlled substances and controlled substance analogues (also known as synthetic drugs). U.S. authorities learned this information from a variety of sources, including cooperators, searches, and wiretaps. Specifically, members of this group traveled to China, Thailand, and Hong Kong, purchased large amounts of controlled substances and synthetic drugs from sources in China, and shipped the substances back to other members of the conspiracy in the United States. Members of this conspiracy redistributed the chemicals throughout the United States for resale, including to locations in the Western District of Virginia.

The roles of some members of the drug conspiracy are as follows: Jason Bradley (Bradley) and his wife Deborah Ryba Bradley (Ryba) served as distributors who obtained the synthetic drugs and Schedule I controlled substances from sources in China and arranged for them to be shipped back to other members of the conspiracy in the United States. Robert Schroeder (Schroeder) and Ryan Buchanan worked in the United States as domestic managers for distribution in the United States. Nicholas Purintun and Brian Lister were domestic retail salesmen and sales points of contact. Nanya Taylor and her husband, Edward Taylor, were domestic sub-distributors.

2

In 2015, Hong Kong Customs and Excise (HKCE) at the Hong Kong International Airport seized and detained two packages that members of this group had caused to be shipped from China to the United States. HKCE notified U.S. authorities about these two seizures and provided photographs of the seized items. Additional evidence gathered during the course of the investigation indicates that Bradley and Ryba caused these packages to be shipped to another member of the conspiracy in the United States. Based upon email messages seized pursuant to search warrants and other evidence developed in this investigation, U.S. authorities believe that Bradley and Ryba caused the packages to be shipped through Hong Kong to avoid suspicion by customs and law enforcement authorities in the United States and Asia.

The first seizure occurred on February 14, 2015, as part of a random search. According to HKCE, the case number associated with this seizure is CEA/3/144/15. The seized package was addressed to Chicago Powerhouse Wholesalers, 1042 Maple Ave., #189, Lisle, IL, 60532, USA. Although this appears to be a physical address, the location is actually a United Parcel Service (UPS) store in which individuals can rent mailboxes and have UPS receive mail for them. Schroeder used the destination name and address. Furthermore, the investigation has revealed that Chicago Powerhouse Wholesalers does not exist as a real company. The package's shipper/cosigner name was Hong Kong Data Express LTD. The shipment identification was EA224906599HK. HKCE discovered chemical substances inside the package. A laboratory examination determined the package contained approximately 1.45 kilograms of controlled substances mephedrone and alpha-pyrrolidinovalerophenone.[1] The assigned incident number is

---

[1]      Mephedrone became a Schedule I controlled substance on October 21, 2011, and alpha-pyrrolidinovalerophenone became a Schedule I controlled substance on March 7, 2014.

3

2015SZ005176101. HKCE shared this information with the U.S. authorities, but did not continue with additional criminal investigation related to the seizure.

On May 18, 2015, HKCE seized another package addressed to Chicago Powerhouse Wholesalers, 5317 Riverview Drive, Lisle, IL, 60532, USA. This was Schroeder's home address. The shipper/cosigner name was Koyer International Tech Co. LTD. The shipper was DHL. The waybill number was 51029335751 and the case number associated with this seizure is CID/1/26/15. HKCE discovered a chemical substance inside that, based on a laboratory examination, was determined to contain approximately 780 grams of a suspected controlled substance, believed to be alpha-pyrrolidinovalerophenone.

According to Senior Investigator Alan Chan of the HSI Attaché Office in Hong Kong, both of these packages remain in the custody of HKCE. These packages and the contents inside these packages are evidence in the investigation of the individuals listed above.

### B.    Persons and Entities Involved

| | |
|---|---|
| Name: | Jason Bradley |
| Address: | Thailand (sometimes he travels to China to arrange shipping) |
| Nationality: | United States |

| | |
|---|---|
| Name: | Deborah Ryba Bradley |
| Address: | Thailand |
| Nationality: | United States |

| | |
|---|---|
| Name: | Robert Schroeder |
| Address: | In custody in the United States |
| Nationality: | United States |

| | |
|---|---|
| Name: | Nicholas Purintun |
| Address: | Illinois |
| Nationality: | United States |

| | |
|---|---|
| Name: | Ryan Buchanan |
| Address: | Illinois |
| Nationality: | United States |

4

Name: Nanya Taylor
Address: North Carolina
Nationality: United States

Name: Edward Taylor
Address: North Carolina
Nationality: United States

Name: Brian Lister
Address: Illinois
Nationality: United States

### C.   Offenses and Penalties Involved

**Title 21, United States Code, Section 841**          **Prohibited Acts**

(a)(1) Unlawful acts
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or
intentionally to manufacture, distribute, or dispense, or possess with intent to
manufacture, distribute, or dispense, a controlled substance . . .

(b)(1)(C) Penalties
In the case of a controlled substance in schedule I . . . , such person shall be sentenced to
a term of imprisonment of not more than 20 years and if death or serious bodily injury
results from the use of such substance shall be sentenced to a term of imprisonment of not
less than twenty years or more than life, a fine not to exceed the greater of that authorized
in accordance with the provisions of title 18 or $1,000,000.

**Title 21, United States Code, Section 846.**          **Drug Conspiracy**

Any person who attempts or conspires to commit any offense defined in this subchapter
shall be subject to the same penalties as those prescribed for the offense, the commission
of which was the object of the attempt or conspiracy.

### III.   NEED FOR ASSISTANCE REQUESTED

The U.S. authorities need the two packages seized by HKCE, identified above, drugs

seized under case number CEA/3/144/15 on February 14, 2015, and drugs seized under case

number CID/1/26/15 on May 18, 2015, to further this ongoing investigation.

5

## IV.    ASSISTANCE REQUESTED

A.    Production of Seized Evidence

Please do the following in accordance with the agreement:

1.    Direct HKCE to transfer custody of the two seized packages and their contents to HSI agents for transportation back to the United States;

2.    Coordinate the transfer of custody with Alan Chan, Senior Investigator with HSI in Hong Kong, who can be reached at (852) 2841-2118; and

3.    Provide chain-of-custody certifications for the seized evidence. The certifications should identify, and be completed by, each of the HKSAR officials who seized and maintained custody of the evidence from the time it was seized until it is transferred to U.S. officials.

B.    Production of Records Pertaining to the Seized Evidence

Please provide documents reflecting the laboratory testing that was conducted, and

all other documents and information relating to the two seizures identified in this request.

C.    Testimony

Please invite each individual who took part in collecting and testing of the foregoing

evidence to come to the United States to testify at trial, in the event their testimony is required to

admit the evidence. The prosecuting authority will cover travel and associated expenses.

## V.    TIMING FOR EXECUTION OF REQUEST

Please execute this request as soon as possible, as the prosecutor plans to present

evidence in this matter in a formal legal proceeding. Furthermore, upon receipt of the items, the

contents must be submitted for forensic chemical analysis in the United States, which can take

significant amounts of time.

## VI.    CONFIDENTIALITY

Pursuant to Article 4 of the Agreement, please treat this document, its contents, and the

fact that this request has been made as confidential and do not disclose it publicly or share it with

6

the subjects of the investigation. Also, please instruct all those who must be made aware of this request for assistance for purposes of its execution that the request, its contents and subject matter are to be kept confidential and should not be shared with the subjects of the investigation nor disclosed publicly.

## VII.   CONTACT PERSONS

Alan Chan, Senior Investigator with HSI in Hong Kong, has been communicating with Fion Wai-Kwan Li and Jenny Hau from Airport Investigations Group, HKCE.

## VIII.   EXPENSES

The prosecuting authority will assume expenses of translation, interpretation, transcription, and other expenses set forth in Article 6(2) of the Agreement.

## IX.   UNDERTAKINGS

The U.S. Central Authority confirms that this request:

A. does not relate to the prosecution or punishment of a person for a criminal offence that is, or is by reason of the circumstances in which it is alleged to have been committed or was committed, an offence of a political character;

B. is not made for the purpose of prosecuting, punishing or otherwise causing prejudice to a person on account of that person's race, religion, nationality, or political opinions;

C. does not relate to the prosecution of a person for an offense in a case in which the person has been convicted, acquitted, or pardoned by a competent court or other authority of the United States of America, or has undergone punishment provided by law of the United States of America, in respect of that offense or of another offense constituted by the same act or omission as that offense; and

7

## CONCLUSION

The U.S. Central Authority thanks authorities in Hong Kong for their attention to this request for assistance, pertaining to Jason Bradley, Deborah Ryba Bradley, Robert Schroeder, Nicolas Purintun, Ryan Buchanan, Nanya Taylor, Edward Taylor and Brian Lister, and extends to the Hong Kong Special Administrative Region the assurance of its highest consideration.

July 13, 2016
Date

Randy Toledo

Randy Toledo
Acting Principal Deputy Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Central Authority pursuant to the
US-HKSAR Mutual Legal Assistance Agreement

8

# CERTIFICATE OF

## CERTIFICATE WITH RESPECT TO SEIZED ITEMS

I, _____[name]_____, make this statement knowing that if I willfully state anything that I

know to be false or do not believe to be true, I may be liable to prosecution for a criminal

offence. My position with the Government of Hong Kong is _____[official title]_____. I

received custody of the items listed below from _____[name of person]_____ on

___[date]___, at _____[place]_____. I relinquished custody of the items listed below to

___[name of person]_____ on _____[date]_____, at _____[place]_____ in the

same condition as when I received them (or, if different, as noted below).

Description of items:

Changes in condition while in my custody:

_____[signature]_____          _____[date]_____

Sworn to or affirmed before me, _____[name]_____, a _____[Notary Public/Commissioner for

Oaths and Declarations/Judicial Officer/etc.]_____ this _____ day of _____, 20___.

DEFENDANT'S
EXHIBIT
Bradley # 7
ID
PENGAD 800-631-6989
3:16cr05008

12

AGREEMENT

BETWEEN

THE GOVERNMENT OF

THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF HONG KONG

ON

MUTUAL LEGAL ASSISTANCE IN

CRIMINAL MATTERS

## TABLE OF CONTENTS

Article 1 . . . . . . . . . . . . . . . . Scope of Assistance

Article 2 . . . . . . . . . . . . . . . . Central Authorities

Article 3 . . . . . . . Limitations on Providing Assistance

Article 4 . . . . . . . . . . . . Form and Contents of Requests

Article 5 . . . . . . . . . . . . . . . Execution of Requests

Article 6 . . . . . . . . . . . . Representation and Expenses

Article 7 . . . . . . . . . . . . . . . . Limitations on Use

Article 8 . . . . . . . . . . . . . . Statements of Persons

Article 9 . . . . . . . . Taking of Evidence or Testimony
                              in the Requested Party

Article 10 . . . . . . . . . . . . . . Publicly Available
                              and Official Documents

Article 11 . . . . . . . . Transfer of Persons in Custody

Article 12 . . . . . . . . . . Attendance of Other Persons

Article 13 . . . . . . . . . . . . . . . . . Safe Conduct

Article 14 . . . Location or Identity of Persons or Items

Article 15 . . . . . . . . . . . . . . Service of Documents

Article 16 . . . . . . . . . . . . . . Search and Seizure

Article 17 . . . . . . . . . . . . . . . . Return of Items

Article 18 . . . . . . . . . . Confiscation and Forfeiture

Article 19 . . . . . . Certification and Authentication

Article 20 . . . . . . . . . . . . . . . Other Assistance

Article 21 . . . . . . . . . . . . . . . . . Consultation

Article 22 . . . . . . . . . . . . Resolution of Disputes

Article 23 . . . . . . . Entry Into Force and Termination

The Government of the United States of America and the
Government of Hong Kong, having been duly authorized by the
sovereign government responsible for the foreign affairs
relating to Hong Kong, hereinafter called "the Parties",

Desiring to improve the effectiveness of law enforcement of
both Parties in the investigation, prosecution, and prevention
of crime and the confiscation or forfeiture of the proceeds and
instrumentalities of crime through cooperation and mutual legal
assistance related to criminal matters,

Have agreed as follows:

- 2 -

### Article 1
### Scope of Assistance

(1)   The Parties shall provide mutual assistance, in accordance with the provisions of this Agreement, in connection with the investigation, prosecution, and prevention of criminal offences, and in proceedings related to criminal matters.

(2)   Assistance shall include:

  (a)   taking evidence, testimony, or statements of persons;

  (b)   providing information, documents, records, and items;

  (c)   locating or identifying persons or items;

  (d)   serving documents;

  (e)   transferring persons in custody and others to provide assistance;

  (f)   executing requests for search and seizure;

  (g)   confiscating and forfeiting the proceeds and instrumentalities of crime and otherwise assisting in relation thereto;

  (h)   delivering property, including lending exhibits or other items; and

  (i)   any other form of assistance not prohibited by the law of the Requested Party.

(3)   This Agreement shall include assistance for criminal offences related to taxation, customs duties, foreign exchange

- 3 -

control, or other revenue matters but shall not include
assistance for non-criminal proceedings relating thereto.

(4) This Agreement is intended solely for mutual legal
assistance between the Parties, and is not intended or designed
to provide such assistance to private parties. A private party
may not rely upon any provision of this Agreement to impede the
execution of a request, or to exclude or suppress evidence
obtained under this Agreement.


Article 2
Central Authorities

(1) Each Party shall establish a Central Authority.

(2) The Central Authority for the United States of America
shall be the Attorney General of the United States or a person
duly authorized by the Attorney General. The Central Authority
for Hong Kong shall be the Attorney General of Hong Kong or a
person duly authorized by the Attorney General.

(3) Requests and other communications pursuant to this
Agreement shall be made directly between the Central Authorities
of the Parties.

- 4 -

## Article 3

### Limitations on Providing Assistance

(1)   The Central Authority of the Requested Party shall refuse assistance if:

(a)   the request for assistance impairs the sovereignty, security, or public order (*ordre public*) of the United States of America or, in the case of Hong Kong, the sovereign government responsible for the foreign affairs relating to Hong Kong;

(b)   it is of the opinion that the granting of the request would impair the Requested Party's essential interests;

(c)   it is of the opinion that the request for assistance relates to a political offence or that there are substantial grounds for believing the request was made for the purpose of prosecuting, punishing, or otherwise proceeding against a person on account of the person's race, religion, nationality, or political opinions; or

(d)   it is of the opinion that the acts or omissions alleged to constitute the criminal offence would not have constituted a criminal offence if they had taken place within the jurisdiction of the Requested Party, or, irrespective of whether they would have done so, would not constitute in the Requesting Party an offence within any of the descriptions in the Annex to this Agreement.

- 5 -

(2)   In considering whether acts or omissions constitute an offence for the purpose of paragraph (1)(d), it shall be irrelevant whether any of those acts or omissions involve interstate transportation or the use of the mails or other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

(3)   The Central Authority of the Requested Party may refuse assistance if:

     (a)   the request relates to an offence under military law that would not be an offence under ordinary criminal law;

     (b)   the request for assistance relates to the prosecution of a person for a criminal offence in respect of which the person has been convicted or acquitted in the Requested Party; or

     (c)   the request is not made in conformity with the Agreement.

(4)   Before refusing assistance pursuant to this Article, the Central Authority of the Requested Party:

     (a)   shall promptly inform the Central Authority of the Requesting Party of the reason for considering refusal; and

     (b)   shall consult with the Central Authority of the Requesting Party to determine whether assistance may be given subject to such terms and conditions

- 6 -

as the Central Authority of the Requested Party
deems necessary.

(5)  If the Requesting Party accepts assistance subject to
the terms and conditions referred to in paragraph (4)(b), it
shall comply with those terms and conditions.

(6)  If the Central Authority of the Requested Party
refuses assistance, it shall inform the Central Authority of the
Requesting Party of the reasons for the refusal.

## Article 4
### Form and Contents of Requests

(1)  Requests shall be made in writing except in urgent
cases.  In urgent cases, requests may be made orally, but shall
be confirmed in writing promptly thereafter.

(2)  Requests and supporting documents shall be submitted
in, or accompanied by a translation into, an official language
of the Requested Party.

(3)  Requests shall include the following:
   (a) the name of the authority conducting the
       investigation, prosecution, or proceeding to
       which the request relates;
   (b) a description of the subject matter and nature of
       the investigation, prosecution, or proceeding,

- 7 -

        including the specific criminal offences that
relate to the matter;

(c)  a description of the evidence, information, or
other assistance sought;

(d)  a statement of the purpose for which the
evidence, information, or other assistance is
sought; and

(e)  a summary of the relevant facts and law.

(4)  To the extent necessary and possible, requests shall
also include:

(a)  information on the identity and location of any
person from whom evidence, information, or other
assistance is sought;

(b)  information on the identity and location of a
person to be served, that person's relationship
to the proceedings, and the manner in which
service is to be made;

(c)  information on the identity and whereabouts of a
person to be located;

(d)  a description of the place or person to be·
searched and of the items to be seized;

(e)  a description of the manner in which any
testimony, evidence, or statement is to be taken
and recorded;

(f)  a list of questions to be asked of a person or a
description of the subject matter about which the
person is to be examined, or both;

- 8 -

(g)   a description of any particular procedure to be
followed in executing the request;

(h)   information as to the allowances and expenses to
which a person asked to appear in the Requesting
Party will be entitled;

(i)   any requirements for confidentiality;

(j)   any time limits relevant to the request;

(k)   a certified copy of any court order sought to be
enforced, and a statement to the effect that it
is a final order not subject to appeal;

(l)   a copy of any certificates or forms to be
completed in order to meet the standards of
admissibility in the Requesting Party; and

(m)   any other information that may be brought to the
attention of the Requested Party to facilitate
its execution of the request.


## Article 5
### Execution of Requests

(1)  The Central Authority of the Requested Party shall
promptly execute the request or arrange for its execution
through its competent authorities.

(2)  Such authorities shall use their best efforts to
execute the request.  The Courts of the Requested Party shall
have authority to issue subpoenas, search warrants, or other
orders necessary to execute the request.

- 9 -

(3)  Requests shall be executed as empowered by this Agreement or by applicable law.  The method of execution specified in the request shall be followed to the extent that it is not incompatible with the law of the Requested Party.

(4)  If the Central Authority of the Requested Party determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that Party, it may postpone execution, or make execution subject to conditions determined necessary after consultations with the Central Authority of the Requesting Party.  If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

(5)  The Requested Party shall promptly inform the Requesting Party of any circumstances that are likely to cause a significant delay in responding to the request.

(6)  The Requested Party shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting Party. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested Party shall so inform the Central Authority of the Requesting Party, which shall then determine whether the request should nevertheless be executed.

- 10 -

(7)  The Central Authority of the Requested Party shall respond to reasonable requests by the Central Authority of the Requesting Party on progress toward execution of the request.

(8)  The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request.  If the request cannot be executed in whole or in part, the Central Authority of the Requested Party shall inform the Central Authority of the Requesting Party of the reasons therefor.

Article 6
Representation and Expenses

(1)  The Requested Party shall make all necessary arrangements for the representation of the Requesting Party in any proceeding arising out of a request for assistance and shall otherwise represent the interests of the Requesting Party.

(2)  The Requested Party shall assume all ordinary expenses of executing a request, except:

      (a)  fees of counsel retained at the request of the Requesting Party;

      (b)  fees of experts;

      (c)  expenses of transcription, and language interpretation and translation; and

- 11 -

    (d)   travel expenses and allowances of persons
travelling at the request of the Requesting Party.

    (3)  If, during the execution of the request, it becomes
apparent that expenses of an extraordinary nature are required
to fulfill the request, the Parties shall consult to determine
the terms and conditions under which the execution of the
request may continue.

### Article 7
### Limitations on Use

    (1)  The Central Authority of the Requested Party may
require that the Requesting Party not use any information or
evidence obtained under this Agreement in any investigation,
prosecution, or proceeding other than that described in the
request without the prior consent of the Central Authority of
the Requested Party.  In such a situation, the Requesting Party
shall comply with the requirement.

    (2)  The Central Authority of the Requested Party may
request that information or evidence furnished under this
Agreement be kept confidential or be used only subject to terms
and conditions it may specify.  If the Requesting Party accepts
the information or evidence subject to such conditions, the
Requesting Party shall comply with the conditions.

- 12 -

(3)  Nothing in this Article shall preclude the use or disclosure in a criminal proceeding of information or evidence to the extent that there is an obligation to do so for the United States under its Constitution or for Hong Kong under its law.  The Requesting Party shall notify the Requested Party in advance of any such proposed disclosure.

(4)  Information or evidence that has been made public in the Requesting Party in accordance with paragraph (1) or (2) may thereafter be used for any purpose.


## Article 8
### Statements of Persons

Where a request is made to obtain the statement of a person for the purpose of an investigation, prosecution, or proceeding related to a criminal matter, the Requested Party shall endeavour, with the consent of the person, to obtain such statement.


## Article 9
### Taking of Evidence or Testimony in the Requested Party

(1)  Where a request is made that evidence be taken for the purpose of an investigation, prosecution, or proceeding related to a criminal matter, the Requested Party shall arrange to have such evidence taken.  A person in the Requested Party from whom

- 13 -

evidence is requested pursuant to this Agreement shall be
compelled, if necessary, to appear and give evidence.

    (2)  For the purposes of this Agreement, the giving or
taking of evidence shall include the giving or taking of
testimony and the production of documents, records, or items.

    (3)  Upon request, the Central Authority of the Requested
Party shall furnish information in advance about the date and
place of the taking of evidence pursuant to this Article.

    (4)  The Requested Party shall permit such persons as are
specified in the request to be present during the execution of
the request and, to the extent permitted by its law, shall allow
such persons to question the person giving the testimony or
evidence.

    (5)  If the person referred to in paragraph (1) asserts a
claim of immunity, incapacity, or privilege under the law of the
Requested Party, it shall be resolved pursuant to the Requested
Party's law.  If such a claim is asserted under the law of the
Requesting Party, the evidence shall nonetheless be taken and
the claim made known to the Central Authority of the Requesting
Party for subsequent resolution by the authorities of that
Party.

    (6)  The Requesting Party may request that documents,
records, and any other items produced in the Requested Party
pursuant to this Article or that are the subject of testimony

- 14 -

taken under this Article be certified in accordance with procedures specified in the request. If certified in accordance with such procedures, they shall be admissible in evidence in the Requesting Party as proof of the truth of the matters set forth therein.


Article 10

Publicly Available and Official Documents


(1)  The Requested Party shall provide the Requesting Party with copies of publicly available records, including documents or information in any form, in the possession of government departments and agencies in the Requested Party.

(2)  The Requested Party may provide copies of any documents, records, or information in the possession of a government department or agency, but not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities.

(3)  The Requesting Party may request that official records produced pursuant to this Article be certified in accordance with procedures specified in the request. If certified in accordance with such procedures, they shall be admissible in evidence in the Requesting Party as proof of the truth of the matters set forth therein.

- 15 -

## Article 11
### Transfer of Persons in Custody

(1)  A person in the custody of the Requested Party whose presence in the Requesting Party is sought for the purpose of providing assistance pursuant to this Agreement shall be transferred from the Requested Party to the Requesting Party for that purpose if the person consents and if the Central Authorities of both Parties agree.

(2)  Where the presence of a person in custody in the Requesting Party is desired in the Requested Party pursuant to Article 9(4) or at the request of the Requesting Party to assist in execution of a request, the person shall be transferred from the Requesting party to the Requested Party if the person consents and if the Central Authorities of both Parties agree.

(3)  For the purposes of this Article:

    (a)  the receiving Party shall have the authority to keep the person transferred in custody and shall be obliged to do so unless otherwise authorized by the sending Party;

    (b)  the receiving Party shall return the person transferred to the custody of the sending Party as soon as circumstances permit or as otherwise agreed by both Central Authorities;

    (c)  the receiving Party shall not require the sending Party to initiate extradition proceedings for the return of the person transferred; and

- 16 -

(d) the person transferred shall receive credit for
service of the sentence imposed in the sending
Party for time served in the custody of the
receiving Party.


### Article 12
### Attendance of Other Persons

The Central Authority of the Requesting Party may request
the assistance of the Requested Party in making a person who is
not in custody available in the Requesting Party for the purpose
of providing assistance pursuant to this Agreement.  Upon
receipt of such a request, the Central Authority of the
Requested Party shall invite the person to travel to the
Requesting Party to provide assistance.  The Central Authority
of the Requested Party shall promptly inform the Central
Authority of the Requesting Party of the response of the person.


### Article 13
### Safe Conduct

(1)  Unless otherwise specified in the request, a person
transferred pursuant to Article 11 or 12 shall not be subject to
any service of process or be prosecuted, punished, or subject to
any restriction of personal liberty by reason of any acts or
omissions that preceded the person's departure from the sending
Party.

(2)  If the request provides for any limitations on the safe conduct referred to in paragraph (1), the person whose presence is requested shall be advised by the Central Authority of the Requested Party of the nature of those limitations.

(3)  Paragraph (1) shall not apply if the person, not being a person transferred in custody under Article 11, and being free to leave, has not left the Requesting Party within a period of fifteen days after being notified that his presence is no longer required, or having left the Requesting Party, has returned.

(4)  A person who consents to provide evidence pursuant to Article 11 or 12 shall not be subject to prosecution based on his testimony, except for perjury.

(5)  A person who consents to provide assistance pursuant to Article 11 or 12 shall not be required to provide assistance other than that to which the request relates.

(6)  A person who does not consent to provide assistance pursuant to Article 11 or 12 shall not by reason thereof be liable to any penalty or coercive measure by the courts of the Requesting or Requested Party.

- 18 -

## Article 14
### Location or Identity of Persons or Items

The Requested Party shall, if requested, endeavour to ascertain the location or identity of any person or item specified in the request.

## Article 15
### Service of Documents

(1)  The Requested Party shall use its best efforts to serve any document transmitted to it pursuant to this Agreement for the purpose of service.

(2)  The Requesting Party shall transmit a request for the service of a document pertaining to a response or appearance in the Requesting Party within a reasonable time before the scheduled response or appearance.

(3)  The Requested Party may effect service of any document by mail or, if the Requesting Party so requests, in any other manner required by the law of the Requesting Party that is not prohibited by the law of the Requested Party.

(4)  The Requested Party shall return a proof of service in the manner specified by the Requesting Party.

(5)  A person who fails to comply with any process served on him shall not thereby be liable to any penalty or coercive

- 19 -

measure pursuant to the law of the Requesting Party unless that
person is, where the United States of America is the Requesting
Party, a national or permanent resident of the United States of
America.

## Article 16
### Search and Seizure

(1)  The Requested Party shall carry out a request for the
search, seizure, and delivery of any item to the Requesting
Party if the request includes the information justifying such
action under the law of the Requested Party.

(2)  The Requested Party shall provide such information as
may be required by the Requesting Party concerning the result of
any search, the place of seizure, the circumstances of seizure,
and the subsequent custody of the property seized.

(3)  The Requesting Party may request that each official
who has had custody of a seized item certify the identity of the
item, the continuity of custody, and the integrity of its
condition in accordance with procedures specified in the
request. Each such certification shall be admissible in evidence
in the Requesting Party as proof of the truth of the matters set
forth therein.

(4)  The Requesting Party shall observe any conditions
imposed by the Central Authority of the Requested Party in
relation to any seized property that is delivered to the
Requesting Party under this Article.

page number

- 20 -

## Article 17
### Return of Items

If required by the Central Authority of the Requested
Party, the Central Authority of the Requesting Party shall
return as soon as possible any documents, records, or items
delivered to it in execution of a request under this Agreement.

## Article 18
### Confiscation and Forfeiture

(1) The Requested Party shall, upon request, endeavour to
ascertain whether any proceeds or instrumentalities of a crime
against the law of the Requesting Party are located within its
jurisdiction and shall notify the Requesting Party of the result
of its inquiries. In making the request, the Requesting Party
shall notify the Requested Party of the basis of its belief that
such proceeds or instrumentalities may be located in its
jurisdiction.

(2) Where, pursuant to paragraph (1), suspected proceeds
or instrumentalities of crime are found, the Requested Party
shall take such measures as are permitted by its law to prevent
any dealing in, transfer, or disposal of those suspected
proceeds or instrumentalities of crime, pending a final
determination by a court of the Requesting Party.

(3) Where a request is made for assistance in securing the
confiscation or forfeiture of proceeds or instrumentalities of

Case 3:16-cr-50008-NKM   Document 594   Filed 11/22/17   Page 35 of 40   Pageid#: 8857

- 20 -

## Article 17
### Return of Items

If required by the Central Authority of the Requested
Party, the Central Authority of the Requesting Party shall
return as soon as possible any documents, records, or items
delivered to it in execution of a request under this Agreement.

## Article 18
### Confiscation and Forfeiture

(1) The Requested Party shall, upon request, endeavour to
ascertain whether any proceeds or instrumentalities of a crime
against the law of the Requesting Party are located within its
jurisdiction and shall notify the Requesting Party of the result
of its inquiries. In making the request, the Requesting Party
shall notify the Requested Party of the basis of its belief that
such proceeds or instrumentalities may be located in its
jurisdiction.

(2) Where, pursuant to paragraph (1), suspected proceeds
or instrumentalities of crime are found, the Requested Party
shall take such measures as are permitted by its law to prevent
any dealing in, transfer, or disposal of those suspected
proceeds or instrumentalities of crime, pending a final
determination by a court of the Requesting Party.

(3) Where a request is made for assistance in securing the
confiscation or forfeiture of proceeds or instrumentalities of

- 21 -

crime, such assistance shall be given by whatever means are
appropriate. This may include enforcing an order made by a
court in the Requesting Party or initiating or assisting in
proceedings in relation to the request.

    (4) The Central Authority of the Requested Party shall
notify the Central Authority of the Requesting Party of any
action taken pursuant to this Article.

    (5) The Party that has custody over proceeds or
instrumentalities of crime shall dispose of them in accordance
with its law. Either Party may transfer such assets, or the
proceeds of their sale, to the other Party, to the extent
permitted by the transferring Party's law and upon such terms as
may be agreed.

Article 19
Certification and Authentication

    Documents, records, or items to be transmitted to the
Requesting Party shall only be certified or authenticated if the
Central Authority of the Requesting Party so requests. Such
documents, records, or items shall be certified or authenticated
by consular or diplomatic officers only if required by the law
of the Requesting Party.

- 22 -

### Article 20
### Other Assistance

The Parties may provide assistance to each other pursuant to other agreements or to applicable laws, arrangements, or practices.


### Article 21
### Consultation

The Central Authorities of the Parties shall consult as appropriate to promote the most effective use of this Agreement. The Central Authorities may also agree on such practical measures as may be necessary to facilitate the implementation of this Agreement.


### Article 22
### Resolution of Disputes

Any dispute arising out of the interpretation, application, or implementation of this Agreement shall be resolved through diplomatic channels if the Central Authorities are themselves unable to reach agreement.

- 23 -

Article 23

Entry Into Force and Termination

(1)  This Agreement shall enter into force thirty days
after the date on which the Parties have notified each other in
writing that their respective requirements for the entry into
force of the Agreement have been complied with.

(2)  This Agreement shall apply to requests whether or not
the relevant acts or omissions occurred prior to this
Agreement's entry into force.

(3)  Either Party may terminate this Agreement by giving
notice to the other in writing.  In that event, the Agreement
shall cease to have effect three months after the date of the
receipt of such notice.  Requests for assistance that have been
received prior to receipt of notice of termination of the
Agreement shall nevertheless be processed in accordance with the
terms of the Agreement as if the Agreement were still in force.

IN WITNESS WHEREOF, the undersigned, being duly authorized
by their respective Governments, have signed this Agreement.

DONE at   Hong Kong   this  15th   day of  April 1997 in
duplicate, in the English and Chinese languages, both texts
being equally authentic.

FOR THE GOVERNMENT OF THE            FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:            HONG KONG:

**ANNEX**

The Parties recognize the importance of providing broad mutual legal assistance in relation to investigations, prosecutions, and proceedings concerning offences such as trafficking in narcotic drugs, hijacking and other terrorist offences, offences against the laws protecting intellectual property, and offences relating to illegal immigration. In addition, the Parties agree to provide assistance in investigations, prosecutions, and proceedings concerning the following offences without regard to whether the acts or omissions alleged to constitute the offence would constitute an offence under the laws of the Requested Party:

(1)  offences against the laws relating to money laundering;

(2)  fraud against the government, including behaviour that has the effect of depriving the government or its agencies of money, valuable property, or the ability to conduct its affairs free from false statements and deceit;

(3)  offences covered by Article 1(3);

(4)  offences against the laws relating to foreign corrupt practices;

(5)  export control offences, including conduct tending to evade the laws controlling the export of goods or arms, and other offences against the laws relating to the control of exportation or importation of goods of any type;

(6)  criminal exploitation of children, whether for sexual or
     other purposes, including commercial dealing in child
     pornography;

(7)  offences against the laws relating to organized crime and
     racketeering; and

(8)  such further offences as may from time to time be agreed
     upon by exchange of diplomatic notes following consultation
     between the Central Authorities.